**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ————————————————— x<br>:<br>PAUL C. KRAFT and LINDA E. KRAFT :<br>JTWROS and RANDALL DOBLER, :<br>Individually and on Behalf of All Others :<br>Similarly Situated, :<br> :<br> :<br> Plaintiff, :<br> :<br> vs. :<br> :<br>THIRD COAST MIDSTREAM, LLC F/K/A/ :<br>AMERICAN MIDSTREAM PARTNERS, LP, :<br>AMERICAN MIDSTREAM GP, LLC, :<br>ARCLIGHT CAPITAL PARTNERS, LLC :<br>STEPHEN W. BERGSTROM, LYNN L. :<br>BOURDON III, JOHN F. ERHARD, ERIC T. :<br>KALAMARAS, DANIEL R. REVERS, :<br>JOSEPH W. SUTTON, AND LUCIUS H. :<br>TAYLOR :<br> :<br> Defendants. :<br> :<br>————————————————— x | Case No. 1:19-cv-09398-LJL<br><br><u>CLASS ACTION</u><br><br><br>AMENDED COMPLAINT FOR<br>VIOLATIONS OF<br>THE FEDERAL SECURITIES LAWS<br><br><br><u>DEMAND FOR JURY TRIAL</u> |

# TABLE OF CONTENTS

Page

I.    SUMMARY OF THE ACTION ................................................................................. 1

II.   JURISDICTION AND VENUE ............................................................................... 8

III.  PARTIES AND RELEVANT ACTORS ................................................................. 8

    A.    Plaintiffs .......................................................................................................... 8

    B.    Entity Defendants............................................................................................ 9

    C.    The Individual Defendants............................................................................ 10

IV.   ADDITIONAL BACKGROUND INFORMATION ........................................... 12

    A.    The Southcross Merger ................................................................................ 12

    B.    Background on Certain of AMID's Transactions......................................... 15

    C.    Background on Certain Provisions of AMID's Partnership Agreement ............ 17

V.    SUBSTANTIVE ALLEGATIONS ....................................................................... 19

    A.    Investment in AMID is Driven by Its Quarterly Cash Distributions................. 19

    B.    AMID's Strong Pre-Class Period Performance ........................................... 22

        1.    AMID's Strong FY2017 Annual Results Were "Unprecedented" ..........22

        2.    AMID's 1Q18 Annual Results Were "Record Setting" ........................ 26

        3.    AMID's Performance During 2Q18 Remained Strong ........................... 29

    C.    Defendants' Capsize AMID's CU Price by Slashing Distributions ................... 33

    D.    Southcross Terminates the Merger ............................................................... 39

    E.    ArcLight Buys AMID CUs............................................................................ 42

    F.    ArcLight Offers to Buy the Partnership........................................................ 43

    G.    Defendants Further Capsize AMID's CU Price by Suspending CU
        Distributions and then Making a Reduced Buyout Offer .................................... 46

    H.    The Buyout is Approved and Eventually Closes .............................................. 47

VI.   ADDITIONAL SCIENTER ALLEGATIONS........................................................ 49

VII.   ADDITIONAL ALLEGATIONS OF LOSS CAUSATION ...........................................51

VIII.  APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE
       MARKET ................................................................................................................52

IX.    NO SAFE HARBOR ...............................................................................................54

X.     CLASS ACTION ALLEGATIONS .........................................................................54

XI.    COUNTS ................................................................................................................57

       COUNT I
       For Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b)
       Promulgated Thereunder Against All Defendants ...........................................57

       COUNT II
       Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)
       Promulgated Thereunder Against All Defendants ...........................................58

       COUNT III
       Violation of Section 20(a) of the Exchange Act
       Against the Individual Defendants ...................................................................59

XII.   PRAYER FOR RELIEF ..........................................................................................60

XIII.  JURY DEMAND .....................................................................................................61

Co-Lead Plaintiffs Paul C. Kraft and Linda E. Kraft JTWORS and Randall Dobler ("Plaintiffs" or "Co-Lead Plaintiffs"), individually and on behalf of all others similarly situated, allege the following based on personal knowledge as to Co-Lead Plaintiffs and Co-Lead Plaintiffs' own acts, and upon information and belief as to all other matters based upon the investigation conducted by and through Co-Lead Plaintiffs' attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by American Midstream Partners, LP ("AMID," "American Midstream," or the "Partnership"), as well as conference call transcripts, news articles, media and analyst reports about the Partnership, and documents filed in other litigations involving the Partnership.  Co-Lead Plaintiffs believe that additional support will exist for the allegations herein after a reasonable opportunity for discovery.

This action is brought against Third Coast Midstream, LLC[1], American Midstream GP, LLC ("GP"), ArcLight Capital Partners, LLC ("ArcLight"), Stephen W. Bergstrom ("Bergstrom"), Lynn L. Bourdon III ("Bourdon"), John F. Erhard ("Erhard"), Eric T. Kalamaras ("Kalamaras"), Daniel R. Revers ("Revers"), Joseph W. Sutton ("Sutton"), and Lucius H. Taylor ("Taylor").

## I.      SUMMARY OF THE ACTION

1.      AMID was a limited partnership in the "midstream" oil business.  Its common units ("CUs") were equity securities that traded on the NYSE, much like common stock.  Its operations were managed by GP, its general partner and an indirect subsidiary of ArcLight.  Co-

---

[1] After the Class Period, American Midstream changed its name to Third Coast Midstream, LLC.  The terms "American Midstream," "AMID" and "the Partnership" are used herein to refer to the entity currently known as Third Coast Midstream, LLC.

Lead Plaintiffs are retirees who invested in the CUs based on the quarterly cash distributions those units paid and bring these claims on behalf of a Class of former investors in AMID's CUs.

2.      Defendants perpetrated a fraudulent and manipulative scheme to depress the price of AMID's CUs so that ArcLight could buy AMID from its public investors on the cheap. The following facts summarize Defendants' scheme.

3.      **Investment in AMID is based on its quarterly cash distributions.**  In SEC filings, AMID recognized that its CUs were "yield-oriented securities."  The partnership agreement "***requires***" AMID to distribute all available cash quarterly, and proscribes a "minimum quarterly distribution" of $0.4125 per unit.  Its SEC filings stated that this policy "cannot be modified" without amending the partnership agreement.  AMID even warned that because of its requirements to distribute cash—rather than reinvesting that cash—it may be constrained in its ability to grow.  Taken in context, this was an admission that it would be impermissible to reduce the distribution to fund growth.  Prior to the Class Period, AMID paid at least its minimum distribution in all 27 of the quarters (nearly 7 years) since going public.

4.      **ArcLight controlled AMID.**  ArcLight is a private equity fund focused on energy assets.  AMID's general partner was an indirect ArcLight subsidiary and provided ***all*** of the employees and management that ran AMID, including its directors (the "Board").  ArcLight also held a large position of AMID's CUs at all times during the Class Period.

5.      **On October 31, 2017, AMID agreed to merge with Southcross.**  Southcross was another midstream oil partnership.  The "Southcross Merger" was an equity-for-equity merger, in which Southcross' investors would receive AMID units.

6.      **By the spring of 2018, ArcLight was privately discussing buying AMID.**  These then-undisclosed discussions took place while AMID was supposed to be working to

close the Southcross Merger.  In April 2019, AMID eventually admitted that: "[I]n spring 2018, ArcLight began to consider a potential strategic transaction involving the Partnership, including a potential take private transaction, and discussed such strategic alternatives internally with the ArcLight investment committee."  Defendant Revers, ArcLight's co-founder and Managing Partner *and* a director managing AMID, was a member of that investment committee.

7.     **AMID's pre-Class Period performance was extremely strong.**  Defendants referred to AMID's 2017 performance as "***unprecedented***" and its 1Q18[2] performance as "***record setting***."  The Partnership's performance remained strong in 2Q18.

8.     **On July 27, 2018, Defendants abruptly cut AMID's distribution.**  For the first time ever, AMID announced it would not be paying its minimum required distribution and was ***cutting its distribution by 75%*** (the "First Cut").  As a result AMID's CU price plummeted ***43%***.  Defendants justified the First Cut with a fabricated need to retain this cash in order to chase "growth opportunities" and promote "balance sheet flexibility."  In truth, the First Cut was done to intentionally drive down the price of AMID's CUs and in furtherance of ArcLight's surreptitious and undisclosed plans to buy AMID on the cheap.

9.     **Two days later, Southcross cancels its merger with AMID.**  Prior to the First Cut, AMID had made extremely positive statements about the deal with Southcross, calling it "highly strategic" and "immediately accretive" to distributable cash flows.  AMID had repeatedly assured the market that it was on course to close the Southcross Merger. Immediately after the First Cut, Southcross cancelled the deal.  This was a nearly guaranteed result of the First Cut, since—when AMID announced the proposed acquisition—AMID correctly said that the deal was "attractive" to Southcross unit holders because of AMID's

---

[2] Quarters are described in the format #QYY, where # is the quarter number and YY is the relevant year.

distributions.  That day, AMID's CU price fell another *7.58%,* and it continued falling the next day, losing another *13.11%*.

10.     **AMID pays a $17 million fee to Southcross.**  Due to the timing of the cancellation and AMID's apparent failures to meet certain closing conditions, it was required to pay a reverse termination fee of $17 million to Southcross.  Remarkably, this fee was ***greater*** than the money AMID saved through the First Cut (*i.e.*, $16.4 million "saved" compared to $17 million lost).  This badly undercuts AMID's explanation for the First Cut, as cutting the distribution prior to closing the Southcross Merger, literally cost AMID cash flows (and a "highly strategic" and "immediately accretive" merger).  ***However***, the termination helped ArcLight to acquire AMID, not only because it further depressed AMID's CU price, but also because the Southcross Merger would have diluted ArcLight's control in AMID, from roughly 100% to 85% control over AMID's general partner and from 48.3% of the CUs to 41.9%.[3] Additionally, the Southcross Merger would have made AMID a much larger and more expensive acquisition target for ArcLight.

11.     **On August 15, 2018, ArcLight buys just over 50% of AMID's units.**  Despite possessing material non-public information about its plans to acquire AMID and about the true reasons for the First Cut, ArcLight bought additional shares on the open market so that it controlled a majority position of all unit votes.  Due to its ownership of voting control and its other forms of control over AMID, ArcLight could push the buyout through without approval by other unit holders.

---

[3] This dilution would make it substantially more difficult for ArcLight to acquire voting control of AMID—and without control, the other unit holders would be able to vote down an unfair deal.

12.     **On September 28, 2018, AMID announces ArcLight's buyout offer.**  The offer, $6.10 per CU, was a *47% discount* to AMID's CU price just before the First Cut, two months prior.

13.     **On December 31, 2018, AMID suspends its distributions indefinitely.**  The announcement of this suspension (the "Second Cut") resulted in AMID's CU price *falling by about 30%* to $3.03.  AMID attributed this cut on a limitation on distributions to a term that Defendants agreed to include in its renegotiated credit facility.

14.     **On January 3, 2019, ArcLight dropped its buyout offer to $4.50 per CU.** Taking advantage of the Second Cut, AMID lowered its buyout offer by 26%, an astounding *61% discount* to the CU price just before the First Cut.

15.     **On March 18, 2019, AMID announced a buyout deal with ArcLight.**  The Partnership also announced that its independent directors had already agreed to this deal and that it would not require a CU vote, due to ArcLight owning over 50% of the votes.  The deal gave AMID CU holders a mere $5.25, which was negotiated up slightly by AMID's independent directors, from the $4.50 offer ArcLight made in January, but still a $6.30 per share discount (*i.e.*, a *55% discount*) compared to the CU price before the First Cut.

16.     The following chart shows AMID's CU price changes from the start of 2Q18 until the buyout announcement:



17.    This course of conduct amounted to a fraudulent and manipulative scheme because Defendants cut the distribution for the purpose of manipulating the CU price downward so that ArcLight could acquire AMID on the cheap.  The facts strongly support the inference that Defendants cut the distribution to serve ArcLight's wrongful goals, including the facts:

(a)    That ArcLight had been internally discussing plans to acquire AMID, but did not disclose this fact until well after the First Cut;

(b)    That AMID previously assured investors of the importance of the distribution, and indicated that distributions could not be cut to pursue growth, but incredibly Defendants abruptly cut the distribution, citing that very impermissible reason;

(c)    That AMID's financial condition was strong at the time of the First Cut, undermining any alternative explanation for the sudden and monumental change;

(d)    That the First Cut was nearly certain to result in termination of the Southcross Merger, a terrible result for AMID shareholders, but one that served a variety of ArcLight's interests in acquiring AMID;

6

(e)    That the Southcross Merger termination resulted in a termination fee that exceeded the cash "saved" by the First Cut, proving the stated reason for the cut false;

(f)    That ArcLight went on a buying spree acquiring majority control of AMID at depressed prices after the First Cut, without disclosing its acquisition plans;

(g)    That ArcLight made an offer to buy AMID at a price reflecting its reduced trading range, less than two months after the First Cut;

(h)    That AMID reduced its offer after further depressing AMID's CUs with yet another distribution cut in December 2018; and

(i)    As explained throughout, that AMID engaged in a wide variety of other suspicious behavior throughout the Class Period.

18.    Defendants' conduct gives rise to several primary violations of the federal securities laws. The stated reasons for the First Cut and Second Cut were false and misleading and materially incomplete. The First Cut was a monumental change to AMID's business, yet Defendants omitted the material facts related to ArcLight's interest in acquiring AMID at that time. Despite buying a controlling position in AMID's CUs while in possession of material non-public information (regarding the true reasons for the First Cut and regarding ArcLight's plans to acquire AMID), Defendants kept that information secret.

19.    Furthermore, the conduct Defendants engaged in was clearly a fraudulent scheme: Defendants' conduct was part of an undisclosed effort by ArcLight to buy AMID on the cheap by deceiving public investors. Similarly, the conduct of cutting the distribution was a manipulative device, as it manipulated the market price of AMID CUs downward, in service of ArcLight's undisclosed and self-interested goal.

20.    Defendants' conduct injured investors—many of whom were retirees—when those investors sold AMID CUs at prices that were reduced due to Defendants' conduct. This scheme benefited ArcLight by saving well over ***$245 million*** in its acquisition of AMID.

## II.    JURISDICTION AND VENUE

21.    The claims asserted herein arise under §§ 10(b) and 20(a) of the Securities

Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5

promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over

the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and § 27 of the Exchange Act, 15

U.S.C. § 78aa.

22.    Venue is proper in this district pursuant to § 27 of the Exchange Act and 28

U.S.C. §1391(b).  A significant portion of the Defendants' actions, and the subsequent damages,

took place within this District.  In addition, at all relevant times AMID's CUs traded on the New

York Stock Exchange ("NYSE").  In connection with the acts alleged in this complaint,

Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including, but not limited to, the mails, interstate telephone communications, and the facilities

of the national securities markets.

## III.    PARTIES AND RELEVANT ACTORS

### A.    Plaintiffs

23.    Plaintiff Paul C. Kraft and Linda E. Kraft JTWORS (the "Kraft Plaintiffs") sold

AMID CUs during the Class Period.  ECF No. 26-1.  When the Kraft Plaintiffs sold their CUs

the price was artificially deflated and the Kraft Plaintiff's sold their AMID CUs for far less than

they had paid for them.  Paul Kraft is a 64-year old retiree and he has decades of investment

experience.  He invested in AMID based on its quarterly distributions, which he relied upon for

retirement income.  At the time the Kraft Plaintiffs acquired and sold AMID CUs, Paul Kraft

resided in Illinois, and he conducted his transactions in AMID through his U.S.-based broker.

24.    Plaintiff Randall Dobler ("Dobler") sold AMID CUs during the Class Period.

(ECF No. 26-1).  When Mr. Dobler sold his AMID CUs, the price was artificially deflated and

he sold his AMID CUs for far less than he had paid for them.  Mr. Dobler is a 63-year-old

retiree, former Navy Officer, and former Director of Operations for the Southampton Public

School District of New York.  He has decades of investment experience, has a Masters of

Business Administration, and is a Certified New York State Business Official.  He invested in

AMID based on its quarterly distributions, which he relied upon for retirement income.  At the

time of acquiring his AMID CUs and at the time he sold his AMID CUs he resided in Maryland

and conducted his transactions in AMID through his U.S.-based broker.

> **B.    Entity Defendants**

25.    Defendant American Midstream ("AMID") is a Delaware publicly-traded limited

partnership ("LP") formed to own, operate, develop, and acquire a diversified portfolio of

midstream energy assets.[4]  On July 23, 2019, AMID publicly announced the completion of the

Merger with ArcLight affiliates.  AMID does not have any employees of its own and acts

through its general partner, who employs people to perform work for AMID, including its

executive officers and directors.

26.    From its initial public offering in 2011 until July 23, 2019, AMID's common

units ("CUs") traded on the NYSE.  The CUs were the only publicly traded equity securities

issued by AMID.

27.    Additionally, AMID issued preferred units ("PUs"), which were held entirely by

owners of its GP, which were also closely affiliated with ArcLight (as described below).  The

preferred units had distribution and liquidation preferences entitling it to priority over the CUs.

The preferred units also had conversion rights, with a conversion rate that adjusted under the

---

[4] The term "MLP" is often used to describe publicly traded LP's, especially in the energy industry.  It
stands for "Master Limited Partnership."

terms of AMID's partnership agreement.  The preferred units voted along with the CUs as a single class and were entitled to one vote for each CU that the preferred unit could be converted into.  The PUs could either be paid distributions in cash, or could be paid distributions "in kind."  As relevant here the "paid-in-kind" option, allowed the Partnership to pay distributions to the PUs, essentially by giving the PU holder additional PUs for the cash value they would have received through the distribution.

28.     Defendant American Midstream GP, LLC ("GP") is AMID's general partner. GP provided AMID with all its employees and management and, therefore, GP had substantial control over all aspects of AMID's operations.  GP is a Delaware limited liability company.  GP is wholly-owned and controlled by entities that are affiliated with and controlled by ArcLight. AMID's public filings state that GP is controlled by ArcLight.

29.     Defendant ArcLight Capital Partners, LLC ("ArcLight") is an infrastructure investment firm focused on investing in North American energy assets.  It is a Delaware LLC. Through subsidiaries and affiliates, ArcLight possessed substantial control over AMID throughout the Class Period, both due to ownership of AMID CUs and PUs and due to its indirect ownership of AMID's general partner.  At times herein, behavior or unit ownership may be attributed to ArcLight, due to the actions or holdings of its subsidiaries or affiliates.

### C.     The Individual Defendants

30.     The Defendants described in this subsection are referred to as the "Individual Directors."

31.     Defendant Stephen W. Bergstrom ("Bergstrom") served as a director of GP and as its President and CEO from 2013 until December 2015.  From December 2015 through at least the end of the Class Period, he remained a director of GP.  AMID's public filings state that he was appointed to the Board in connection with his affiliation with ArcLight.  Bergstrom

acted as an exclusive consultant to ArcLight from 2002 to 2015, assisting ArcLight in connection with its energy investments.

32.     Defendant Lynn L. Bourdon III ("Bourdon") was AMID's Board Chairman, President and Chief Executive Officer ("CEO").  On April 24, 2019, Bourdon resigned from AMID, effective May 3, 2019, which was just over a month after the buyout was announced, and before the buyout closed.  He received an exit package covering his full 2019 anticipated compensation, along with accelerated payment on his outstanding equity interests in AMID.  He was also provided a lucrative consulting position with ArcLight upon his resignation, which did not include any specific work requirement.

33.     Defendant John F. Erhard ("Erhard") served as a director of GP from April 2013 until at least the end of the Class Period.  AMID's public filings state that he was appointed to the Board in connection with his affiliation with ArcLight.  He is a partner at ArcLight, where he has been employed since 2001.

34.     Defendant Eric T. Kalamaras ("Kalamaras") was AMID's Chief Financial Officer ("CFO").  Kalamaras stayed with AMID through the close of the buyout.

35.     Defendant Daniel R. Revers ("Revers") served as a director of GP from April 2013 until at least the end of the Class Period.  AMID's public filings state that he was appointed to the Board in connection with his affiliation with ArcLight.  He is Managing Partner of and co-founder of ArcLight.

36.     Defendant Joseph W. Sutton ("Sutton") served as a director of GP from May 2013 until at least the end of the Class Period.  AMID's public filings state that he was appointed to the Board in connection with his affiliation with ArcLight.

37.     Defendant Lucius H. Taylor ("Taylor") served as a director of GP from April 2013 until at least the end of the Class Period.  AMID's public filings state that he was appointed to the Board in connection with his affiliation with ArcLight.  Since 2007, Taylor has been employed by ArcLight and currently serves as a principal of the fund.

## IV.     ADDITIONAL BACKGROUND INFORMATION

### A.     The Southcross Merger

38.     On November 1, 2017, AMID announced that it had entered into an agreement to acquire Southcross Energy Partners, L.P. ("SXE"), from its general partner (Southcross Holdings LP) and public investors, in an equity-for-equity merger (the "Southcross Merger").  SXE was another midstream limited partnership with assets that were apparently complimentary to AMID's assets.

39.     The announcement of the Southcross Merger stated that the deal (1) would "accelerate the transformation of AMID, furthering asset density and full value-chain participation within core operating areas;" (2) "Expand[] AMID's onshore gathering, processing and transmission services in the highly economic Eagle Ford Shale play and in the Southeast U.S. gas transmission market;" (3) "Expand[] AMID's commercial and operational capabilities across a high-quality asset platform;" and, most importantly, (4) AMID stated that the transaction would be "[i]mmediately accretive to 2018 distributable cash flow[5] per unit."

---

[5] As AMID states in its public filings "distributable cash flows" ("DCF") is a "significant performance metric" used to "compare basic cash flows generated by us to the cash distributions we expect to pay the Partnership's unitholders."  AMID stated that "[u]sing this metric, management and external users of the Partnership's financial statements can quickly compute the coverage ratio of estimated cash flows to planned cash distributions.  DCF is also an important financial measure for the Partnership's unitholders since it serves as an indicator of the Partnership's success in providing a cash return on investment."

40.     The Southcross Merger was valued at $815 million, and would have created a

partnership that AMID said would have an enterprise value of $3 billion—this meant that, while

this was a substantial acquisition, AMID was about two-thirds bigger than SXE.

41.     The deal called for Southcross Holdings to receive (1) a 15% stake in the GP,

diluting the ArcLight affiliates that previously owned 100% of the GP; (2) 3.4 million AMID

CUs; (3) 4.5 million new Series E convertible PUs, entitled to a single vote with the CUs; and

(4) options to acquire 4.5 million AMID CUs, with an $18.50 strike price that expire in 2022.

As a term of the Series E convertible PUs, their holders would be entitled to a minimum of $15

per unit, in the event of any merger by AMID after their issuance.

42.     The deal called for public unit holders of SXE to receive 0.160 AMID common

units for each SXE common unit in a unit-for-unit merger, which represented a 5% premium to

the 20-day volume weighted average exchange ratio of AMID and SXE common units as of

October 30, 2017.  This would result in 3.5 million new AMID CUs going to SXE unit holders.

In the press release announcing the Southcross Merger, AMID stated that:

> AMID expects the proposal to be attractive to public holders of
> SXE common units as it will permit them to participate in the
> future anticipated growth of AMID's businesses, including the
> benefit of AMID's cash distributions on common units, currently
> paying $1.65 per common unit annually.

43.     Similarly, during the presentation slides used for the conference call about the

Southcross Merger, AMID stated that "SXE common unit holders will benefit from cash

distributions."  During the conference call, the CEO of Southcross Holdings described AMID's

cash distributions as "perhaps [the] most important" factor making the transaction attractive to

SXE investors.

44.     The Southcross Merger also included certain customary closing conditions,

including approval by regulators, approval by SXE investors, and the repayment of $139 million

of estimated Southcross Holdings' net debt and approximately $517 million of SXE's net debt

(together the "Southcross Debt").  Paying down an acquisition target's existing debts is a

common component of mergers.  Such requirements, this one included, are not directly about

reducing the indebtedness of the post-merger entity.  Rather, these requirements exist due to

terms in the target's existing debt agreements imposed by creditors to minimize the risk that

they will loan money only to see the debtor transform into a riskier business through a merger.

This is all to say that, AMID could pay down these debts merely by replacing them with new

loans.[6]

45.     The issue of repaying the Southcross Debt should have been especially

unconcerning, due to the expected immediate financial benefits of the transaction.  Upon the

deal announcement, AMID explained that it would be (a) "immediately accretive to

[distributable cash flow] per unit," with annual EBITDA synergies of $15-20 million realized

within 18 months of closing; (b) that they had "already identified numerous operational and

commercial synergies that we will work to realize ***immediately upon closing***;" (c) that the

transaction would "immediately allow[] for the new American Midstream to continue growing

its distributable cash flow."

46.     The leverage ratio of adjusted EBITDA to debt is a core metric for assessing the

debt-load of public LPs.  Thus, AMID's statements that the transaction would "immediately"

improve EBITDA, strongly indicated that AMID would easily be able to secure financing to

repay the Southcross Debt, as needed.  Upon announcing the Southcross Merger, AMID said the

"combined company will carry at ***closing*** pro forma debt to EBITDA of approximately 4.5

---

[6] While not a perfect analogy, this is roughly similar to what occurs when an individual purchases a house with an existing mortgage on it; the old mortgage bank demands repayment (typically paid out of the purchase price) and the person buying the house finances that purchase with a new mortgage.

times with an 18-month path towards 3.5 times."  This compared favorably to AMID's indebtedness at the time of 4.68 times and 5.23 times, at the close of 3Q17 and 4Q18 respectively.  In other words, based on one of the main metrics of indebtedness, AMID should not only have been able to easily refinance the Southcross Debt, but likely should have been able to do so at terms more favorable than it obtained for its existing debt.

47.     AMID explained that its plan to refinance the net debt involved "$400 to $500 million of non-core asset sales, revolver borrowings, proceeds from bond issuances, and modest equity raises."  It identified the Partnership's "terminals business" as a source of non-core assets that could be sold.

48.     AMID's CFO, Eric Kalamaras, announced that AMID expected the Southcross Merger to close in 2Q18.  Under the merger agreement for the Southcross Merger, the "Outside Date" for the merger was June 1, 2018, and if the merger was not closed by then, the parties would have certain rights to cancel the transaction.  Furthermore, if ArcLight cancelled the transaction after the closing date and AMID (and its affiliates) had not satisfied certain conditions (called a "Funding Failure"), then AMID would be required to promptly (i.e., within three business days), pay Southcross a "Reverse Termination Fee," of $17 million.

**B.      Background on Certain of AMID's Transactions**

49.     From mid-2017 until the First Cut in mid-2018, aside from the Southcross Merger, AMID engaged in a number of transactions, in which it both demonstrated its ability to raise capital and its willingness to spend capital.  Many of these transactions involved ArcLight—and in fact, in that roughly 1 year period, AMID bought about $205 million in assets

from ArcLight, which is striking considering that ArcLight paid the public investors only about $205 million to buy the entirety of AMID in the buyout.[7]   The transactions were as follows:

(a)    **Use of Capital**.  On June 2, 2017, AMID purchased 100% of the Viosca Knoll Gathering System from Genesis Energy, L.P. for total consideration of approximately $32 million in cash.

(b)    **Use of Capital**.  On August 8, 2017, AMID purchased 100% of the membership interests in each of Panther Operating Company, LLC, Panther Offshore Gathering Systems, LLC and Panther Pipeline, LLC from Panther Asset Management, LLC for $39.1 million in cash, among other non-cash consideration.

(c)    **Capital Raising**.  On September 1, 2017, AMID sold 100% of its interests in Pinnacle Propane, LLC to SHV Energy N.V. for approximately $170 million.

(d)    **Use of Capital**.  On September 29, 2017, AMID purchased an additional 15.5% equity interest in the Delta House for $125.4 million in cash from affiliates of ArcLight.

(e)    **Use of Capital**.  On October 2, 2017, AMID exercised a call right and repurchased all outstanding Series D PUs from affiliates of ArcLight for approximately $37 million.

(f)    **Use of Capital**.  On October 27, 2017, AMID acquired an additional 17% equity interest in the Destin Pipeline from affiliates of ArcLight for a total consideration of approximately $30 million.

---

[7] The buyout was completed at a price of $5.25 and required ArcLight to buy about 39 million CUs, meaning that they purchased the outstanding AMID shares for only about $205 million.  The sales to the ArcLight affiliates in the roughly one year period before the distribution cut totaled about the same amount–$205 million.  Further, including the cash flowing to ArcLight through the call of the Series D PUs, the total cash flowing to ArcLight through these asset purchases and PU calls was about $242 million.

(g)     **Use of Capital**.  On November 3, 2017, AMID purchased the Trans-Union pipeline from affiliates of ArcLight for approximately $49.4 million.

(h)     **Capital Raising**.  On December 19, 2017, AMID issued notes that were set to mature at the end of 2021, raising about $125 million.

50.     Additionally, in the period after the First Cut, AMID sold additional assets raising substantial additional capital.  The transactions were as follows:

(a)     **Capital Raising**.  On July 31, 2018, AMID completed the sale of its Marine Products liquid terminals to certain institutional investors for net proceeds of $208.6 million.

(b)     **Capital Raising**.  On December 20, 2018, AMID sold its Refined Products terminals to Sunoco LLC for approximately $125 million in cash.

51.     Altogether, these transactions demonstrate that AMID was operating in a flexible environment, was able to generate capital, and was spending capital on acquisitive activities, in ways that strongly suggested it was not facing liquidity challenges.  Nor was it shying away from growth.

### C.     Background on Certain Provisions of AMID's Partnership Agreement

52.     Under AMID's partnership agreement the GP shall "conduct, direct and manage all activities of the Partnership . . . [and] all management powers over the business and affairs of the Partnership shall be exclusively vested in the General Partner."  However, in exercising this power the GP, and the Board (and any committee thereof) are subject to a requirement of good faith.  Specifically, the partnership agreement states that:

> ***Whenever the General Partner, the Board of Directors or any committee of thereof (including the Conflicts Committee), makes a determination or takes or declines to take any other action****,* or any of its Affiliates causes the General Partner to do so, in the General Partner's capacity as the general partner of the Partnership

as opposed to in its individual capacity, whether under this Agreement, any Group Member Agreement or any other agreement contemplated hereby or otherwise, then, unless another express standard is provided for in this Agreement, ***the General Partner, the Board of Directors, such committee or such Affiliates causing the General Partner to do so, shall make such determination or take or decline to take such other action in good faith*** and shall not be subject to any other or different standards (including fiduciary standards) imposed by this Agreement, any Group Member Agreement, any other agreement contemplated hereby or under the Delaware Act or any other law, rule or regulation or at equity. ***In order for a determination or other action to be in "good faith" for purposes of this Agreement, the Person or Persons making such determination or taking or declining to take such other action must subjectively believe that the determination or other action is in, or not opposed to, the best interests of the Partnership.***

53.     Furthermore, under the partnership agreement, there was a requirement that any merger be approved by a majority of votes (with CUs and PUs voting as a single class). However, a vote was not required if a written consent of a majority of votes was submitted. Therefore, gaining a majority of the outstanding voting rights in AMID permitted one to close a transaction without a vote. Without majority control, a formal vote would be needed.

54.     Under the partnership agreement conflicted transactions are subject to special approval processes.[8]  Most relevant here, the provision applies whenever "a potential conflict of interest exists or arises between the General Partner . . . and the Partnership . . . or any Partner." It holds that any "resolution or course of action" by the GP shall be permitted if it is "approved by Special Approval."[9]  The term "Special Approval" refers to approval by a "Conflicts

---

[8] The buyout by ArcLight was a conflicted transaction.  AMID concedes this point in its 2018 annual report, which stated that "The Pending Merger involves a conflict of interest between ArcLight and the Partnership."  The buyout was, therefore, subject to the heightened requirements for a conflicted transaction.

[9] The text of the provision is as follows and does permit approval by means other than Special Approval:

Committee," which itself refers to a committee of the independent directors.  The only independent directors during the Class Period were Peter A. Fasullo, Gerald A. Tywoniuk, and Donald R. Kendall, Jr.

## V.    SUBSTANTIVE ALLEGATIONS

55.    AMID is a Delaware publicly traded Limited Partnership formed to own, operate, develop, and acquire a diversified portfolio of midstream energy assets.  The "midstream" sector involves the transportation, storage, and wholesale marketing of oil, natural gas, and natural gas liquids.

### A.    Investment in AMID is Driven by Its Quarterly Cash Distributions

56.    Public investors in AMID were drawn to the Partnership due to its sizable and stable distributions.  Distributions refer to payments to unit holders out of AMID's available cash.  In its 2017 annual report, AMID recognized that its CUs were "yield-oriented securities," referring to the fact that those investing in them purchased them because of the distributions they yielded.  By the time it issued its 2018 annual report, AMID clarified that statement, recognizing that its CUs were "designed to be yield-oriented securities," which further acknowledged that the "design" or purpose of the CUs was focused on providing distributions.

---

[W]henever a potential conflict of interest exists or arises between the General Partner . . . or any of its Affiliates, on the one hand, and the Partnership, any Group Member or any Partner, on the other, any resolution or course of action by the General Partner or its Affiliates in respect of such conflict of interest shall be permitted and deemed approved by all Partners, and shall not constitute a breach of this Agreement, of any Group Member Agreement, of any agreement contemplated herein or therein, or of any duty hereunder stated or implied by law or equity or otherwise, if the resolution or course of action in respect of such conflict of interest is: **(i)** approved by Special Approval, **(ii)** approved by the vote of a majority of the Outstanding Common Units (excluding Common Units owned by the General Partner and its Affiliates), **(iii)** on terms no less favorable to the Partnership than those generally being provided to or available from unrelated third parties, or **(iv)** fair and reasonable to the Partnership, taking into account the totality of the relationships between the parties involved (including other transactions that may be particularly favorable or advantageous to the Partnership).

Under the agreement "Partners" are defined as the General Partner and the Limited Partners.

57.     The term "distributions," is roughly analogous to the term "dividends," as used when discussing corporations.  The literal difference comes down to the terminology used in the context of partnerships and corporations.  However, practically speaking AMID's distributions were different in another way.  While in many corporations the dividend rate is entirely a matter of management discretion, AMID's partnership agreement established rules requiring certain minimum quarterly distributions and requiring the distribution of available cash.

58.     AMID's distribution policy was discussed in its annual report each year.  It stated: "Our Partnership Agreement requires us to distribute all of our available cash quarterly. Our cash distribution policy reflects our belief that our unit holders will be better served if we distribute rather than retain our available cash."  It then defined "available cash," as "cash on hand at the end of a quarter after the payment of our expenses and the establishment of cash reserves and . . . cash on hand resulting from working capital borrowings made after the end of the quarter."

59.     In the annual reports, investors were assured that the cash distribution policy "may not be modified or repealed without amending our Partnership Agreement."  Therefore, AMID stated that the amount of distributions could fluctuate, but this fluctuation would occur based on "the amount of cash we generate from our business and the amount of reserves our General Partner establishes in accordance with our Partnership Agreement."

60.     This focus on distributions is partially a result of AMID's structure as a LP, which provides special tax benefits.  Assuming certain other requirements are met, an LP does not have to pay income tax and instead "passes" the income tax liability through to the unit holders upon receipt of the distributions.  This avoids so-called "double-taxation," wherein a business pays taxes and then individuals must also pay taxes on the dividends/distributions.  As

a result of this tax advantage, publicly traded LP's have traditionally been built around high

distributions and typically include requirements—like the ones present in AMID's partnership

agreement—requiring the distribution of available cash.

61.     Another result of this structure, is that publicly traded LP's are overwhelmingly

held by individual investors drawn to the LP's securities for the steady distributions they

produce—a trait that is particularly useful to retirees who may rely on the cash flows to help pay

for their living expenses.  This was the case for both the Co-Lead Plaintiffs, who are retirees

that were drawn to AMID for its distributions.  A report for the National Association of Publicly

Traded Partnerships submitted to the Senate in 2015, stated that "the vast majority" of public LP

investors are individuals, many of whom are seniors, and roughly 75% of public LP investors

are over 50 years old.[10]  That same report explained that for the most part these investors are

seeking "a relatively secure income-oriented investment providing a reasonable return" and that

these investments are "particularly attractive to fixed income investors because [they] generally

are contractually required to distribute all cash available from their operating surplus every

quarter, providing investors with a reliable income stream."

62.     In light of its commitment to paying regular distributions, AMID recognized in

each of its annual reports that the requirement that it "distribute [its] available cash . . . could

limit [its] ability to grow and make acquisitions."  It then warned of certain risks imposed on the

business due to this constraint on the Partnership.  It stated:

> Accordingly,  we  will  rely  primarily  upon  external  financing
> sources,  including  commercial  bank  borrowings  and  the  issuance

---

[10] Nat'l Ass'n of Publicly Traded P'ships, *Written Statement of the National Association of Publicly
Traded Partnerships Submitted to the Senate Committee on Finance Tax Reform Working Group on
Community Development & Infrastructure* (2015), http://www.finance.senate.gov/legislation
/download/?id=a9191f81-b109-4543-a342-6d0f7ba6f379.

> of debt and equity securities, to fund our acquisitions and
> expansion capital expenditures. As a result, to the extent we are
> unable to finance growth externally, our cash distribution policy
> will significantly impair our ability to grow. . .  In addition,
> because we intend to distribute our available cash, our growth may
> not be as fast as that of businesses that reinvest their available cash
> to expand ongoing operations.

Taken in context, this warning also meant the reverse–that AMID was recognizing its inability

to cut the distribution in order to pursue growth opportunities.  While AMID's management

could make certain business decisions that might impact the availability of cash, they clearly

understood that AMID could not withhold distributions in order to grow or "expand ongoing

operations."

63.     AMID's partnership agreement also specified a "minimum quarterly

distribution" of $0.4125 per unit per quarter "such amount having been determined by the Board

of Directors at the time of the Initial Public Offering."  After the year of its initial public

offering and until the Class Period, AMID *always* made distributions to its CU holders of *at*

*least* the minimum quarterly amount.

**B.     AMID's Strong Pre-Class Period Performance**

**1.     AMID's Strong FY2017 Annual Results Were "Unprecedented"**

64.     Prior to the Class Period, AMID had been going through a period of change, in

order to expand its capabilities while simplifying its business.  The strong expectations for the

Partnership were well-summarized by Bourdon on November 8, 2017, during AMID's 3Q17

results call, when he stated: "Quite frankly folks, *this train is leaving the station*.  I hope as

investors you are as excited as we are about our future and if you stay with us or you get

onboard quick, because we have an exciting and successful journey ahead of us and we're not

waiting around."  In fact, during 2017, AMID had acquired JP Energy Partners LP in March

2017, announced the Southcross Merger in November 2017, and it had been identifying non-core assets, such as its propane segment that it could sell to finance its growth initiatives.

65.     On March 12, 2018, AMID held its 4Q17 earnings call, where its performance was described in glowing terms.  CFO Kalamaras started his remarks by stating that "[d]uring the fourth quarter and the entirety of 2017, our *accomplishments are simply unprecedented*." He explained how the Partnership had "continued to execute on [its] capital optimization strategy by utilizing capital from noncore assets and reinvesting this cash in higher-growth areas, all while creating a simplified business structure in a self-funding growth plan."  He added, "this strategy will enable us to create meaningful scale and asset density, allowing us to capitalize on strategic business opportunities and drive significant growth for our unit holders." He later added "[t]he partnership has undergone tremendous positive change for 2017, all looking at self-funding growth strategy that will continue to bear fruit as we progress through 2018."

66.     During the results call, Kalamaras boasted that the Partnership announced its "26th consecutive quarterly distribution."  He also described various financial metrics to further emphasize the health of the Partnership.  He explained that they had reduced borrowing under AMID's revolving credit facility "by more than 20% since 2016 and . . . taken significant steps in positioning ourselves with capital flexibility to continue to execute on our strategies."  He boasted that "the partnership is well positioned [for a] materially higher 2018 and 2019 EBITDA and distributable cash flow" and assured investors that "*we see our distribution coverage growing* for the back half of 2018 and significantly reduce leverage in 2019."  He concluded:

> In summary, the groundwork for a larger, yet simple American Midstream, began in 2016 and as we continue through 2018, we'll have a partnership with more focus and scale in our core operating areas and an asset footprint that allows us to capture meaningful growth opportunities.

67.   Bourdon stated that he was "pleased with [AMID's] fourth quarter results," while boasting of the Partnership's many accomplishments, which were achieved while "maintaining a strong coverage ratio[11] and declaring our 26th consecutive quarterly distribution."  He concluded his prepared remarks by stating:

> Our asset base is growing.   Our scale and density are increasing. . . .   We will continue to make a concerted effort towards creating value, driving growth and generating meaningful returns for all of our stakeholders.  2017 has been a year where we set the stage to open the door to a tremendous set of organic investment opportunities as we move into 2018.  And as such, we are excited about what the future holds in the [AMID] story.

68.   In addition to these tremendous results and unmitigated optimism, during the 2017 results call, Defendants spoke positively about the Southcross Merger.  Specifically, Bourdon described the transaction as "highly strategic," said it would be a "game-changer for AMID," and that he could not "stress enough the strategic value we see in this transaction."  He also reiterated that there were "numerous immediate synergies we have identified and will begin to realize upon closing."

69.   Bourdon expressed confidence about the transaction closing.  Noting that the deal was still "expected to close later in the second quarter of 2018," adding that "we remain on that course."  Relatedly, he described how the "collective teams are already hard at work on the integration of our 2 companies" and that the teams were "working with the existing and new

---

[11] Coverage ratio refers to the operating ratio available as compared to debt service obligations.  It is a key measurement of how much extra cash AMID would have available to pay distributions and, after paying the required distributions, to spend on growth activities.

potential producers as well as end users to strengthen the commercial opportunity set so that once combined, we will already have a running start towards improving the performance of the business."  He concluded the conference call by saying: "we certainly look forward to the close with Southcross and Southcross Holdings here in the next couple of months."

70.     AMID also described some issues that had arisen with one of the businesses that it was invested in, called Delta House.  According to AMID's 2017 annual report, "Delta House is a semi-submersible floating production system with associated crude oil and natural gas export pipelines located in the Mississippi Canyon region of the deepwater Gulf of Mexico."  Prior to 2017, AMID had acquired interests in Delta House from ArcLight affiliates.  On September 29, 2017, AMID spend $125.4 million purchasing another 15.5% equity interest in Delta House from affiliates of ArcLight.

71.     However, during the 2017 results call, Bourdon explained that in late 2017, the Delta House volumes were "curtailed" to "address maintenance issues with some of their subsea service equipment."  In other words, these issues were reported the very same quarter that ArcLight sold AMID an additional 15.5% interest in Delta House.  Bourdon stated that the maintenance was scheduled to run through mid-second quarter of 2018, "at which time they are expected to resume full production," and later added that "[w]hen full production resumes, we anticipate a quick ramp-up in volumes back to or actually above their original levels over the next couple of months."  More specifically, Bourdon explained that production from Delta House had dropped to about 70,000 barrels per day, which was roughly half of what it produced the prior quarter.  However, he added that the reduction is "only a *temporary deferral* and does not impact the total amount of production we expect to see from the field supporting Delta House."

25

72.     While the Delta House maintenance was a significant development, Bourdon stated that "ArcLight has agreed to offset the temporary drop in cash flow so that the partnership is not financially impacted this year by this event."  Kalamaras added that AMID had entered into a "new agreement with ArcLight that will offset potential near-term financial impacts to the [extent] it occurs."  During the Q&A portion of the conference call, an analyst from Citigroup Inc., asked for further details on the agreement, and Bourdon said that "cash" would come in "to the extent we needed."  The 2017 annual report stated that an ArcLight affiliate had agreed to provide support "up to the difference between the actual cash distribution received by us on account of our interest in Delta House and the quarterly cash distribution expected to be received if production flows to Delta House had not been not curtailed."

73.     This support regarding the Delta House issues was presented as evidence of ArcLight's status as a supportive General Partner.  However, it is not disclosed what consideration AMID paid for the support agreement or if the agreement was put in place to avoid claims arising out of the ArcLight affiliates' sale of ownership interest in Delta House to AMID, just before the negative disclosures about Delta House.

## 2.     AMID's 1Q18 Annual Results Were "Record Setting"

74.     On May 15, 2018, AMID held its 1Q18 earnings call.  CEO Bourdon began the 1Q18 results call by describing AMID's performance as "record-setting."  He explained that the "strong first quarter . . . was driven by a combination of continued solid performance from [AMID's] core operating businesses and positive contributions from [its] 2017 organic capital projects and acquisitions."  He also assured investors that "[w]e expect this momentum to carry forward, as we progress through the rest of 2018 and into 2019."

75.     Bourdon also explained that the Southcross Merger had been approved by Southcross unit holders, that integration planning was underway, and that certain regulatory

approvals had been obtained.  During the results call, an analyst asked for an update about the Southcross Merger and Kalamaras responded, stating that there are a "variety" of ways they could fund the transaction over the short term, until putting in place "permanent financing," but that in "a few weeks" they would "come out with a broader strategy."

76.     Kalamaras mirrored Bourdon's positive comments and began his prepared remarks by stating that he wanted to "reiterate the strong quarter we had with record-setting EBITDA and meaningful growth across our core segments."  He also explained that AMID had "announced [its] 27th consecutive distribution of $0.4125 per common unit or $1.65 annually to unitholders record as of May 7."

77.     Kalamaras described how the Partnership was moving on to "the next phase of our growth strategy," which he said would involve "more organic growth projects, which should prove to have not only higher returns, but also allow us to pace our capital deployment in the steadier fashion toward these opportunities."

78.     During the 1Q18 results call, Kalamaras also commented on the Partnership's debt levels.  He noted that it had a total of $1.2 billion in debt with a total leverage ratio of 5.2x.[12]  This ratio was essentially unchanged from the ratio AMID had at the close of 4Q17.  It was higher than AMID's stated goals, but far from concerning.  For example, in 2016, Alerian (one of the major "information services" for the energy LP industry), stated that of the 48 other MLPs that Alerian tracked (including only those with listed leverage ratios), 11 (*i.e.*, 22%) had leverage ratios higher than 5.2x.

---

[12] The term "leverage ratio" refers to AMID's long-term debt divided by its EBITDA.  A higher ratio means that the company has more debt relative to its earnings.

79.     Kalamaras assured investors that recent strategies had "substantially transformed our business with minimal, if any equity," which had "put ***short-term*** pressure on our balance sheet, ***as our growth opportunity has simply outpaced our ability to create internal cash.***"  He explained that the Partnership had a "defined approach to increasing EBITDA and distributable cash flow, reducing leverage and allocating capital towards growth assets with tangible targets for reaching our desired long-term goals."

80.     During the 1Q18 results call, Bourdon also commented on the progress that had been made on closing the Southcross Merger.  He stated that they had "crossed multiple milestones in the past 6 weeks as it relates to the merger," including the receipt of "overwhelming support" by a vote of 95% of Southcross' public unit holders and final state-level regulatory approval.  He reiterated that they planned to close the Southcross Merger in 2Q18.  He also confirmed that AMID and SXE were already "hard at work" on integration—a strong signal that they were both confident in the merger—and that the teams "from both AMID and Southcross have done a fantastic job on getting these 2 companies ready for Day 1 so that we are off and running as one company."

81.     During the analyst Q&A portion of the 1Q18 results call, an analyst from Coherence Capital asked Kalamaras for additional information about the logistics of closing the Southcross Merger.  He noted that the Southcross Merger was planned for a 2Q18 closing, but that one of the assets sales AMID was working on was planned to close in 3Q18, which left a question about whether AMID was expecting the proceeds from that sale to fund the repayment of the Southcross Debt, before closing the Southcross Merger.  Specifically, he asked:

> And then as far as just the Southcross logistics of closing it, you'd mentioned the asset sales should be wrapping up by third quarter and closing Southcross second quarter, just as far as timing, how should we think about the remaining any (sic) delta in the

> financing that you need just to actually close that? And how do you
> — when do you think any financings would launch?

In response, Kalamaras expressed no concerns about financing the Southcross Merger or about how the timing of asset sales could impact closing the Southcross Merger.  He stated:

> We can't certainly comment on forward capital markets transactions.  What I can say is this, we will — there are variety of mechanisms that we could fund that on a short-term or bridge basis, to do that, call it temporarily until we put our permanent financing plans in place.  In a few weeks, we'll come out with a broader strategy and around all of that.

82.     This answer indicated that AMID had flexibility in financing the Southcross Merger and that it was not concerned with its ability to do so.  He even specifically mentioned that they could finance the Southcross Merger with a "bridge" loan.  A bridge loan is a short-term loan to bridge a gap in financing, which is typically taken out with the plan to put in place more permanent financing at a later date or until a transaction can be funded through other means.  Thus, the discussion of bridge loans was an accurate acknowledgement that AMID could simply take out short-term financing to get the deal closed, if its permanent plans were taking longer than expected.

83.     Bourdon also commented on the issues with Delta House.  He explained that production remained at under half of the prior levels, but that they expected those numbers to improve dramatically in July.  He also reiterated that there was a support agreement in place from ArcLight, regarding the monetary shortfalls related to the maintenance at Delta House.

### 3.     AMID's Performance During 2Q18 Remained Strong

84.     AMID published a set of slides, dated May 23-24, 2018, from the "MLP & Energy Infrastructure Conference," which boasted of AMID's "financial strength."  It reminded investors that AMID had "strong first quarter results driven by meaningful growth across core

segments." It described "record throughput" and other operational highlights, and boasted of 12% year-over-year EBITDA growth.

85.     The slide presentation highlighted AMID's several recent successful acquisitions and states that while financing these activities can be challenging, that because the Partnership has a "strong portfolio of high value non-core assets and strong sponsorship, AMID will remain positioned to execute on the opportunities it generates." The presentation also included a slide showing the Southcross Merger and a planned divestiture of "marine terminals," as well as other non-core assets it was considering selling.

86.     On June 18, 2018, AMID issued a press release announcing that it has successfully reached an agreement to sell the marine terminals for $210 million. AMID wrote that the agreed upon deal "demonstrates the Partnership's continued ability to execute on its strategy of generating internal capital from high value non-core assets." It said that it would immediately apply the cash to paying down its revolving credit facility—though because this was repayment on a revolver, the money could be taken back from the revolver as needed. The same press release explained that the Southcross Merger was still underway. The "outside date" for closing the merger (at which time certain cancellation rights would accrue) had been extended by the parties to the Southcross Merger to June 15, 2018.

87.     In addition to the previously described statements by management about AMID's strong outlook coming into 2Q18, various other factors suggested the midstream industry was doing well during the period between AMID's announcement of its 1Q18 results and the First Cut.

        (a)     **Positive Regulatory Developments.** On July 19, 2018, one of the major energy regulators, the "Federal Energy Regulatory Commission," issued a major policy change

that positively affected the tax treatment of publicly traded LPs.  Altogether, while there had

been serious market concerns that this rulemaking could negatively impact the MLP industry,

the final rule that was enacted was seen as a victory for the industry.  This led Alerian, to write

"FERC Finalized Rule Positive for MLPs; Cue the Relief Rally."

   (b) **Strong Performance from Peers.**  For example, the Alerian MLP Index,

"the leading gauge of energy infrastructure Master Limited Partnerships . . . whose constituents

earn the majority of their cash flow from midstream activities involving energy commodities,"

showed strong performance during the period.  Specifically, between May 15, 2018 (when

AMID announced its 1Q18 results) and July 26, 2018 (the day before AMID announced it was

cutting its distribution), the index showed that the industry grew by a rapid 6.61% (in just over

70 days).

   (c) **Strong Underlying Industry Metrics.**  Midstream companies tend to

perform better when oil and natural gas prices are higher.  Prices leading up to the Class Period

were mixed—but certainly not grounds for concern.  For example, the "Henry Hub Natural Gas

Spot Price" (a major indicator of natural gas prices) was at $2.83 per million Btu when AMID

released its 1Q18 results and traded at an average of $2.89 per million BtU in the period prior to

July 27, 2018.  The WTI crude oil closing price—a price frequently referred to when analyzing

the midstream industry—was roughly 2.8% lower by the start of the Class Period (July 27,

2018), than it was when AMID released its 1Q18 results (May 15, 2018), though its high point

during that period was about 5.6% higher than its price on May 15, 2018.

88.     It is now known that AMID's performance during 2Q18 was strong.  When AMID eventually released its 2Q18 results it disclosed strong financial performance.[13]

89.     During the earnings call, CEO Bourdon described the Partnership's "very positive business performance this quarter" and explained that AMID "continue[d] to execute across [its] core businesses" and stated that it had seen a "dramatic improvement year-over-year as evidenced by our solid second quarter performance."  He added, "we expect the momentum we have witnessed in the first half of this year to continue as we progress through 2018 and into early 2019."  Similarly, CFO Kalamaras reiterated that the Partnership had seen "strong financial performance and meaningful growth across [its] core segments."

90.     The Partnership's financial results themselves also show that its performance in the Second Quarter was strong and that its Distributable Cash Flow was stable.  The following table compares these key figures in 2Q17 and 2Q18.

| Comparison of Key Financial Metrics 2Q17 to 2Q18 | | | |
|---|---|---|---|
| | 2Q17 | 2Q18 | Change from 2Q17 to 2Q18 |
| Revenues | $162,030 | $220,217 | + $58,187 (*i.e.*, 36%) better in 2Q18 |
| Operating Loss | ($25,574) | ($7,641) | - $17,933 (*i.e.*, 70%) better in 2Q18 |
| Adjusted EBITDA | $44,540 | $51,240 | + $6,700 (*i.e.*, 15%) better in 2Q18 |
| Distributable Cash Flow | $21,756 | $21,012 | - $744 (*i.e.*, near flat) |

91.     The following table shows the same data points as the prior table, but compares 1Q18 against 2Q18.

| Comparison of Key Financial Metrics 1Q18 to 2Q18 | | | |
|---|---|---|---|
| | 1Q18 | 2Q18 | Change from 1Q18 to 2Q18 |
| Revenues | $205,827 | $220,217 | + $14,390 (*i.e.*, 7%) better in 2Q18 |
| Operating Loss | ($12,381) | ($7,641) | - $4,740 (*i.e.*, 38%) better in 2Q18 |
| Adjusted EBITDA | $52,417 | $51,240 | - $1,177 (*i.e.*, near flat) |
| Distributable Cash Flow | $21,871 | $21,012 | - $859 (*i.e.*, near flat) |

---

[13] These results were released on August 9, 2019—after the start of the Class Period.

92.     Additionally, in the first two quarters of 2018, AMID saw a limited increase in its long-term debt, but an even stronger increase in its Adjusted EBITDA.  In those two quarters, long-term debt increased by about 6% and adjusted EBITDA increased by about 20%.  Thus, while the Partnership's indebtedness was increasing, its ability to generate earnings was apparently increasing at an even more rapid pace.

## C.     Defendants' Capsize AMID's CU Price by Slashing Distributions

93.     As is now known,[14] by the spring of 2018, ArcLight's investment committee, which included Defendant Revers was discussing the acquisition of AMID.  Rather than disclosing this interest, Defendants acted to materially depress the price of AMID's CUs, then acquired voting control of the Partnership, and only after securing that control and depressed market price, did they disclose their plans to acquire AMID.

94.     The Class Period begins on July 27, 2018, when before markets opened, AMID issued a press release abruptly announcing that its Board and GP were slashing its distribution to CU holders by 75% from the "minimum quarterly distribution" of $0.4125 to $0.1031 (the "First Cut").  As for Defendants,[15] this accomplished their fraudulent goal of capsizing AMID's CU price, which plummeted from $11.55 on July 26, 2018 down *42.86%* to $6.60 on July 27, 2018.

95.     On that day, despite this being the first time in AMID's history that it did not meet its minimum required distribution, Defendants did not hold any sort of conference call.

---

[14] ArcLight's early discussions were disclosed in AMID's April 24, 2019, preliminary information statement regarding the merger.

[15] Well after the First Cut, in its 2018 Annual Report, AMID commented on the obvious relationship between the First Cut and its CU price decline.  Specifically it said, because the CUs were "designed to be yield-oriented securities" suspension of distributions could "adversely impact our unit price."  Then it explained that the First Cut was the first time it ever did not lay the minimum quarterly distribution and that it "had an adverse impact on the trading price" of the CUs.

This alone is astoundingly suspicious, given the gravity of the decision.  Instead, AMID issued a false and misleading press release explaining the supposed justification for the cut.  The press release stated that:[16]

> ***American Midstream . . . today announced a revised capital allocation strategy that is intended to significantly reduce leverage, provide capital for strategic growth opportunities, and create long-term value.***
>
> ***As part of the revised capital allocation strategy the Partnership has determined the most prudent sources of accretive growth capital are proceeds from the sale of non-core assets and the retention of an increased portion of operating cash flow through the reduction of its common unit distribution.***
>
> Exclusive of the potential combination with Southcross Energy Partners, L.P. and Southcross Holdings LP, the Partnership has identified attractive organic growth projects across all core segments.  These opportunities will enable the Partnership to continue building an integrated midstream company with greater scale and density in its core operating areas as well as expanding its reach across growing resource developments.  The identified projects will focus on the continued development of infrastructure along the Gulf Coast, which would further the Partnership's ability to participate in the growing export market offshore and to Mexico.  The aggregate of non-acquisition related growth opportunities ranges from $200 to $300 million through 2020 at a blended multiple near 5-times expected EBITDA.
>
> ***The Partnership's management team and Board evaluated and continue to evaluate numerous strategies to maximize long-term value.  Equity capital market constraints for master limited partnerships and the availability of equity capital at acceptable costs and in sufficient quantities, warrants retaining an increased portion of operating cash flow to support growth of the Partnership.***  Additionally, the Partnership anticipates materially increasing proceeds from non-core asset sales, including previously announced terminal divestitures.  ***Together, cash flow retention and asset sales will enable the Partnership to reallocate capital to meaningful growth opportunities, while promoting***

---

[16] The text in the following quote that is in ***bold and italics*** is alleged to be actionably false and misleading.

> *balance sheet flexibility, substantially reducing indebtedness and minimizing the need to raise external equity capital.*
>
> *Consistent with the revised capital allocation strategy, the Partnership today announced that the Board of Directors of its general partner declared a quarterly cash distribution of $0.1031 per common unit, or $0.4125 per common unit annualized, with respect to the second quarter of 2018. The distribution will be paid on August 14, 2018 to unitholders of record as of the close of business on August 6, 2018. The Partnership and the Board of Directors of its general partner will continue to evaluate its distribution policy as it executes its plans for growth, deleveraging, and capital access.*

96. This press release and the First Cut were part of Defendants' fraudulent scheme,[17] aimed at enabling ArcLight to buy AMID from its unit holders on the cheap.

97. **First**, the press release provided false and misleading explanations for the First Cut, when in truth the distribution was slashed to pave the way for ArcLight's then-undisclosed plan to acquire AMID. Thus, the assertion that the distribution was slashed as part of a "***revised capital allocation strategy that is intended to significantly reduce leverage, provide capital for strategic growth opportunities, and create long-term value***" was false and misleading, because this was not the reason that the distribution was cut, and because it failed to disclose that the distribution was cut as part of ArcLight's then-undisclosed plan to acquire AMID. This statement was also false and misleading because the reference to "***long-term value***" implied that ArcLight was managing the Partnership for investors over the long term, when in fact they were

---

[17] The First Cut was only possible due to Defendants' fraudulent conduct. Without providing a false rationale for cutting the distribution, the proposed conduct would have been subject to approval by AMID's Conflicts Committee, as such a proposal—*i.e.*, cutting the distribution as part of plan to take AMID private—would have been a conflicted transaction. Furthermore, a public disclosure of the true reason for the distribution cut would have provided shareholders with a factual basis to pursue litigation to protect their rights. By hiding the truthful information from investors, AMID deprived shareholders of the factual information necessary to exercise these rights or incorporate the value of that litigation into the valuation of their shares. Similarly, it is beyond peradventure that the Conflicts Committee would have evaluated the eventual buyout proposal far more skeptically, if Defendants had not first capsized AMID's CU price.

planning to take the Partnership private.  The statement that "*[a]s part of the revised capital allocation strategy the Partnership has determined the most prudent sources of accretive growth capital are proceeds from the sale of non-core assets and the retention of an increased portion of operating cash flow through the reduction of its common unit distribution*" was false and misleading, because this was not the reason that the distribution was cut, and because it failed to disclose that the distribution was cut as part of ArcLight's then-undisclosed plan to acquire AMID.  As was the statement that the "cash flow retention" would "*enable the Partnership to reallocate capital to meaningful growth opportunities, while promoting balance sheet flexibility*," since the true purpose of the distribution cut was not allocating capital to growth opportunities or promoting flexibility, but rather a part of ArcLight's scheme to take AMID private.

98.     **Second**, the press release was also misleading because, while purporting to disclose a substantial new strategy—one that apparently involved cutting the distribution from a Partnership that was primarily focused on that distribution—Defendants omitted to disclose ArcLight's interest in acquiring AMID and the discussion that had occurred regarding ArcLight's interest in acquiring AMID.

99.     **Third**, the First Cut and the explained reasons for that cut, were deceptive insofar as—in the context of AMID's business, where the Partnership was committed to distributing available cash and paying minimum distributions—it strongly implied that the financial situation within AMID was dire, when in truth the financial situation was strong and not dramatically changed from 1Q18.  Defendants omitted and withheld facts necessary for public investors to understand the distribution cut in context, and instead left them with the false impression that the Partnership was facing dire circumstances.

100.   **Fourth**, the First Cut itself was a manipulative device, which manipulated AMID's CU price downwards for the benefit of ArcLight.  Defendants knew that the vast majority of AMID's public investors valued the Partnership for its distribution—many because they needed the money as retirement income—and Defendants intentionally and artificially depressed the price of AMID CUs, because many of these investors would need to sell their CUs once those units stopped paying the minimum distribution, which sell-off would depress AMID's market price.

101.   **Fifth**, through both the First Cut and the related disclosures and omissions, Defendants employed a device, scheme, or artifice to defraud, and engaged in an act, practice, or course of business which operated as a fraud or deceit on investors, because their conduct was aimed at reducing the price of AMID CUs, without the disclosure of this goal.

102.   Notably, Defendants did not even try to defend the First Cut in terms of available cash flow, and provided no description of why this strategic approach was appropriate given Defendants' prior assurances that the cash distribution policy would not be "modified" without amending the partnership agreement, and Defendants' prior explanation that the required distribution could limit growth.  It was now supposedly doing the opposite—limiting the distribution to enable growth.

103.   Altogether the First Cut "saved" AMID $16.389 million, since it only paid $5.463 million to CU holders, compared to the $21.852 million it would have paid at the minimum quarterly distribution rate.  Remarkably, AMID later disclosed in its 2Q18 financial results that its distributable cash flows, were reported to be $21.012 million.  This meant it was reportedly just $840,000 short of having distributable cash flows sufficient to pay the full

distribution, at best justifying a 3.9% cut to the distribution.[18]  Yet, Defendants did not pay even this amount, notwithstanding the previous assurance that the Partnership was required by its partnership agreement to distribute all available cash.

104.    Furthermore, the stated distributable cash flow figure could itself have been reduced by Defendants, since they controlled many of the levers that could affect that number. The following are just two of the many examples of how the supposed 3.9% cash shortfall could easily have been contrived by Defendants due to business decisions.

105.    First, Defendants controlled the form of distribution payments to the PUs and had the option to pay the PU distributions "in kind," essentially by issuing additional PUs, rather than in cash.  While AMID had historically paid PUs with a mixture of cash and "paid in kind" units, in 1Q18 and 2Q18 it paid the preferred holders (who were affiliates of ArcLight), entirely in cash.  So, for example, in 2Q17 AMID had paid the Series A PUs with a mix of $2.117 million in cash and paid-in-kind units worth $2.181 million, but in 1Q and 2Q of 2018, AMID chose to pay its PUs entirely in cash.  As a result, AMID had less cash on hand in 2Q18 than it would, had it followed its historical practice.

106.    Second, Defendants controlled the conflict-laden contribution agreement with ArcLight, through which ArcLight was supposed to be covering any shortfall from Delta House's temporary issues, and it is now known AMID was not receiving full support for losses as previously promised.[19]  The contribution agreement lacked transparency in ways that would

---

[18] Note that distributable cash flows already account for any cash the company has determined needs to be reserved due to operations.  It is not as if paying out 100% of the distributable cash flows indicates the company is zeroing out all its accounts or otherwise acting in any sort of risky way.

[19] Public filings do not make it clear how much of the EBITDA shortfall from Delta House ArcLight ultimately covered.  It is clear that when the arrangement was described in the conference call for

enable ArcLight to underpay at its discretion.  In fact, the payment amount was set in terms that gave ArcLight nearly complete discretion in determining how much to pay, as it required AMID and ArcLight to "determine the relevant Distribution Difference," payable under the contribution agreement.

107.    Driving down the CU price was extremely beneficial to ArcLight, who was secretly planning to take AMID private by acquiring all outstanding CUs, as doing so would allow it to acquire majority control on the cheap and then make a lowball offer to acquire the remaining CUs – which is exactly what happened.

### D.    Southcross Terminates the Merger

108.    On Monday July 30, 2018, the next trading day after the First Cut, Southcross announced that on July 29, 2018 it formally terminated its merger with AMID.  It had the right to terminate because AMID had not completed the closing within the required time.  Both AMID and Southcross have remained vague regarding which closing conditions were not yet complete, but it is clear that at least one such condition constituted a "Funding Failure" by AMID, because as a result of this termination, AMID was required to pay a termination fee of $17 million.

109.    Southcross terminating the merger was all but certain the moment that AMID announced the First Cut.  As AMID had stated when announcing the Southcross Merger, the distribution was a major aspect of what made the merger appealing to Southcross common unit holders.  During the joint press conference announcing the Southcross Merger, Southcross' CEO said the distribution was the "most important" reason the offer was attractive.

---

AMID's 2017 results, investors were told the arrangement would cover *the entire* shortfall, but in AMID's annual report for 2018 stated that "ArcLight has offset *some*" of the shortfall.

Furthermore, the merger was a unit-for-unit conversion—and the obvious result of the First Cut was to capsize AMID's CU price, rendering the conversion ratio unappealing to Southcross.

110.    The termination benefited ArcLight, in its scheme to acquire AMID at an unfairly low price.

111.    **First**, it immediately depressed AMID's CU price even further, from a closing price on July 27, 2018, of $6.60 down *7.58%* to a price of $6.10 on July 30, 2018.  The price continued to fall the next day, closing on July 31, 2018, at a price of $5.30, down another *13.11%.*  Altogether, between July 27, 2018 (when the First Cut was announced) and July 31, 2018, the price of AMID's CUs fell *63.55%*.

112.    **Second**, the merger would have substantially diluted ArcLight's ownership of AMID, making it harder for ArcLight to force a buyout transaction through.  The Southcross Merger would have reduced ArcLight's control of the GP from 100% to 85%.  The Southcross Merger also called for the issuance of 11.4 million new units (6.9 million CUs and 4.5 million PUs), which would have reduced ArcLight's stake in AMID from 48.3% of the CUs to 41.9%.[20] This ignores the additional dilution that might have occurred as part of any new issuance of equity capital to fund the deal and ignored the options related to the deal.

113.    **Third**, aside from the issue of dilution, the post-merger Partnership would have been substantially larger than the pre-merger Partnership, and likely would have required ArcLight to pay substantially more in any take-private transaction.  Even though ArcLight

---

[20] These numbers assume ownership at the rates and units outstanding based on AMID's 2017 annual report.

would have been acquiring a bigger Partnership—it is not clear whether it would have had the appetite to conduct a larger buyout of the merged companies (Southcross and AMID).[21]

114.    **Fourth**, strategy in the midstream industry is largely driven by developing specific combinations of assets that are expected to work together to maximize value.  For example, the geography of various assets (such as pipelines) in comparison to the market conditions in the energy industry play a major role in strategy.  When AMID announced the Southcross Merger, it explained why the combination of those two businesses made sense.  For example, in the presentation announcing the Southcross Merger, one slide said that the "[c]ombination creates a synergistic Gulf Coast footprint" and another slide described the plan to connect each "Southcross asset with a corresponding AMID asset."  And while, by all accounts, this combination continued to make sense, when viewed from the combination of combining AMID and Southcross—there is no reason to believe that the combination made sense in the same way, when combining AMID with Southcross **and** ArcLight's vast portfolio of other midstream assets.[22]  Put differently, while AMID determined that Southcross' assets were not redundant to the assets it owned (and in fact were synergistic), it is highly likely that ArcLight owned other assets that would have rendered certain Southcross assets redundant once ArcLight merged with AMID.

---

[21] Additionally, the PUs that were to be issued through the Southcross Merger were entitled to repayment of the 4.5 million PUs issued in connection with the Southcross Merger at a minimum rate of at least $15 per unit in the event of a merger, compared to the eventual buyout price of $5.25.  Had ArcLight needed to buy these units in a merger, they would cost roughly an extra $44 million, beyond the simple need to buy these units at the buyout price of $5.25.

[22] In 2018 ArcLight's website listed over 25 different midstream projects in its active portfolio.

E.    **ArcLight Buys AMID CUs**

115.    On August 17, 2018, ArcLight and affiliates filed a Form 4 with the SEC

revealing that despite having cut AMID's distribution just over two weeks previously, ArcLight

and its affiliates had gone on a buying spree, acquiring an additional 597,728 CUs at an average

price of $6.16 on August 15, 2018.

116.    These purchases resulted in ArcLight controlling 14,575,437 total CUs.  By

making these purchases after the distribution cut, at the artificially depressed average price of

$6.16 per CU, ArcLight was able to save at least $3.22 million, relative to the price of $11.55,

on July 26, 2018, just before the distribution cut.  These purchases also resulted in ArcLight

controlling the majority of AMID CUs,[23] which greatly enhanced ArcLight's ability to take the

Partnership private by ending any possibility that public CU holders could vote to reject a deal.

117.    At the time of this purchase, ArcLight knew the material non-public information

that it was intending to, and had discussed its plans to, acquire AMID.  It also knew of the true

reasons for the First Cut and that the stated reasons were false.  Defendants had an obligation to

disclose this information at the time of these purchases, but did not do so.

118.    On August 20, 2018, ArcLight and its affiliates filed a Form SC 13D/A with the

SEC, in which they ostensibly disclosed the reason for purchasing the shares.  This filing

omitted ArcLight's true reasons for the purchase and made no mention of ArcLight's interest in

buying AMID.  Instead, it disclaimed any specific plans and instead spoke in vague boilerplate

---

[23] As of AMID's 2018 annual report (published April 1, 2019) there were 54.21 million CUs outstanding
and PUs outstanding equal to 24 million CUs on a fully converted basis.  AMID did not buy back any
CUs between August 2018 and April 2019.  As of ArcLight's August 15, 2018 purchases, it owned
15.39 million CUs and PUs that were equal to 24 million CUs on a fully converted basis.  Therefore,
upon these purchases, AMID held at least 50.39% of AMID, giving it majority control of the CUs.

generalities about what it may do. The relevant portion of the filing is copied below and is alleged to be false and misleading, for the reasons just stated:[24]

> ***Although no Reporting Person has any specific plan or proposal to acquire, transfer or dispose of Units, consistent with its investment purpose, each Reporting Person may, either directly or through one or more affiliates, from time to time or at any time and subject to price, market and general economic and fiscal conditions and other factors, acquire or seek to acquire additional Units in the open market, in privately negotiated transactions or otherwise, or dispose of or seek to dispose of all or a portion of Units now owned or hereafter acquired. In addition, any Reporting Person may, either directly or through one or more affiliates, from time to time or at any time and subject to price, market and general economic and fiscal conditions and other factors, consolidate or seek to consolidate assets held by such Reporting Person and its affiliates, including acquiring assets owned by, or selling assets to, the Issuer, or make changes or seek to make changes to the capital structure of the Issuer. Each Reporting Person reserves the right to change its intention with respect to any or all of the matters required to be disclosed in this Item 4.***

## F.  ArcLight Offers to Buy the Partnership

119.   As was eventually disclosed[25] on September 14, 2018, less than two months after the distribution cut was announced, a representative of ArcLight contacted Gerald Tywoniuk, the Chairman of AMID's Conflicts Committee, and informed him and Bourdon that ArcLight was considering a potential buyout. It is unclear if this was when ArcLight first informed AMID's independent directors of its intentions, but it is now known that ArcLight had been interested in taking the Partnership private since the Spring of 2018 – well before the First Distribution Cut.

---

[24] The following quote is alleged to be actionably false and misleading.

[25] The details of this negotiation were disclosed in AMID's April 24, 2019, preliminary information statement regarding the merger.

43

120.    On September 17, 2018, Mr. Tywoniuk contacted the other members of the Conflicts Committee, Peter Fasullo and Don Kendall, to inform them of the potential offer from ArcLight.  On September 26, 2018, the Conflicts Committee held a call to discuss the potential offer.

121.    On September 27, 2018, Magnolia Infrastructure Holdings, LLC ("MIH"), an affiliate of ArcLight that partially owned the GP, delivered a non-binding offer to the GP to acquire all of the issued and outstanding publicly held common units of AMID that were not directly owned by MIH or its affiliates in exchange for $6.10 in cash for each such common unit (the "September Offer").  The September Offer represented a discount of more than *47%* to AMID's CUs price prior to the distribution cut on July 27, 2018.

122.    The September Offer stated that the transaction would be structured as a merger between the Partnership and a subsidiary of MIH.  On September 28, 2018, MIH and its affiliates filed an amendment to their existing Schedule 13D and issued a press release announcing that MIH had made the September Offer, and the Partnership issued a press release announcing receipt of the September Offer.

123.    On September 28, 2018, AMID announced the offer publicly by press release. The press release stated that:[26]

> *American Midstream . . . today announced the Board of Directors of American Midstream GP, LLC ("GP Board") has received an unsolicited non-binding proposal from affiliates of ArcLight Energy Partners Fund V, L.P. ("ArcLight"), directed to members of the GP Board, pursuant to which ArcLight would acquire all common units of the Partnership that ArcLight and its affiliates do not already own in exchange for $6.10 per common unit.  If approved, it is currently expected that the*

---

[26] The following quote is alleged to be actionably false and misleading.

*transaction would be consummated through a merger of the Partnership with a subsidiary of ArcLight.*

*The proposed transaction is subject to a number of contingencies, including the approval of the Conflicts Committee of the GP Board, the approval by holders of a majority of the outstanding common units of the Partnership, and the satisfaction of any conditions to the consummation of a transaction set forth in any definitive agreement concerning the transaction. There can be no assurance that definitive documentation will be executed or that any transaction will materialize on the terms described above or at all.*

124. However, the announcement was materially misleading because it failed to disclose that ArcLight had actually been considering acquiring AMID since spring of 2018. The description of the offer as "unsolicited" was materially misleading because ArcLight controlled the GP and had been interested in acquiring AMID since the spring of 2018—it makes no sense to call an offer "unsolicited," when the very party making the offer is also the party to whom the offer was effectively made. The announcement also failed to disclose that the distribution cut was orchestrated as part of Defendants' scheme to enable ArcLight to buy the Partnership for less than its fair value.

125. With a majority control, ArcLight could push a transaction forward without the support of other CU holders. However, it would still need to persuade AMID's Conflicts Committee to accept the offer. By driving down the CU price through the distribution cuts ArcLight knew that they were making it far more likely that the Conflicts Committee would approve the transaction. Given that the September Offer was at a 47% discount to AMID's pre-distribution cut market price, it would have been laughed out of consideration, but for the distribution cut.

### G.   Defendants Further Capsize AMID's CU Price by Suspending CU Distributions and then Making a Reduced Buyout Offer

126.   On December 21, 2018, AMID's Conflicts Committee, was still evaluating and negotiating the September 27 buyout offer from ArcLight.  When they learned that AMID had entered into a renegotiated credit facility requiring AMID to ***withhold all distributions*** until certain requirements under the credit facility were met, they deliberated further and determined to accept ArcLight's offer of $6.10 per CU.  The Conflicts Committee approved of Mr. Tywoniuk, the Committee Chair, reaching out to ArcLight to accept the offer.

127.   AMID's public filings do not make clear when Mr. Tywoniuk actually reached out with that offer.  However, it is known that sometime on December 21, 2018, after the Conflicts Committee had determined to accept the offer—which had been outstanding for almost two months—ArcLight, clearly realizing the leverage this new change to the distribution policy provided them, abruptly pulled the offer.

128.   On December 31, 2018, AMID filed a form 8-K announcing that on December 27, 2018, it had entered into a revised credit agreement.  As part of this renegotiated credit facility, AMID agreed to suspend its distributions until it achieved a reduced leverage ratio. The 8-K stated:[27]

> ***As a result of the amendment described in the second bullet above, the Partnership is not permitted to declare or pay any cash distributions until its Consolidated Total Leverage Ratio is reduced to less than 5.00:1.00, as shown in the Compliance Certificate required to be delivered together with audited financial statements for the most recently completed fiscal year and unaudited financial statements for the most recently completed quarter. Therefore, the Partnership does not expect to make any cash distributions on its common units or preferred units with respect to the fourth quarter of 2018.***

---

[27] The following quote is alleged to be actionably false and misleading.

129.     By voluntarily tying its own hands in a way that dramatically limited AMID's ability to issue distributions, Defendants were furthering the fraudulent scheme and manipulative course of conduct to drive down AMID's CU price in order to enable ArcLight to buy the Partnership on the cheap.  By representing that the payment of distributions had been limited "as a result of" the new terms and that "therefore" the Partnership does not expect to make any cash distributions, Defendants were misleading the market by failing to disclose that the suspension of the distribution was in furtherance of the fraudulent scheme and manipulative course of conduct to drive down AMID's CU price in order to enable ArcLight to buy the Partnership on the cheap.

130.     As expected, the Partnership's CU price collapsed upon this disclosure, from a closing price of $4.33 on December 28, 2018, down ***30.02%*** to a closing price of $3.03 on December 31, 2018.

131.     ArcLight let a single trading day pass, and on January 2, 2019, revised its buyout offer downward to $4.50 per CU (the "January Offer").  This offer was communicated publicly the next day.  This was $1.60 per unit reduction—or a decline of 26%--compared to the September Offer.  The revised offer amounted to a 61% discount to AMID's trading price the day before the First Cut on July 27, 2018.

### H.    The Buyout is Approved and Eventually Closes

132.     On March 17, 2019, AMID's three-person Conflicts Committee authorized the acceptance of a merger agreement, accepting ArcLight's revised offer to buy the Partnership at a price of $5.25 per CU.  They ostensibly considered the opinion of the investment bank Evercore, that the Merger Consideration was fair, from a financial point of view, to the public investors.  The Conflicts Committee also purportedly determined that the agreement was "in the best interests of the Partnership and Partnership Unaffiliated Unitholders."

133.    The following day AMID announced that it had reached this deal.  It also announced that, under the Partnership Agreement, a vote of the CU holders was not required, *because ArcLight controlled a majority of votes* and provided written consent approving the deal.  Thus, at this point the buyout was nearly assured.

134.    On April 24, 2019, AMID published its preliminary information statement regarding the merger.  This information statement partially disclosed the true origins of the transaction, for the first time.  It stated that:

> As a result of these developments and market conditions, in spring 2018, ArcLight began to consider a potential strategic transaction involving the Partnership, including a potential take private transaction, and discussed such strategic alternatives internally with the ArcLight investment committee.

135.    Defendant Revers, a director of AMID who serves in connection with his affiliation from ArcLight as its co-founder and Managing Partner, is a member of ArcLight's investment committee.  Thus, in addition to the obvious conclusion that due to its many points of control over AMID, these interests were known to AMID, it is admitted in the preliminary information statement that Defendant Revers knew of ArcLight's interest in buying AMID as of at least the Spring of 2018.

136.    Finally, on July 23, 2019, the merger was closed and AMID was taken private by ArcLight.  In the end, ArcLight was able to acquire AMID for $6.30 less per share than it traded for the day before the distribution was cut.  This saved ArcLight approximately $246 million compared to just the pre-fraud trading price[28]—and probably considerably more since, without the fraud, it likely could not have bought the Partnership without paying a substantial premium.

---

[28] At the time the merger closed there were 54,493,273 CUs outstanding, and ArcLight owned 15,385,954 of those units, leaving about 39 million CUs.  By saving $6.30 per CU, ArcLight saved about $246 million.

## VI.   ADDITIONAL SCIENTER ALLEGATIONS

137.   During the Class Period, as alleged herein, the Defendants acted with scienter in that the Defendants knew–or were reckless in not knowing–whether the public documents and statements issued or disseminated in the name of the Partnership during the Class Period were materially false and misleading; Defendants knew–or were reckless in not knowing–whether such statements or documents would be issued or disseminated to the investing public; and Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

138.   Defendants AMID, GP, and ArcLight have the scienter of their management level employees and other agents.  Defendants AMID and GP have the scienter of each of the Individual Defendants due to those Defendants' positions of management over the management and operations of AMID and GP.  Defendants AMID, GP, and ArcLight also have scienter with respect to any other information known to them or motivations attributable to them.

139.   Defendant ArcLight's fraudulent intent can be established due to its motive and opportunity to defraud.  At all times, ArcLight stood to benefit substantially by reducing the price it would need to pay in order to acquire AMID.  By reducing the trading price of AMID's units and by defrauding the public regarding the true reasons for the distribution cut, as alleged herein, ArcLight stood to benefit through reducing the price it would need to pay to acquire AMID.  ArcLight had the opportunity to act on these motivations due to its control over AMID's operations, managerial-level decisions, and public disclosures; due to its control of the GP; due to the fact that a majority of the Board was appointed through their connections with ArcLight; and due to its controlling stake in AMID's CUs.

140.     Defendant GP acted with the same motive and opportunity as ArcLight, because it operated under the complete control of ArcLight, due to being an (indirect) wholly-owned subsidiary of ArcLight, and due to the fact that a majority of the Board was appointed through their connections with ArcLight.

141.     The Individual Defendants had the same motive as ArcLight because they served on the Board due to their connection to ArcLight and were therefore operating as agents of ArcLight; they served at the discretion of ArcLight; and therefore shared ArcLight's motivations.  As employees of ArcLight, their service on the Board, and through their positions at ArcLight, it can be inferred that the Individual Defendants stood to gain personally through accomplishing ArcLight's goals.  The Individual Defendants had the opportunity to act on these motivations due to their involvement in the managerial-level decisions of AMID, including the decisions to reduce AMID's distributions and to falsely describe the reasons for the distribution reduction.

142.     The Individual Defendants were directly involved in the decision to cut the distribution and, due to their management-level positions at AMID and ArcLight, they were able to and did control the information disseminated by AMID about that decision.

143.     As Defendants ultimately disclosed, Defendant Revers knew of ArcLight's interest in acquiring AMID and consideration of strategic transactions to accomplish that goal throughout the Class Period because, *inter alia*, such interest and consideration was publicly discussed with Mr. Revers given his involvement with the ArcLight investment committee.

144.     The matters alleged herein are at the core of AMID's business.  The distributions at issue, the true reasons for cutting the distributions, and the Southcross Merger were dealt with at the managerial level, and directly involved AMID's senior management.  To the extent any

Individual Defendant was not directly involved in these issues of monumental importance, their non-involvement evidences a reckless disregard for the truth.

## VII.   ADDITIONAL ALLEGATIONS OF LOSS CAUSATION

145.   Defendants' fraudulent and deceptive conduct depressed the price of the CUs. As a result, Co-Lead Plaintiffs and Class Members selling their shares received less than the fair value of those shares.  As a result of their sale of the CUs during the Class Period, Co-Lead Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.  The true value of AMID CUs exceeded the prices that Co-Lead Plaintiffs and Class Members sold their CUs for during the Class Period.

146.   As explained throughout, during the Class Period, Defendants made material false and misleading statements and omissions and this fraudulent conduct depressed teh price of AMID CUs, resulting in loss to Co-Lead Plaintiffs and Class members when they sold CUs.

147.   As explained throughout, during the Class Period, Defendants engaged in conduct that violated the federal securities laws by manipulating the price of AMID CUs downward, resulting in loss to Co-Lead Plaintiffs and Class members when they sold CUs at reduced levels due to Defendants' manipulative conduct.  Specifically, Defendants manipulated the price for AMID CUs by reducing and then suspending the distributions paid to AMID CU holders.

148.   As explained throughout, during the Class Period, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially deflated the price of AMID CUs and operated a fraud or deceit on Class members by failing to disclose and misrepresenting the facts detailed herein.  This course of conduct misled the Class members, facilitated the manipulation of the CU price downward, and resulted in their sale of the CUs at an artificially depressed price.

149.    Notably, (1) Defendants' conduct depressed the price of AMID's CUs prior to ArcLight affiliates obtaining voting control over AMID, (2) Defendants' conduct depressed the price of AMID's CUs, which undoubtedly assisted in persuading the Conflicts Committee to accept ArcLight's offer (in other words, this low offer would never have been accepted unless the First Cut had lowered the CU price to begin with); and (3) Defendants' false explanation for the distribution cuts enabled them to accomplish those distribution cuts, since a truthful explanation would have demonstrated that the distribution cuts were conflicted transactions under the partnership agreement.  For the previous three reasons, Defendants' conduct constituted an essential link in taking AMID private.  Defendants' false explanation for the distribution cuts and omissions of the truth also deprived shareholders of information necessary to accurately value their shares, including any value that could be obtained through litigation.

## VIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

150.    Co-Lead Plaintiffs and Class members are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact that the Defendants had a duty to disclose, including the duty to "abstain or disclose" before insider trading.

151.    Co-Lead Plaintiffs and Class members are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory because, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)     the Partnership's CUs traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Partnership's CUs; and

(e)     Co-Lead Plaintiffs and other members of the Class transacted in AMID CUs between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

152.    At all relevant times, the markets for AMID CUs were efficient for the following reasons, among others:

(a)     as a regulated issuer, AMID filed periodic public reports with the SEC;

(b)     AMID regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services, and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)     AMID was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)     AMID CUs were actively traded in an efficient market, namely the NYSE.

153.    As a result of the foregoing, the market for AMID CUs promptly digested current information regarding AMID from all publicly available sources and reflected such information in the CUs' price.  Under these circumstances, all those who sold or otherwise

acquired AMID CUs during the Class Period suffered similar injury through sales of CUs at artificially deflated prices, and the presumption of reliance applies.

154.    Co-Lead Plaintiffs relied on the market price and the integrity of the market price when selling AMID CUs.

## IX.    NO SAFE HARBOR

155.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded herein.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of AMID or GP who knew that the statement was false when made.

## X.    CLASS ACTION ALLEGATIONS

156.    Co-Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all former owners of American Midstream common units (ticker symbol "AMID") who (a) sold common units, and were damaged thereby, during the period from July 27, 2018 through July 23, 2019, both dates inclusive, (the "Class

Period"), except as excluded below, or (b) sold  (*i.e.*, "tendered") common units as part of the

merger with ArcLight that closed on July 23, 2019, except as excluded below, (the "Class").

157.    Excluded from the Class are: (i) Defendants; (ii) members of the immediate

families of the Individual Defendants and the directors and officers of AMID, GP, or ArcLight

during the Class Period; (iii) any person who was an officer or director of AMID, GP, or

ArcLight during the Class Period; (iv) any firm, trust, corporation, or other entity in which any

Defendant has or had a controlling interest; and (v) the legal representatives, affiliates, heirs,

successors-in-interest, or assignees of any such excluded person in (i)-(iv) of this paragraph, in

their capacities as such.

158.    The members of the Class are so numerous that joinder of all members is

impracticable.  During the Class Period, AMID had over 50 million outstanding CUs that were

widely held and traded on the NYSE.  While the exact number of Class members is unknown to

Co-Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, it is

likely that the proposed Class numbers in the thousands and is geographically widely dispersed.

Record owners and other members of the Class may be identified from records maintained

either by AMID or by other customary means, and may be notified of the pendency of this

action by mail, using a form of notice as is customary in securities class actions.  Thus, the

disposition of their claims in a class action will provide substantial benefits to the parties and

the Court.

159.    There is a well-defined community of interest in the questions of law and fact

involved in this case.  Questions of law and fact common to the members of the Class which

predominate over questions which may affect individual Class members include:

    (a)    Whether Defendants violated the Exchange Act;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether the Defendants engaged in a fraudulent scheme or manipulative conduct;

(e)     Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(f)     Whether Defendants acted with the intent to defraud Class members;

(g)     Whether the price of AMID CUs was artificially deflated; and

(h)     The extent of the damage sustained by Class members and the appropriate measure of damages;

(i)     Whether the Individual Defendants, GP, or ArcLight were controlling persons of AMID; and

(j)     Whether reliance may be presumed pursuant to the fraud-on-the-market doctrine and/or the presumption of reliance afforded by *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

160.    Co-Lead Plaintiffs' claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' alleged wrongful conduct in violation of the Exchange Act as complained of herein.

161.    Co-Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in securities class action litigation.  Co-Lead Plaintiffs have no interests that conflict with those of the Class.

162.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XI.     COUNTS

**COUNT I**
**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b)**
**Promulgated Thereunder Against All Defendants**

163.     Co-Lead Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

164.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements, which they knew or recklessly disregarded were misleading.

165.     Defendants violated § 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder in that they made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

166.     Co-Lead Plaintiffs and the Class have suffered damages in that they sold AMID CUs at artificially deflated prices due to Defendants' fraudulent statements and omissions.  Due to Defendants' conduct, Co-Lead Plaintiffs and the Class were deprived of accurate information regarding and/or affecting the value of their CUs.  Defendants' fraudulent conduct was an essential link in ArcLight's acquisition of AMID, including the CUs that were sold by Co-Lead Plaintiffs' and the Class.  As a direct and proximate result of these Defendants' wrongful

conduct, Co-Lead Plaintiffs and the other members of the Class suffered damages in connection with their sales of AMID CUs during the Class Period.

167.    By reason of the foregoing, Defendants violated § 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, and are liable to Co-Lead Plaintiffs and the Class for damages suffered in connection with their sale of AMID CUs during the Class Period.

**COUNT II**
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)**
**Promulgated Thereunder Against All Defendants**

168.    Co-Lead Plaintiffs repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

169.    Defendants violated § 10(b) of the Exchange Act and Rule 10b-5(a) and (c) in that they employed devices, schemes, and artifices to defraud and/or engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Co-Lead Plaintiffs and others similarly situated in connection with their transactions in AMID CUs during the Class Period.

170.    Defendants' manipulative acts including cutting AMID's distribution, engaging in conduct that caused AMID's distribution to be cut in furtherance of a fraudulent scheme, and engaging in acts that caused AMID to falsely explain or describe the true reason for the distribution cut.  AMID and GP engaged in the act of cutting the distribution.  Each of the Individual Defendants engaged in the act of cutting the distribution insofar as it was a major corporate decision that they necessarily would have been involved with as the individuals managing AMID.  ArcLight engaged in the act of cutting the distribution insofar as it acted through its indirect wholly-owned subsidiary, GP.

171.    Defendants' conduct in furtherance of their wrongful scheme involved acting to cut the distribution without disclosing that the distribution cuts constituted a conflicted transaction, acting in ways that disseminated a false explanation of the distribution cuts, and

acting in ways that caused AMID to omit to disclose the true reason for the distribution cuts.  In sum, the scheme was to cut the distribution and provide a false explanation for doing so, to drive down AMID's CU price to assist ArcLight in acquiring AMID for less than fair value.

172.    Each Defendant acted with scienter to the extent that they knew or were reckless in not knowing the facts that rendered their conduct fraudulent or deceptive or components of a device, scheme, artifice to defraud, and/or act, practice, or a course of business that operated as a fraud or deceit.  Each Defendant acted with scienter to the extent that they intended their conduct to defraud or deceive.

173.    Co-Lead Plaintiffs and the Class have suffered damages in that they sold AMID CUs at artificially deflated prices due to Defendants' manipulative conduct.  Co-Lead Plaintiffs and the Class reasonably relied upon the integrity of the market in which AMID CUs traded. Due to Defendants' conduct, Co-Lead Plaintiffs and the Class were deprived of accurate information regarding and/or affecting the value of their CUs.  Defendants' fraudulent conduct was an essential link in ArcLight's acquisition of AMID, including the CUs that were sold by Co-Lead Plaintiffs' and the Class.  As a direct and proximate result of Defendants' wrongful conduct, Co-Lead Plaintiffs and the other members of the Class suffered damages in connection with their sales of AMID CUs during the Class Period.

174.    By reason of the foregoing, Defendants violated § 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and are liable to Co-Lead Plaintiffs and the Class for damages suffered in connection with their sale of AMID CUs during the Class Period.

<u>COUNT III</u>
**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

175.    Co-Lead Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

59

176.    The Individual Defendants acted as controlling persons of GP and AMID within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements by and about AMID, the Individual Defendants had the power and ability to control the actions of AMID and its employees.  By virtue of their positions and their power to control the actions by GP and AMID alleged herein, the Individual Defendants had the power and ability to control the actions of AMID, GP and its employees.

177.    As alleged herein, Defendants managed AMID and GP, and the wrongful conduct alleged herein–including both the dissemination of false and misleading statements and omissions through formal corporate processes (such as SEC filings and analysts events), and the wrongful reduction of AMID's distribution and related scheme–directly involved AMID's senior management.  Due to their involvement in this wrongful conduct, Defendants were at least culpable participants in the wrongdoing and securities law violations alleged herein.

178.    In the alternative, if Defendants were not involved in the wrongful conduct alleged herein, due to the nature of that activity, which occurred at the level of AMID's executive management, Defendants were culpable insofar as they were recklessly uninvolved in the management of AMID, despite their status as AMID's management.

179.    By reason of the foregoing, Defendants violated § 20(a) of the Exchange Act, and are liable to Co-Lead Plaintiffs and the Class for damages suffered in connection with their sale of AMID CUs during the Class Period.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Co-Lead Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action is a proper class action and certifying Co-Lead Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure, and appointing Co-Lead Plaintiffs' counsel as Lead Counsel for the Class;

B.      Awarding compensatory damages in favor of Co-Lead Plaintiffs and the other

Class members against all Defendants, jointly and severally, for all damages sustained as a

result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Co-Lead Plaintiffs and the Class their reasonable costs and expenses

incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as deemed appropriate by the

Court.

## XIII.   JURY DEMAND

Co-Lead Plaintiffs demand a trial by jury.


DATED:  February 18, 2020                    Respectfully submitted,

                                             **LABATON SUCHAROW LLP**

                                             Carol C. Villegas
                                             David J. Schwartz
                                             Jake Bissell-Linsk
                                             140 Broadway
                                             New York, New York 10005
                                             Telephone: (212) 907-0700
                                             Facsimile: (212) 818-0477
                                             cvillegas@labaton.com
                                             dschwartz@labaton.com
                                             jbissell-linsk@labaton.com

                                             *Counsel for Co-Lead Plaintiffs Paul C.
                                             Kraft and Linda E. Kraft JTWROS, and
                                             Randall Dobler, and Lead Counsel for the
                                             Class*