**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PAUL C. KRAFT and LINDA E. KRAFT JTWROS and RANDALL DOBLER, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> vs. <br><br> THIRD COAST MIDSTREAM, LLC f/k/a AMERICAN MIDSTREAM PARTNERS, LP, AMERICAN MIDSTREAM GP, LLC, ARCLIGHT CAPITAL PARTNERS, LLC, STEPHEN W. BERGSTROM, LYNN L. BOURDON III, JOHN F. ERHARD, ERIC T. KALAMARAS, DANIEL R. REVERS, JOSEPH W. SUTTON, and LUCIUS H. TAYLOR, <br><br> Defendants. | Case No.: 1:19-cv-09398-LJL <br><br> ECF Case |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

Sandra C. Goldstein, P.C.
Stefan Atkinson, P.C.
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York  10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
sandra.goldstein@kirkland.com
stefan.atkinson@kirkland.com

*Counsel for Defendants*

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ..................................................................................... 2

      A.    Defendants ............................................................................................. 2

      B.    AMID's High Leverage Ratio Requires It to Adopt a New Capital Allocation Strategy ................................................................................. 3

      C.    ArcLight Proposes to Acquire the Partnership and Amends Its Schedule 13D. ....... 5

      D.    AMID Is Forced to Renegotiate Its Credit Agreement. ............................................. 5

      E.    AMID and ArcLight Finalize the Take-Private Transaction. .................................. 6

ARGUMENT ............................................................................................................. 6

I.   LEGAL STANDARD ......................................................................................... 7

      A.    The Rule 10b-5(b) Standard .................................................................. 7

      B.    The Rule 10b-5(a) and (c) Standard ...................................................... 8

II.  THE COMPLAINT DOES NOT STATE A CLAIM UNDER RULE 10b-5(b). .................. 9

      A.    Plaintiffs' 10b-5(b) Claim Fails to Plead Actionable Misstatements or Omissions. ........................................................................................... 9

      B.    Plaintiffs Fail to Plead Loss Causation as to Their Rule 10b-5(b) Claim. ............. 17

III. THE COMPLAINT DOES NOT STATE A CLAIM UNDER RULE 10b-5(a) OR (c). ...... 19

      A.    Plaintiffs Fail to Sufficiently Plead a Manipulative Act. ....................................... 19

      B.    Plaintiffs Fail to Plead That ArcLight Made Any Representations. ...................... 20

IV. PLAINTIFFS' RULE 10b-5 CLAIMS ALL FAIL TO SUFFICIENTLY PLEAD SCIENTER BY GP, THE INDIVIDUAL DEFENDANTS, OR AMID AND SO SHOULD BE DISMISSED AS TO THOSE DEFENDANTS. .................................................................. 21

      A.    Plaintiffs Cannot Impute ArcLight's Alleged Scienter to GP. .............................. 22

      B.    Plaintiffs Cannot Impute ArcLight's Alleged Scienter to the Individual Defendants. ......................................................................................... 23

     C.     Revers's Alleged Knowledge of ArcLight's Take-Private Intentions Does
           Not Raise a Strong Inference of Scienter as to Revers or AMID............................ 24

V.  THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 20(a)..................... 25

CONCLUSION.................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amida Capital Mgmt. II, LLC v. Cerberus Capital Mgmt., L.P.*,
    669 F. Supp. 2d 430 (S.D.N.Y. 2009) ....................................................................15

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................................................................7

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) ................................................................................ *passim*

*In re AXIS Capital Holdings Ltd. Sec. Litig.*,
    456 F. Supp. 2d 576 (S.D.N.Y. 2006) ..............................................................11, 12

*Azurite Corp. v. Amster & Co.*,
    52 F.3d 15 (2d Cir. 1995) .........................................................................................15

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
    980 F. Supp. 2d 564 (S.D.N.Y. 2013) .....................................................................16

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ..............................................................................................9, 16

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
    506 F. App'x 32 (2d Cir. 2012) ................................................................................10

*Brady v. Top Ships Inc.*,
    2019 WL 3553999 (E.D.N.Y. Aug. 5, 2019) ...........................................................20

*Chill v. Gen. Elec. Co.*,
    101 F.3d 263 (2d Cir. 1996) .....................................................................................22

*City of Brockton Ret. Sys. v. Avon Prods., Inc.*,
    2014 WL 4832321 (S.D.N.Y. Sept. 28, 2014) .....................................................2, 25

*In re CRM Holdings, Ltd. Sec. Litig.*,
    2012 WL 1646888 (S.D.N.Y. May 10, 2012) ..........................................................23

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
    2017 WL 4049253 (S.D.N.Y. June 28, 2017) ..........................................................10

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) .................................................................................................19

*Feasby v. Industri-Matematik Int'l Corp.*,
  2003 WL 22976327 (S.D.N.Y. Dec. 19, 2003) ....................................................................11

*Fezzani v. Bear, Stearns & Co.*,
  716 F.3d 18 (2d Cir. 2013)..................................................................................................20, 21

*Janus Capital Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011) ...................................................................................................................21

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005)...................................................................................8, 17, 19

*Liptow v. Net1 UEPS Techs., Inc.*,
  131 F. Supp. 3d 144 (S.D.N.Y. 2016) ................................................................................24

*In re Lululemon Sec. Litig.*,
  14 F. Supp. 3d 553 (S.D.N.Y. 2014)..............................................................*passim*

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)....................................................................................11, 13, 24

*Onel v. Top Ships, Inc.*,
  2020 WL 1608523 (2d Cir. Apr. 2, 2020) ........................................................................20

*Ong v. Chipotle Mexican Grill, Inc.*,
  294 F. Supp. 3d 199 (S.D.N.Y. 2018)..............................................................................13

*Pac. Inv. Mgmt. Co. v. Mayer Brown LLP*,
  603 F.3d 144 (2d Cir. 2010)................................................................................................21

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)........................................................................................8, 10

*Salvani v. ADVFN PLC*,
  50 F. Supp. 3d 459 (S.D.N.Y. 2014)....................................................................17, 18, 19

*Schwab v. E\*TRADE Fin. Corp.*,
  258 F. Supp. 3d 418 (S.D.N.Y. 2017)................................................................................24

*Shields v. Citytrust Bancorp, Inc.*,
  25 F.3d 1124 (2d Cir. 1994)................................................................................................24

*Stratte-McClure v. Morgan Stanley*,
  776 F.3d 94 (2d Cir. 2015)....................................................................................................9

*Tabor v. Bodisen Biotech, Inc.*,
  579 F. Supp. 2d 438 (S.D.N.Y. 2008)................................................................................10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)........................................................................................8, 21

*In re Tempur Sealy Int'l Inc. Sec. Litig.*,
    2019 WL 1368787 (S.D.N.Y. Mar. 26, 2019) ........................................8, 12, 16, 17

*In re UBS AG Sec. Litig.*,
    2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012).........................................................21

*Valenti v. Citigroup, Inc.*,
    837 F. Supp. 2d 304 (S.D.N.Y. 2011)....................................................................22

*Vladimir v. Bioenvision Inc.*,
    606 F. Supp. 2d 473 (S.D.N.Y. 2009)....................................................................15

*Wilamowsky v. Take-Two Interactive Software, Inc.*,
    818 F. Supp. 2d 744 (S.D.N.Y. 2011)....................................................................18

*Wilson v. Merrill Lynch & Co.*,
    671 F.3d 120 (2d Cir. 2011)............................................................................19, 20

*Youngers v. Virtus Inv. Partners Inc.*,
    2017 WL 5991800 (S.D.N.Y. Dec. 4, 2017) ....................................................22, 23

**Statutes**

15 U.S.C. § 78t-1 ...........................................................................................2, 7, 25

15 U.S.C. § 78u-4 .......................................................................................8, 10, 12

15 U.S.C. § 240.13d-101 ...................................................................................15

**Rules**

17 C.F.R. § 240.10b-5.................................................................................. *passim*

Fed. R. Civ. P. 9 ...........................................................................................7, 10, 12

v

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| AMID or the Partnership | American Midstream Partners, LP, now known as Third Coast Midstream LLC |
| AMID Form 8-K or Ex. 3 | American Midstream Partners, LP, Form 8-K, dated Dec. 31, 2018 |
| ArcLight | ArcLight Capital Partners, LLC |
| ArcLight Schedule 13D or Ex. 4 | American Midstream Partners, LP, Schedule 13D, dated Aug. 17, 2018 |
| Class Period | The putative class period set out in paragraph 156 of the Complaint (July 27, 2018, through July 23, 2019) |
| Complaint or Compl. | Amended Class Action Complaint, dated Feb. 18, 2018 [Dkt. # 32] |
| Ex. __ | Exhibit to the Declaration of Stefan Atkinson, dated Apr. 20, 2020 |
| GP | American Midstream GP, LLC |
| Individual Defendants | Stephen W. Bergstrom, Lynn L. Bourdon III, John F. Erhard, Eric T. Kalamaras, Daniel R. Revers, Joseph W. Sutton, and Lucius H. Taylor |
| July 2018 Press Release or Ex. 2 | American Midstream Partners, LP, Press Release, *American Midstream Announces Revised Capital Allocation Strategy and Second Quarter Common Unit Distribution*, dated July 27, 2018 |
| MLP | Master limited partnership |
| Plaintiffs | Paul C. Kraft and Linda E. Kraft JTWROS and Randall Dobler |
| Proxy or Ex. 1 | Definitive Information Statement Relating to Merger or Acquisition, dated July 3, 2019 |
| PSLRA | Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 |
| Rule 10b-5 | 17 C.F.R. § 124.10b-5 |
| Section 10(b) | Securities Exchange Act, 15 U.S.C. § 78j(b) |
| Section 13D | Securities Exchange Act, 15 U.S.C. § 78m(d) |
| Section 20(a) | Securities Exchange Act, 15 U.S.C. § 78t(a) |

| September 2018 Press Release or Ex. 5 | American Midstream Partners, LP, Press Release, *American Midstream Receives Buyout Offer from ArcLight*, dated Sept. 28, 2018 |
|---|---|
| Southcross | Southcross Energy Partners, L.P. |
| 2018 10-K or Ex. 6 | American Midstream Partners, LP, Form 10-K, dated Apr. 9, 2018 |

## PRELIMINARY STATEMENT[1]

Plaintiffs' Complaint makes clear that they disagree with decisions AMID made as it faced difficult financial conditions, including a rising debt leverage ratio and shrinking access to capital, in 2018 prior to the Partnership's privatization in 2019.  Plaintiffs attempt to package these disagreements as supposed violations of the securities laws by alleging that (i) when Defendants undertook a series of cost-savings measures—including reducing unitholder distributions to conserve cash and amending the Partnership's credit agreement to avoid default—Defendants engaged in a fraudulent plan to depress AMID's unit price and enable ArcLight to take the Partnership private more cheaply (supposedly in violation of Section 10(b) and Rule 10b-5(a) and (c)) (Count II); and (ii) Defendants made misleading statements by failing to disclose this purported plan (supposedly in violation of Section 10(b) and Rule 10b-5(b)) (Count I).  But a disagreement over management decisions does not state a claim for securities fraud.

*First*, Plaintiffs' allegation that Defendants made misleading statements under Rule 10b-5(b) by not disclosing their purported plan to depress AMID's unit price fails because Plaintiffs do not allege particularized facts showing that any Defendant had any such plan or that any Defendant's statements were materially false or misleading.  Plaintiffs also have not pled loss causation with respect to their Rule 10b-5(b) claims.  Count I should be dismissed against all Defendants.

*Second*, Plaintiffs cannot sustain a Rule 10b-5(a) or (c) claim either.  They have not properly pled that Defendants made any actionable misstatements in connection with the supposed manipulation, and, as to ArcLight, they have not alleged that ArcLight ever communicated

---

[1]   Unless otherwise noted, all emphases are added, and all citations, alterations, and internal quotation marks are omitted.

anything at all about the allegedly manipulated price of the Partnership's units.  Therefore, Count II should be dismissed against all Defendants.

*Third*, Plaintiffs have not alleged particularized facts supporting a strong inference that GP, the Individual Defendants, or AMID acted with scienter.  Plaintiffs' sole allegation with respect to GP and the Individual Defendants—that ArcLight's supposed motive and opportunity to acquire the Partnership at a low price can be imputed to those Defendants—is contrary to law.  Courts in this Circuit will not impute one entity's motive to an affiliate simply because, as Plaintiffs allege, an entity controls the affiliate.  And the Second Circuit has rejected the idea that a corporation's officers and directors share the corporation's motivations where a plaintiff fails (as here) to plead that the officers and directors stood to realize personal and concrete benefits from the alleged fraud.  Further, Plaintiffs' attempt to establish Revers's and AMID's scienter by alleging that Revers served on ArcLight's investment committee also fails.  A defendant's corporate role, without more, does not establish scienter, and Plaintiffs' failure sufficiently to plead that Revers acted with scienter likewise defeats their claims that AMID shared his alleged scienter.  Accordingly, Counts I and II should be dismissed against GP, the Individual Defendants, and AMID.

*Fourth*, Plaintiffs cannot state a claim against the Individual Defendants under Section 20(a) because they have not stated a primary violation of the securities laws.

## FACTUAL BACKGROUND[2]

### A.     Defendants

AMID was an MLP that, before it was taken private in 2019, managed midstream energy assets, including "the transportation, storage, and wholesale marketing of oil, natural gas, and

---

[2]    The facts set out below are drawn from the Complaint, documents upon which the Complaint "relies heavily," and "legally required public disclosure documents filed with the SEC."  *City of Brockton Ret. Sys. v. Avon Prods., Inc.*, 2014 WL 4832321 at *12 (S.D.N.Y. Sept. 28, 2014).

natural gas liquids." (Compl. ¶¶ 25, 55.)  The Partnership's common units traded on the New York Stock Exchange.  (*Id.* ¶ 26.)  When the Partnership was able, it provided unitholders with quarterly distributions that were calculated based on the Partnership's available cash, as defined in its limited partnership agreement.  (*Id.* ¶¶ 56, 58.)  GP was AMID's general partner.  (*Id.* ¶ 28.)  ArcLight manages a portfolio of energy assets in North America; affiliates of ArcLight own and control GP.  (*Id.* ¶¶ 28-29.)  The Individual Defendants are GP's and AMID's former directors and officers.  (*See id.* ¶¶ 31-37.)

**B.     AMID's High Leverage Ratio Requires It to Adopt a New Capital Allocation Strategy.**

In the months preceding July 2018 (when the Class Period begins), MLPs faced a volatile market.  Once popular for their unique tax benefits, MLPs' tax advantage over other corporate investment vehicles shrunk with the enactment of the Tax Cuts and Jobs Act at the end of 2017.  (Ex. 1 at 18.)  This development, along with the threat of regulatory changes, "resulted in or coincided with negative investor interest in investments in MLPs in general," making it difficult for MLPs to perform at their prior levels and, consequently, to access necessary capital.  (*Id.*)

At the same time, the Partnership was facing its own challenges as well, including difficulty "access[ing] capital in the public equity markets in any material amount, or on terms reasonably acceptable to the Partnership."  (*Id.*)  The Partnership could not rely on external capital to fund its business plan and instead drew on its corporate revolver.  But this strategy was only viable in the short term:  as the Partnership's leverage rose from borrowing, it faced increasing difficulty complying with the terms of its loans and finding investors willing to agree to reasonable investment terms.  (*Id.*)  Without ready access to outside funds, the Partnership switched to a self-funded model, relying on "proceeds from the sale of non-core assets."  (*See* Compl. ¶ 95.)

3

As a result of these challenges, AMID announced a revised capital allocation strategy focused on self-funding and sustainable sources of equity in its July 2018 Press Release.  (*Id.*) Specifically, AMID disclosed that it was adopting this strategy due to "[e]quity capital market constraints for master limited partnerships" and the limited "availability of equity capital at acceptable costs and in sufficient quantities."  (Ex. 2.)  AMID's new strategy was intended to "significantly reduce leverage" and "enable the Partnership to target a long-term leverage ratio near 4-times by mid-2019."  (*Id.*; *see also* Compl. ¶ 95.)

In the July 2018 Press Release, AMID also explained that, as part of this strategy, it would be reducing its quarterly cash distribution for the second quarter of 2018.  (*See* Ex. 2; *see also* Compl. ¶ 95.)  AMID predicted that the additional "cash flow retention" from such reduction, coupled with asset sales, would permit the Partnership to reallocate its resources while reducing leverage.  (*See* Ex. 2; Compl. ¶¶ 94-95.)  AMID's unit price fell from $11.55 to $6.60 on the first day of trading following the July 2018 Press Release.  (Compl. ¶ 94.)

Unfortunately, as another symptom of the Partnership's liquidity crunch, the day after AMID announced its revised capital strategy, AMID received notice from Southcross, a midstream MLP with assets complementary to AMID's, that it was terminating its planned merger with AMID "due to the Partnership's inability to obtain financing on terms acceptable to the Partnership."  (*Id.* ¶ 108; Ex. 1 at 19.)  The termination forced AMID to pay a $17 million termination fee in the midst of its already difficult situation.  (Compl. ¶ 108.)

Nearly a month into AMID's new capital strategy, ArcLight and its affiliates purchased additional common units of the Partnership.  (*Id.* ¶ 115.)  That purchase was disclosed in a Form 4 on August 17, 2018 (*id.*), and a Schedule 13D on August 20, 2018, which stated that "no Reporting

Person has any specific plan or proposal to acquire, transfer or dispose of Units," but each Reporting Person "reserve[d] the right to change its intention" in the future. (*Id.* ¶ 118.)

### C.    ArcLight Proposes to Acquire the Partnership and Amends Its Schedule 13D.

In September 2018, given the Partnership's financial difficulties, ArcLight and its affiliates hired advisors to provide advice on their investment in the Partnership and analyze "the viability of organic growth projects, and related party or third party acquisitions, as well as the potential benefits of a sponsor take private action." (Ex. 1 at 19.)  Following this exploratory period with advisors, on September 14, 2018, an ArcLight affiliate informed the independent directors it would make a merger offer, and tendered a non-binding offer to acquire AMID's common units for $6.10 per unit on September 27.  (Compl. ¶¶ 119-121.)  AMID promptly formed a Conflicts Committee, consisting of the three independent directors, to evaluate the offer.  (*See id.* ¶ 120.)  The next day, AMID issued the September 2018 Press Release, which announced the offer's terms, together with AMID's process for evaluating the offer.  (*Id.* ¶ 123.)  On that same day, ArcLight and its affiliates filed an amended Schedule 13D, which included information about the offer.  (*Id.* ¶ 122.)

### D.    AMID Is Forced to Renegotiate Its Credit Agreement.

While the Conflicts Committee weighed ArcLight's offer, the Partnership continued to face liquidity issues, as U.S. financial and oil markets suffered significant declines. (Ex. 1 at 23.)  These and other market headwinds forced the Partnership to delay sales of non-core assets, on which AMID had been relying to reduce its leverage.  (*Id.*)  Without this source of income to pay down its debts, the Partnership faced a risk of impending default under its credit agreement, and in the fourth quarter of 2018, AMID was forced to seek relief from its lenders to avoid such a default. (*Id.*)  AMID ultimately negotiated and disclosed an amendment to the credit agreement, which increased its permissible total leverage ratio to 6.25:1.  (Ex. 3.)

But to convince the lenders to consent to this amendment, AMID had to agree to suspend its quarterly distributions until its total leverage ratio was less than 5:1.  (*Id*. at 3.)  As AMID disclosed in the December 2018 8-K, because its total leverage ratio exceeded 5:1 in the fourth quarter of 2018, AMID could not make a cash distribution.  (*Id*.)  The announcement was followed by a dip in AMID's unit price from $4.33 to $3.03.  (Compl. ¶ 130.)

### E.    AMID and ArcLight Finalize the Take-Private Transaction.

The Conflicts Committee completed its review of ArcLight's proposal and attempted to accept it on December 21, 2018.  (*Id*. ¶ 126.)  However, given the Partnership's continued difficulty accessing affordable capital and its declining unit price, ArcLight revised its offer downward in lieu of an acceptance.  (*Id*. ¶¶ 130-131.)  The Conflicts Committee met repeatedly with its financial and legal advisors and analyzed updated projections of the Partnership's value.  (*See* Ex. 1 at 24-25.)  The Conflicts Committee "saw value in the Partnership that substantially exceeded" ArcLight's offer.  (*Id*. at 26.)  It therefore sent ArcLight a series of counterproposals and successfully negotiated ArcLight up more than 15%, from $4.50 to $5.25 per unit.  (*Id*. at 24, 26-27; *see also* Compl. ¶¶ 15, 132.)  The merger closed on July 23, 2019.  (Compl. ¶ 136.)

### ARGUMENT

Plaintiffs allege that Defendants (1) conspired to artificially depress AMID's unit price to enable ArcLight to take the Partnership private on terms favorable to ArcLight, in violation of Section 10(b) and Rule 10b-5(b) (Count II); and (2) made materially false or misleading statements by not disclosing that supposed plan, in violation of Section 10(b) and Rule 10b-5(a) and (c) (Count I).  According to Plaintiffs, Defendants carried out their supposed takeover plan by way of the following three actions:  (i) reducing AMID's distribution in the second quarter of 2018 (*id.* ¶ 96); (ii) amending AMID's credit agreement in such a way that AMID could not issue a

distribution in the fourth quarter of 2018 (*id.* ¶ 129); and (iii) finalizing ArcLight's take-private transaction (*id.* ¶ 136).

As described herein, however, Defendants took fair and reasonable actions to address the Partnership's indebtedness; they did not commit securities fraud, and the Complaint should be dismissed in its entirety.  After setting out the relevant legal standard (Section I), Defendants will show that Plaintiffs have failed to plead particularized facts showing that Defendants made any misrepresentations or that the alleged misrepresentations caused Plaintiffs' supposed losses (Section II); that Plaintiffs have failed to allege that Defendants manipulated the market given that Defendants fully disclosed the supposedly manipulative acts, or that ArcLight made any misrepresentations or omissions in connection with the purported plan (Section III); that Plaintiffs have not sufficiently pled that AMID, GP, or the Individual Defendants acted with scienter (Section IV); and that Plaintiffs' Section 20(a) claim fails because they have not pled any primary violation of the securities laws (Section V).

## I.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Additionally, as described below, "[s]ecurities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

### A.    The Rule 10b-5(b) Standard

To state a Rule 10b-5(b) claim, Plaintiffs must sufficiently plead the following elements:

(1) that the defendants either made one or more misstatements of material fact, or omitted to state a material fact that the defendants had a duty to disclose (2) with scienter (3) in connection with the purchase or sale of securities; (4) that one or more plaintiffs relied upon the misstatement or omission; and (5) that such reliance was the proximate cause of a plaintiff[']s loss (loss causation).

*In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 570 (S.D.N.Y. 2014); *see also Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005).  Federal Rule of Civil Procedure 9(b) "requires that in all averments of fraud . . . , the circumstances constituting fraud or mistake shall be stated with particularity." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004).  To state fraud with particularity, Plaintiffs must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.*  In other words, the Second Circuit "has repeatedly required" that a Rule 10b-5(b) "pleading explain why the statements were fraudulent." *Id.* at 172. "[P]laintiffs must do more than simply assert that a statement is false—they must demonstrate *with specificity why that is so*." *Lululemon*, 14 F. Supp. 3d at 571.  When, as here, "a plaintiff alleges that a statement is false or misleading based on information and belief, the plaintiff must state sufficient facts to support that belief." *In re Tempur Sealy Int'l Inc. Sec. Litig.*, 2019 WL 1368787, at *6 (S.D.N.Y. Mar. 26, 2019).  In addition, the PSLRA requires Plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

## B.     The Rule 10b-5(a) and (c) Standard

To state a claim under Rule 10b-5(a) and (c), Plaintiffs must adequately "allege (1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter, (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of . . . any facility of a national securities exchange." *ATSI*, 493 F.3d at 101.  Plaintiffs must allege manipulative acts "with particularity" by stating "the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants." *Id.* at 102.  The PSLRA's "heightened standards" for alleging a strong inference of scienter apply to 10b-5(a) and (c) claims in the same manner as they do to 10b-5(b) claims. *Id.*

## II.       THE COMPLAINT DOES NOT STATE A CLAIM UNDER RULE 10b-5(b).

Plaintiffs' Rule 10b-5(b) claim fails against all Defendants for two independent reasons: *first*, Plaintiffs fail to plead any actionable omissions, and *second*, Plaintiffs fail to articulate a viable theory of loss causation.[3]

### A.       Plaintiffs' 10b-5(b) Claim Fails to Plead Actionable Misstatements or Omissions.

Plaintiffs' claim that Defendants made fraudulent misstatements and omissions should be dismissed because Plaintiffs have not pled with particularity that any of Defendants' statements were materially misleading.  Plaintiffs allege that the July 2018 Press Release, the ArcLight Schedule 13D, the September 2018 Press Release, and the December 2018 8-K were misleading because they omitted Defendants' purported plan to depress the price of AMID units in advance of taking the Partnership private.

As a threshold matter, "an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts."  *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988). A duty to disclose arises only where further disclosure is "necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading," or where the duty "derive[s] from statutes or regulations that obligate a party to speak."  *Stratte-McClure*, 776 F.3d at 100, 102.  Plaintiffs have not pled that any statute or regulation required Defendants to disclose the alleged plan.  So, their allegation of falsity turns on whether Defendants had any duty—based on what Defendants said—to disclose the supposed plan.  Plaintiffs establish no such duty.

---

[3]     Additionally, as explained below in Section IV, Plaintiffs have failed to allege that GP, the Individual Defendants, or AMID acted with scienter, which provides an independent basis for dismissal of their Rule 10b-5 claim against those Defendants.

1.      **The Complaint Fails to Allege Any Specific Misstatements or Omissions.**

The Complaint fails as a general matter because it improperly relies on "puzzle pleading"—offering lengthy block quotes, sometimes with entire paragraphs bolded and italicized, followed by a list of purportedly omitted information that does not identify specific misleading statements by Defendants. *See Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 452-53 (S.D.N.Y. 2008); *see also Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37-38 (2d Cir. 2012) (summary order).   Complaints that rely on puzzle pleading cannot satisfy the requirements of the PSLRA or Rule 9(b) because they do not "demonstrate with specificity why and how" each statement is materially false or misleading. *Rombach*, 355 F.3d at 174; *see also Boca Raton*, 506 F. App'x at 38.   Yet the Complaint relies *entirely* on puzzle pleading—baldly asserting that large block quotes from Defendants' disclosures are misleading.   (*See* Compl. ¶¶ 95, 118, 123, 128.)   Thus, in addition to the pleading deficiencies described below, Plaintiffs' failure to allege specific misleading statements alone justifies dismissal of the Complaint. *See, e.g.*, *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, 2017 WL 4049253, at *5 (S.D.N.Y. June 28, 2017).

2.      **AMID's July 2018 Press Release Did Not Contain Any Material Misstatements or Omissions.**

Plaintiffs' allegation that the July 2018 Press Release was misleading fails for four reasons.

*First*, Plaintiffs fail to allege with particularity that any fraudulent plan existed.   (*Id.* ¶¶ 97-98.)   Plaintiffs allege that the following statements in the July 2018 Press Release were misleading because they did not disclose the purported plan to drive down AMID's unit price:

- That the "reduction of [the Partnership's] common unit distribution" was "part of the revised capital allocation strategy that [was] intended to significantly reduce leverage, provide capital for strategic growth opportunities, and create long-term value."   (*Id.* ¶¶ 95, 97.)

- That "[a]s part of the revised capital allocation strategy the Partnership ha[d] determined the most prudent sources of accretive growth capital [were] proceeds from the sale of non-core

10

assets and the retention of an increased portion of operating cash flow through the reduction of its common unit distribution." (*Id.*)

- And finally, that "cash flow retention" would "enable the Partnership to reallocate capital to meaningful growth opportunities, while promoting balance sheet flexibility." (*Id*.)

But, according to Plaintiffs' own theory, the only reason the supposed plan would ever have to be disclosed is if such a plan actually existed. Plaintiffs have not sufficiently pled the plan existed.

Because Plaintiffs make their allegations "upon information and belief" (*id*. at 1),[4] they must allege with particularity, using documentary evidence or a description of the sources of their belief, that AMID's actions were not merely the actions of a partnership in the midst of a liquidity crunch, but were a plan that was intended to deceive AMID's investors. *See Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 200). But Plaintiffs offer nothing more than their say-so that a fraudulent plan existed. Without detailed factual pleadings supporting the existence of a fraudulent plan, Defendants had no duty to disclose any such plan to make the July 2018 Press Release accurate.

In *In re AXIS Capital Holdings Ltd. Securities Litigation*, this Court considered similar allegations that a defendant's statements were fraudulent because they failed to disclose an alleged scheme. 456 F. Supp. 2d 576 (S.D.N.Y. 2006). There, the plaintiffs alleged that AXIS made material misrepresentations by failing to disclose that it was engaged in "a scheme to manipulate the insurance market through improper and anticompetitive agreements." *Id.* at 581. Because the plaintiffs' securities claims were "premised on the nondisclosure of the alleged scheme," the plaintiffs needed "to allege facts which would establish such an illegal scheme." *Id*. at 585 (emphasis omitted). But the AXIS plaintiffs did not do so: they alleged "that AXIS engaged in

---

[4] Plaintiffs also claim that their allegations are "based upon the investigation conducted by and through Co-Lead Plaintiffs' attorneys." (Compl. at 1.) This does not alter the particularity requirement. *See Feasby v. Industri-Matematik Int'l Corp.*, 2003 WL 22976327, at *4 (S.D.N.Y. Dec. 19, 2003) (rejecting as "meritless" argument that allegations "based upon the investigation of counsel" need not be pled with particularity).

the 'steering' of business," but failed to provide an "explication of how the steering occurred." *Id.* Without such allegations, the "plaintiffs' bald allegations of a scheme," the Court held, were "far too conclusory to satisfy the requirements of Rule 9 and the PSLRA." *Id.* at 586.

Plaintiffs, like the plaintiffs in *AXIS*, have failed to meet their burden of alleging particularized facts showing that Defendants engaged in any undisclosed plan. They do not identify any documentary evidence (such as statements, meeting minutes, or subsequent disclosures), any personal sources for their alleged belief (such as confidential witnesses), or any other actual facts showing that Defendants orchestrated a plan by which ArcLight could buy the Partnership at low cost. *See Tempur Sealy*, 2019 WL 1368787, at *6. Moreover, the facts that Plaintiffs do allege regarding ArcLight's take-private transaction refute the existence of any such plan. As Plaintiffs allege, AMID formed an independent Conflicts Committee to evaluate ArcLight's offer (*see* Compl. ¶¶ 54, 120); hired a leading investment bank to provide an independent fairness opinion (*see id.* ¶ 132); and spent months considering and forcing multiple increases in ArcLight's offer (*see id.* ¶¶ 127, 131-132), all while subject to a duty to act in good faith (*id.* ¶ 53). In contrast, Plaintiffs' "bald allegations of a scheme," *AXIS*, 456 F. Supp. 2d at 586, rely on no particularized facts that show that Defendants actually carried out any fraudulent scheme. As such, Plaintiffs cannot carry their burden to allege fraud with particularity. This is decisive of their claim that Defendants made material misrepresentations in the July 2018 Press Release (or anywhere else) by failing to disclose the alleged scheme.

*Second*, Plaintiffs' allegation that AMID's July 2018 Press Release was misleading because it did not disclose ArcLight's true intentions fails because Plaintiffs cannot allege that the Press Release was false when AMID made it. "A violation of Section 10(b) and Rule 10b-5 premised on misstatements cannot occur unless an alleged material misstatement was false *at the*

time it was made." *Lululemon*, 14 F. Supp. at 571.  "[W]ithout *contemporaneous* falsity, there can

be no fraud." *Id.* (emphasis in original); *see also Novak*, 216 F.3d at 309 (no "fraud by hindsight").

Plaintiffs allege that AMID's July 2018 Press Release was false because ArcLight was

"planning to take the Partnership private."  (*See* Compl. ¶¶ 97, 98, 118.)  But ArcLight did not

decide to take AMID private until September 14, 2018—well after the July 2018 Press Release

was issued on July 27, 2018.  (*Id.* ¶ 119.)  Indeed, as the Complaint alleges, ArcLight merely

"*began to consider*" a take-private transaction in the spring of 2018.  (*Id.* ¶ 134.)  Plaintiffs do not

allege that ArcLight *actually decided* to take AMID private prior to the Press Release.  As such,

the Press Release cannot be false on the basis that AMID did not disclose an as-yet unformed plan

to take the Partnership private.  *See Novak*, 216 F.3d at 309.

*Third*, Plaintiffs' allegation that the July 2018 Press Release was misleading because "it

implied that ArcLight was managing the Partnership for investors over the long term"

(Compl. ¶ 97) also fails.  The Press Release never mentions ArcLight and cannot be construed to

say anything about ArcLight's intentions for managing AMID.  (Ex. 2); *see Ong v. Chipotle*

*Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 234 (S.D.N.Y. 2018) (dismissing claims where "the

alleged misstatement . . . [was] far too attenuated from the alleged omission").

*Fourth*, Plaintiffs have not demonstrated that the statements in the Press Release

misrepresented AMID's allegedly "dire" financial situation.  (Compl. ¶ 99.)  The Press Release

plainly and specifically informed investors of the financial issues the Partnership was facing and

laid out a plan for the Partnership's continued growth.  It explained that the new capital allocation

strategy was prudent in light of "[e]quity capital market constraints for master limited partnerships

and the availability of equity capital at acceptable costs and in sufficient quantities."  (Ex. 2.)

Indeed, in the years leading up to the July 2018 Press Release, the Alerian MLP Index, a leading

gauge of energy MLPs, had declined by 44% (Ex. 1 at 18), and the Press Release noted that the new strategy was targeted at earning "an improved credit rating, which would further reduce borrowing costs" (Ex. 2). Plaintiffs have not alleged specific facts that contradict the Partnership's truthful representations that its access to credit at acceptable costs was dwindling.

### 3. ArcLight's Schedule 13D Did Not Contain Any Material Misstatements or Omissions.

Plaintiffs next allege that ArcLight's Schedule 13D, which disclosed that ArcLight and its affiliates had acquired additional AMID common units, was misleading because ArcLight did not disclose that AMID cut its distribution supposedly to advance a plan to take AMID private. (Compl. ¶ 117; *see id.* ¶ 118 & n.24.) These allegations fail for the same reasons addressed in Section II.A.2—the Complaint contains no particularized allegation of any such plan. The allegations also fail because Plaintiffs have not alleged that the Schedule 13D was false when filed or that Defendants breached their limited disclosure duty.

*First*, as with their allegations concerning AMID's July 2018 Press Release, Plaintiffs have failed to allege that ArcLight's Schedule 13D was contemporaneously false. Plaintiffs allege that ArcLight's Schedule 13D was misleading because it "disclaimed any specific plans and instead spoke in vague boilerplate generalities." (*See* Ex. 4; Compl. ¶ 118.) But there is no actual factual allegation supporting their conclusive claim that when ArcLight filed the Schedule 13D on August 20, 2018, it had a plan to take the Partnership private. Per the Complaint, ArcLight "began to consider" a merger in the spring of 2018 (Compl. ¶ 134), but it did not notify the independent directors that it would submit a bid until September 14, 2018 (*id.* ¶ 119). As such, the allegations fail to plead that ArcLight's Schedule 13D—filed a month before that bid—was false because it did not disclose ArcLight's unformed plan to take AMID private. *See Lululemon*, 14 F. Supp. 3d at 571 ("[W]ithout *contemporaneous* falsity, there can be no fraud." (emphasis in original)).

14

*Second*, Plaintiffs' allegations that ArcLight "had an obligation to disclose" its plans to acquire AMID (Compl. ¶ 117) fail because they misstate the disclosure obligations Section 13(d) imposes.  The alleged omission in Schedule 13D was actionable only to the extent that Section 13(d) required its disclosure.  *See Amida Capital Mgmt. II, LLC v. Cerberus Capital Mgmt., L.P.*, 669 F. Supp. 2d 430, 438 (S.D.N.Y. 2009).  And "a 13D filer must only disclose any 'definite' or 'fixed' plans regarding an issuer" and "need not disclose 'tentative' or 'inchoate' plans, or make predictions about future behavior."  *Id.* at 440.

Plaintiffs allege only that ArcLight "was intending to[] and had discussed its plans to acquire AMID."  (Compl. ¶ 117.)  These allegations describe precisely the type of "preliminary" or "tentative" plan that "need not be disclosed" in a Schedule 13D.  *Azurite Corp. v. Amster & Co.*, 52 F.3d 15, 19 (2d Cir. 1995) (finding Schedule 13D was not misleading where discussions regarding proxy battle were preliminary); *see also Vladimir v. Bioenvision Inc.*, 606 F. Supp. 2d 473, 495 (S.D.N.Y. 2009).  Indeed, when the plans did become sufficiently definite, ArcLight and its affiliates promptly filed an amendment to the Schedule 13D disclosing the September offer. (Compl. ¶ 122.); *see also Amida*, 669 F. Supp. 2d at 440 ("An amendment was required only when the filer formed a definite plan to undertake a proxy contest.").

### 4.    AMID's September 2018 Press Release Did Not Contain Any Material Misstatements or Omissions.

Plaintiffs also allege that AMID made misleading statements in the September 2018 Press Release announcing that an ArcLight affiliate had made a bid to purchase AMID.  (Compl. ¶ 123.) The September 2018 Press Release described the terms of the offer, including that ArcLight had offered $6.10 per common unit, and briefly explained the vetting process for the proposal.  (*See id.*) Plaintiffs allege that the September 2018 Press Release was misleading because it (1) failed to disclose Defendants' supposed plan; (2) did not disclose that ArcLight had been considering a

take-private acquisition since the spring of 2018; and (3) inaccurately described ArcLight's offer as "unsolicited." (*Id.* ¶ 124.) Plaintiffs' allegation that the September 2018 Press Release was misleading because it failed to disclose Defendants' alleged plan fails for the reasons articulated in Section II.A.2, and their remaining allegations fail too.

*First*, Plaintiffs cannot establish that AMID had a duty to disclose in the September 2018 Press Release that ArcLight had "been considering acquiring AMID since spring of 2018." (*See id.*) In a two-paragraph release announcing the proposed terms of the merger and the process for reviewing the proposal, AMID had no duty to disclose *when* ArcLight began considering a merger (indeed, Plaintiffs have not alleged that AMID even knew when ArcLight began considering a merger). *See Basic*, 485 U.S. at 239 & n.17 ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."); *see also Tempur Sealy*, 2019 WL 1368787, at *12 (no obligation to disclose "all facts that would be interesting in light of and in relation to a disclosed fact"). The timeline of ArcLight's consideration is simply not relevant to the basic terms of the offer.

*Second*, AMID's description of the offer as "unsolicited" was not misleading. Plaintiffs claim that because "ArcLight controlled the GP," "the very party making the offer is also the party to whom the offer was effectively made." (Compl. ¶ 124.) This is nonsense. Investors were fully informed as to AMID's ownership structure; clearly, no one was misled by AMID calling the offer "unsolicited." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 577 (S.D.N.Y. 2013) ("Where allegedly undisclosed material information is in fact readily accessible in the public domain, a defendant may not be held liable for failing to disclose this information."). And in fact, the offer was "not asked for or requested"—which is the dictionary definition of the word "unsolicited," *Unsolicited*, Merriam-Webster (last accessed Apr. 8, 2020)—and Plaintiffs do not

16

allege otherwise.  As such, they do not allege facts supporting their contention that the offer was solicited, and their claims fail.  *See Tempur Sealy*, 2019 WL 1368787, at *12 (dismissing claim when plaintiffs "failed to plead sufficiently the very *existence* of the alleged omitted facts").

      **5.**      **AMID's December 2018 8-K Did Not Contain Any Material Misstatements or Omissions.**

Finally, Plaintiffs challenge AMID's December 2018 8-K statement that "the Partnership is not permitted to declare or pay any cash distributions until its Consolidated Total Leverage Ratio is reduced to less than 5.00:1.00 . . . .  Therefore, the Partnership does not expect to make any cash distributions on its common units or preferred units with respect to the fourth quarter of 2018." (Compl. ¶¶ 128-129.)  Plaintiffs allege this was misleading because it did not disclose that the distribution cut was part of a supposedly fraudulent plan.  (*Id.* ¶ 129.)  As explained in Section II.A.2, because Plaintiffs do not adequately plead the existence of any plan, these allegations fail.

    **B.**      **Plaintiffs Fail to Plead Loss Causation as to Their Rule 10b-5(b) Claim.**

Plaintiffs also fail to plead a viable theory of loss causation for their Rule 10b-5(b) claim, and Count I against all Defendants can be dismissed on this independent basis.  "Loss causation . . . is the proximate causal link between the alleged misconduct and the plaintiff's economic harm." *ATSI*, 493 F.3d at 106.  "[A] plaintiff must allege that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell*, 396 F.3d at 173 (emphasis in original).  Plaintiffs may do so by alleging either that (1) "the market reacted negatively to a corrective disclosure regarding the falsity of" a misstatement or omission, *id.* at 175; or (2) "the caused loss was within the zone of risk concealed by the representations and omissions," *id.* at 173 (emphasis omitted); *see also Salvani v. ADVFN PLC*,

50 F. Supp. 3d 459, 474 (S.D.N.Y. 2014).  Further, Plaintiffs must allege "a *direct* connection" between their losses and Defendants' alleged omissions.  *See Salvani*, 50 F. Supp. 3d at 475; *Lululemon*, 14 F. Supp. 3d at 575.

Nowhere do Plaintiffs allege that the market reacted negatively to a corrective disclosure revealing any purportedly omitted facts.  Accordingly, Plaintiffs must allege that their supposed "loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement."  *See, e.g.*, *Wilamowsky v. Take-Two Interactive Software, Inc.*, 818 F. Supp. 2d 744, 751 (S.D.N.Y. 2011).  Plaintiffs allege Defendants' supposed fraud was their failure to disclose earlier ArcLight's purported intention to take AMID private.  (*See* Compl. ¶¶ 97-98, 117-118, 124, 129.)  The "risk" this purported omission concealed was, of course, that ArcLight would acquire AMID.  But Plaintiffs have not alleged that the acquisition caused their losses—indeed, there was *no* decline in unit price when the offers or deal were announced.  (*See id.* ¶ 16 (unit price chart).)

So Plaintiffs must resort to a different, and far more tortured, theory.  Plaintiffs allege that their loss was caused by the announcement of the 2018 distribution cuts (in the July 2018 and September 2018 Press Releases).  (*See id.* ¶¶ 94, 111, 130.)  But Plaintiffs cannot *directly* tie their losses resulting from those cuts to the fraud that they actually allege.  *Salvani*, 50 F. Supp. 3d at 475 ("The materialization of risk theory . . . requires a direct connection between the risk that is hidden from investors and the subsequent loss suffered by those investors.").  Rather, Plaintiffs can cobble together only an implausible theory of *indirect* loss.  Plaintiffs' theory appears to be that, if Defendants had disclosed that ArcLight's intent to acquire AMID was the true rationale for the distribution cuts, then the Partnership's decision to reduce distributions "would have been subject to approval by AMID's Conflicts Committee, as such a proposal . . . would have been a conflicted transaction."  (*Id.* ¶¶ 96 n.17, 149.)  The omission of that "fact," the theory goes, enabled

the Partnership to cut distributions without the Conflicts Committee's review, which drove down the unit price and caused their purported losses.  (*See id.*)  Of course, Plaintiffs point to no facts showing that the distribution cuts were motivated by a potential future acquisition of AMID.  (*See* Section II.A.2.)  But even if they had pled such facts, their theory would still fail because it would at most allege an indirect connection between the alleged misstatements and Plaintiffs' losses.

Plaintiffs' theory would require this Court to impermissibly connect a "number of dots"—including that the Conflicts Committee needed to review the cuts and would not have approved them—to link their losses to Defendants' omissions.  *Lululemon*, 14 F. Supp. 3d at 587.  This attenuated chain fails to state "a direct connection between the risk that is hidden from investors and the subsequent loss suffered by those investors."  *Salvani*, 50 F. Supp. 3d at 475.  Plaintiffs have not alleged a direct connection, and this Court should reject their Rule 10b-5(b) claim.[5]

## III.   THE COMPLAINT DOES NOT STATE A CLAIM UNDER RULE 10b-5(a) OR (c).

Plaintiffs' Rule 10b-5(a) and (c) claims fail because Plaintiffs do not sufficiently plead a manipulative act.  Plaintiffs' claims fail against ArcLight in particular for the added reason that Plaintiffs do not plead that ArcLight made any representation regarding the alleged manipulation.

### A.     Plaintiffs Fail to Sufficiently Plead a Manipulative Act.

To state a claim under Rule 10b-5(a) and (c), Plaintiffs must allege that Defendants engaged in "manipulative acts."  *ATSI*, 493 F.3d at 101.  Generally, an act is manipulative if the "transaction sends a false pricing signal to the market."  *Wilson v. Merrill Lynch & Co.*, 671 F.3d

---

[5]   Plaintiffs' allegation that Defendants' alleged misstatements and omissions "depressed teh [sic] price of AMID CUs, resulting in loss" (Compl. ¶ 146) is also insufficient to establish loss causation.  The Second Circuit has rejected allegations that misstatements "induced a disparity between the transaction price and the true 'investment quality'" of securities.  *Lentell*, 396 F.3d at 175; *see also Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).

120, 130 (2d Cir. 2011).  Therefore, "[i]n order for market activity to be manipulative, that conduct must involve [a] misrepresentation or nondisclosure" because "the market is not misled when a transaction's terms are fully disclosed."  *Id.*

Plaintiffs here must identify a misrepresentation or nondisclosure regarding Defendants' alleged manipulative acts (cutting distributions in the second and fourth quarters of 2018).  (*See* Compl. ¶¶ 96, 129).  Plaintiffs, however, concede that Defendants disclosed the distribution cuts (*see id.* ¶¶ 95, 128), and claim that Defendants made misrepresentations by "falsely explain[ing]" and "omit[ting]" the "true reason for the distribution cut[s]," which was purportedly to further the fraudulent scheme.  (*Id.* ¶¶ 170-171.)  But this claim—that "[D]efendants did not disclose to the market the[] [acts'] 'true purpose'"—is merely an allegation that "defendants' conduct was manipulative because they did not tell [unit]holders that their conduct was manipulative."  *See Brady v. Top Ships Inc.*, 2019 WL 3553999, at *8 (E.D.N.Y. Aug. 5, 2019), *aff'd sub nom. Onel v. Top Ships*, *Inc.*, 2020 WL 1608523 (2d Cir. Apr. 2, 2020) (summary order).  This "circular reasoning"—again, simply that Defendants' "failure to disclose at the outset that they were undertaking a manipulative scheme transformed their transactions into a manipulative scheme"—is "fatally conclusory," and fails at the pleadings stage.  *See Onel*, 2020 WL 1608523, at *3.

### B.      Plaintiffs Fail to Plead That ArcLight Made Any Representations.

Plaintiffs' Rule 10b-5(a) and (c) manipulation claims against ArcLight are also untenable because Plaintiffs do not allege that ArcLight made any representations in connection with the alleged manipulation.  For this independent reason, Count II against ArcLight should be dismissed.

As discussed, "for market activity to be manipulative," the Second Circuit requires that the "conduct . . . involve misrepresentation or nondisclosure."  *Wilson*, 671 F.3d at 130; *see also Fezzani v. Bear, Stearns & Co.*, 716 F.3d 18, 25 (2d Cir. 2013) ("[M]anipulation violates Section 10(b) when an artificial or phony price of a security is communicated to persons who, in

20

reliance upon a misrepresentation that the price was set by market forces, purchase the securities."). "[A] plaintiff must allege that the specific defendant was identified as making the pertinent misrepresentation(s)." *Fezzani*, 716 F.3d at 24. "[T]he maker of a statement is the entity with the authority over the content of the statement and whether and how to communicate it." *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142-43 (2011). Thus, "*only the person who communicates the misrepresentation* is liable in private actions under Section 10(b)." *Fezzani*, 716 F.3d at 25. "[S]econdary actors," like ArcLight, "can be liable in a private action under Rule 10b-5 for only those statements that are explicitly attributed to them." *Pac. Inv. Mgmt. Co. v. Mayer Brown LLP*, 603 F.3d 144, 155 (2d Cir. 2010). Under Rule 10b-5(a) and (c), Plaintiffs therefore must allege that ArcLight communicated the purportedly artificial price of the security to investors. But Plaintiffs have not alleged—because they cannot—that ArcLight communicated *anything* about AMID's unit price. ArcLight therefore has no primary liability under Rule 10b-5(a) or (c). Count II against ArcLight must be dismissed.

## IV.  PLAINTIFFS' RULE 10b-5 CLAIMS ALL FAIL TO SUFFICIENTLY PLEAD SCIENTER BY GP, THE INDIVIDUAL DEFENDANTS, OR AMID AND SO SHOULD BE DISMISSED AS TO THOSE DEFENDANTS.

Plaintiffs fail to "state with particularity facts giving rise to a strong inference" that GP, the Individual Defendants, or AMID acted with scienter, and Counts I and II against those Defendants should be dismissed. *See Tellabs*, 551 U.S. at 324. Plaintiffs must allege facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99.

Where a complaint is brought against multiple defendants, it "must state with particularity facts giving rise to a strong inference that *each defendant* acted with scienter." *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *9 (S.D.N.Y. Sept. 28, 2012). Plaintiffs rely on two theories to attempt to plead scienter as to each Defendant. *First*, they allege that ArcLight had the motive and

opportunity to defraud AMID's investors and that ArcLight's scienter can be imputed to GP and the Individual Defendants.  (*See* Compl. ¶¶ 139-141.)  *Second*, they allege that, because Revers served on ArcLight's investment committee, he "knew of ArcLight's interest in acquiring AMID"; therefore, Plaintiffs claim, ArcLight's "interests were known to AMID."  (*See id*. ¶¶ 135, 143.) Plaintiffs then claim that Revers's alleged scienter can therefore be imputed to AMID.  (*Id.* ¶ 138.)

## A.   Plaintiffs Cannot Impute ArcLight's Alleged Scienter to GP.

Plaintiffs allege that GP shared ArcLight's scienter "because it operated under the complete control of ArcLight, due to being an (indirect) wholly-owned subsidiary of ArcLight, and due to the fact that a majority of the Board was appointed through their connections to ArcLight." [6]  (*Id.* ¶ 140.)  But the Second Circuit has held that "whether [an affiliate] defrauded plaintiffs and whether its parent . . . defrauded plaintiffs are different questions."  *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996).  Indeed, "a parent-subsidiary relationship is not on its own sufficient to impute the scienter of the subsidiary to the parent or affiliate."  *Valenti v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 317 (S.D.N.Y. 2011).  "Rather, a plaintiff must demonstrate that the parent or affiliate possessed some degree of control over, or awareness about, *the fraud*."  *Youngers v. Virtus Inv. Partners Inc.*, 2017 WL 5991800, at *5 (S.D.N.Y. Dec. 4, 2017) (emphasis in original).

This Court has rejected attempts to plead that an affiliate's control over a corporation imputes one affiliate's scienter to another.  In *Youngers*, for example, the plaintiff alleged that a subsidiary "shared several of the same officers and directors as [the parent] and that [the parent] exercised complete control over [the subsidiary]."  *Id*.  The court held that these allegations were

---

[6]   Plaintiffs incorrectly allege that GP was "an (indirect) wholly-owned subsidiary of ArcLight." (Compl. ¶ 140.)  As Plaintiffs allege earlier in the Complaint, GP is not owned by ArcLight but is owned in large part by "entities that are affiliated . . . with ArcLight."  (*Id.* ¶ 29.)

insufficient because the plaintiffs were "required" to allege the parent's "involvement, knowledge, or control over" the alleged *fraud*—but had merely alleged control over the company. *Id.*

Likewise here, while Plaintiffs have alleged that GP "operated under the complete control of ArcLight," they have not alleged *how* ArcLight exercised that control to cause GP to commit any *fraud*. (Compl. ¶ 140.) Absent from the Complaint are any allegations of any kind regarding, for example, how ArcLight coordinated with or influenced GP to commit the alleged fraud. Plaintiffs likewise do not provide any corporate insider testimony suggesting that ArcLight exerted pressure on GP to reduce distributions. Nor do they point to documentary evidence showing ArcLight informed GP of its intentions to take the Partnership private prior to ArcLight informing the independent directors of its offer. *See Youngers*, 2017 WL 5991800, at *5 (requiring "allegations concerning [the parent's] *involvement, knowledge, or control*" over fraud). Without particularized facts, Plaintiffs' allegations that ArcLight "exercised complete control" over GP are insufficient to impute ArcLight's scienter to GP. *See id.*

### B. Plaintiffs Cannot Impute ArcLight's Alleged Scienter to the Individual Defendants.

Plaintiffs allege the Individual Defendants "had the same motive as ArcLight" because they served on GP's board due to their "connection[s]" to ArcLight and they served "at the discretion of ArcLight," such that they "shared ArcLight's motivations."[7] (Compl. ¶ 141.) As an initial matter, Plaintiffs have not made specific allegations of scienter as to each Individual Defendant, and their reliance on the group-pleading doctrine is alone grounds for dismissal as to the Individual Defendants. *See In re CRM Holdings, Ltd. Sec. Litig.*, 2012 WL 1646888, at *30 (S.D.N.Y. May 10, 2012) (scienter "cannot be satisfied through group pleading"). Moreover,

---

[7] As a threshold matter, this claim cannot apply to Kalamaras because Plaintiffs do not allege that he was a board member of GP or that he had ties to ArcLight. (*See* Compl. ¶ 34.)

Plaintiffs "must allege that the defendants benefitted in some concrete and personal way from the purported fraud." *Schwab v. E\*TRADE Fin. Corp.*, 258 F. Supp. 3d 418, 431 (S.D.N.Y. 2017).

Plaintiffs allege in general terms that "it can be inferred that the Individual Defendants stood to gain personally through accomplishing ArcLight's goals." (Compl. ¶ 141.) But the Second Circuit has rejected this theory: "If motive could be pleaded by alleging the defendant's desire for continued employment . . . the required showing of motive and opportunity would be no realistic check on aspersions of fraud . . . ." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994). "[M]otives possessed by virtually all corporate insiders," such as "the desire to . . . prolong the benefits of holding corporate office," are not "concrete and personal" benefits. *Novak*, 216 F.3d at 307-08; *Shields*, 25 F.3d at 1130. Plaintiffs' allegations as to the Individual Defendants' motives are squarely in this category.

Additionally, all the Individual Defendants owned common units of AMID. (Ex. 6 at 117.) They therefore had no motive to participate in an effort to depress AMID's unit price. *See Shields*, 25 F.3d at 1131 (as to scienter, "we assume that the defendant is acting in his or her informed economic self-interest.").

**C.     Revers's Alleged Knowledge of ArcLight's Take-Private Intentions Does Not Raise a Strong Inference of Scienter as to Revers or AMID.**

Plaintiffs also cannot establish that Revers—and therefore AMID—acted with scienter by alleging that Revers was "a member of ArcLight's investment committee" and thus knew that ArcLight was considering taking AMID private. (*See* Compl. ¶¶ 6, 93, 135, 143.) "[T]o establish an inference of scienter, Plaintiff must do more than allege that the Individual Defendants had or should have had knowledge of certain facts . . . *simply by virtue of their high-level positions*." *Liptow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2016). But Plaintiffs have

failed to identify anything more than Revers's corporate position, and they cannot establish that Revers, and by extension AMID, acted with scienter.

Moreover, Revers's alleged knowledge that ArcLight was considering taking AMID private is *not* knowledge that ArcLight would purportedly engage in *fraud* to take AMID private. In *City of Brockton Retirement System v. Avon Products, Inc.*, this Court rejected similar allegations that a corporate executive was aware of circumstances suggesting fraud and therefore acted with scienter. 2014 WL 4832321, at *20-21 (S.D.N.Y. Sept. 28, 2014). There, the Court held that plaintiffs fell short of stating that a defendant was actually aware of a fraud by alleging the defendant "knew" of the fraud due to the defendant's corporate position and the fact that her reporting executives had achieved results that could suggest fraud. *See id.* at *19-20. The plaintiffs there failed to "plead facts sufficient to demonstrate that [the defendant] became aware" of the *fraud*. *Id.* Plaintiffs' allegations are similarly insufficient; at best, the Complaint alleges Revers was aware that ArcLight was considering taking AMID private, but it does not allege Revers was aware that ArcLight was considering taking AMID private allegedly *by fraud*. And, without establishing Revers acted with scienter, Plaintiffs cannot impute Revers's scienter to AMID.

## V.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 20(a).

Because Plaintiffs have failed to state a claim for a primary violation of Section 10(b), its Section 20(a) claim should also be dismissed. *See, e.g.*, *ATSI*, 493 F.3d at 108.

## <u>CONCLUSION</u>

Defendants respectfully request this Court dismiss the Complaint in full, with prejudice.

Dated:  New York, New York
        April 20, 2020

Respectfully submitted,

  /s/ Sandra C. Goldstein
Sandra C. Goldstein, P.C.
Stefan Atkinson, P.C.
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York  10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
sandra.goldstein@kirkland.com
stefan.atkinson@kirkland.com

*Counsel for Defendants*