**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| PAUL C. KRAFT and LINDA E. KRAFT JTWROS and RANDALL DOBLER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>THIRD COAST MIDSTREAM, LLC F/K/A/ AMERICAN MIDSTREAM PARTNERS, LP, AMERICAN MIDSTREAM GP, LLC, ARCLIGHT CAPITAL PARTNERS, LLC STEPHEN W. BERGSTROM, LYNN L. BOURDON III, JOHN F. ERHARD, ERIC T. KALAMARAS, DANIEL R. REVERS, JOSEPH W. SUTTON, AND LUCIUS H. TAYLOR<br><br>Defendants. | Case No. 1:19-cv-09398-LJL<br><br>ORAL ARGUMENT REQUESTED |

**LEAD PLAINTIFFS' OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................................................... ii

I.      INTRODUCTION ......................................................................................................... 1

II.     SUMMARY OF FACTUAL BACKGROUND ........................................................... 2

III.    LEGAL STANDARDS FOR ANALYZING ALLEGATIONS & INFERENCES ........... 4

IV.     DEFENDANTS' WRONGDOING ................................................................................ 4

        A.      The Actionable Scheme – Rule 10b-5(a)/(c) ........................................... 4

                1.      The Allegation of Defendants' Scheme is Highly Plausible ...................... 5

                2.      Defendants' Competing Inference is Implausible ...................................... 6

                        (a)     The First Cut Conflicts with AMID's Business Model .................. 6

                        (b)     The Liquidity Crisis is a Retroactive Fabrication .......................... 7

                        (c)     The SXE Merger Undermines Defendants' Explanation ............... 9

                                (i)     The Undisputed Facts About the SXE Merger .................... 9

                                (ii)    Analysis of the Cut and the SXE Merger ......................... 11

                3.      Defendants' Scheme Violates Rule 10b-5(a)/(c) ...................................... 13

                4.      ArcLight is Liable for the Fraudulent Scheme ........................................ 15

        B.      THE AC STRONGLY ALLEGES VIOLATIONS OF RULE 10b-5(b) ............. 15

                1.      July 27, 2018 – The First Cut........................................................ 16

                2.      August 20, 2018 – ArcLight Discloses Its AMID Unit Purchases ........... 18

                3.      September 28, 2018 – Deal Announcement ............................................ 20

                4.      December 31, 2018 – The Second Cut .................................................... 20

V.      THE AC STRONGLY ALLEGES SCIENTER ................................................................ 21

VI.     THE AC STRONGLY ALLEGES LOSS CAUSATION .............................................. 23

VII.    SECTION 20(a) CLAIMS ................................................................................................ 25

VIII.   CONCLUSION.................................................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amida Cap. Mgmt. II, LLC v. Cerberus Cap. Mgmt.,*
669 F. Supp. 2d 430 (S.D.N.Y. 2009)........................................................................................19

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
493 F.3d 87 (2d Cir. 2007)................................................................................................4, 13, 14

*In re Avon Sec. Litig.,*
2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019)...........................................................................21

*Azurite Corp. v. Amster & Co.,*
52 F.3d 15 (2d Cir. 1995)...........................................................................................................19

*In re Banco Bradesco S.A. Sec. Litig.,*
277 F. Supp. 3d 600, 667 (S.D.N.Y. 2017)...............................................................................23

*In re Braskem S.A. Sec. Litig.,*
246 F.Supp.3d 731, 764-65 (S.D.N.Y. 2017) ...........................................................................22

*Buxbaum v. Deutsche Bank A.G.,*
2000 WL 33912712 (S.D.N.Y. Mar. 7, 2000) ...........................................................................22

*Caiola v. Citibank, N.A.,*
295 F.3d 312 (2d Cir. 2002)......................................................................................................16

*Cochran v. Channing Corp.,*
211 F.Supp. 239 (S.D.N.Y. 1962) .........................................................................................5, 13

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.,*
2020 WL 248729 (S.D.N.Y. Jan. 15, 2020) .............................................................................16

*In re Dole Food Co., Inc. S'holder Litig.,*
2015 WL 5052214 (Del. Ch. Aug. 27, 2015) ..............................................................................5

*Dura Pharm., Inc. v. Broudo,*
544 U.S. 336 (2005).............................................................................................................24, 25

*In re EVCI Colls. Holding Corp. Sec. Litig.,*
469 F. Supp. 2d 88 (S.D.N.Y. 2006)............................................................................................4

*In re Fairway Grp. Holding Corp. Sec. Litig.*,
2015 WL 249508 (S.D.N.Y. Jan. 20, 2015) ...................................................................23

*Fezzani v. Bear, Stearns & Co.*,
716 F.3d 18 (2d Cir. 2013)..........................................................................................15

*Finn v. Smith Barney*,
471 F. App'x 30 (2d Cir. 2012) .................................................................................8, 12

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F.Supp.2d 171 (S.D.N.Y. 2010).............................................................................1

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000).........................................................................................6

*Giunta v. Dingman*,
893 F.3d 73 (2d Cir. 2018)...........................................................................................4

*In re Glob. Crossing, Ltd. Sec. Litig.*,
322 F. Supp. 2d 319 (S.D.N.Y. 2004)......................................................................14, 15

*Greenapple v. Detroit Edison Co.*,
618 F.2d 198 (2d Cir. 1980)........................................................................................18

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
2013 WL 1223844 (S.D.N.Y. Mar. 27, 2013) ..............................................................14

*Kirschner v. KPMG LLP*,
938 N.E.2d 941 (N.Y. 2010).......................................................................................15

*Knipe v. Skinner*,
999 F.2d 708 (2d Cir. 1993)...............................................................................9, 10, 23

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015).....................................................................................23, 25

*Lorenzo v. S.E.C.,*,
139 S. Ct. 1094 (2019).............................................................................................14, 15

*Maverick Fund L.D.C. v. Comverse Tech., Inc.*,
801 F. Supp. 2d 41 (E.D.N.Y. 2011) .............................................................................6

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
900 F.2d 576 (2d Cir. 1990)................................................................................18, 19, 20

*Mut. Shares Corp. v. Genesco, Inc.*,
384 F.2d 540 (2d Cir. 1967)................................................................................. *passim*

iii

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)......................................................................................21, 23

*O'Neill v. Maytag*,
339 F.2d 764 (2d Cir. 1964).............................................................................................13

*Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012).................................................................................4

*S.E.C. v. Goldman Sachs & Co.*,
790 F.Supp.2d 147 (S.D.N.Y. 2011)................................................................................17

*S.E.C. v. Life Partners Holdings, Inc.*,
41 F. Supp. 3d 550, 561 (W.D. Tex. 2013).......................................................................5

*Santa Fe Indus., Inc. v. Green*,
430 U.S. 462 (1977)..........................................................................................................1

*Sapirstein-Stone-Weiss Foundation v. Merkin*,
950 F.Supp.2d 621 (S.D.N.Y. 2013)................................................................................17

*SEC v. China Ne*,
27 F. Supp. 3d 379, 392 (S.D.N.Y. 2014) .................................................................. 14-15

*SEC v. Saltsman*,
2016 WL 4136829 (E.D.N.Y. Aug. 2, 2016).....................................................................17

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
417 F. Supp. 3d 379, 415 (S.D.N.Y. 2019)......................................................................25

*Solow v. Citigroup, Inc.*,
827 F.Supp.2d 280 (S.D.N.Y. 2011)................................................................................22

*Speakes v. Taro Pharm. Indus., Ltd.*,
2018 WL 4572987 (S.D.N.Y. Sept. 24, 2018)............................................................23, 24

*Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank*,
250 F.3d 87 (2d Cir. 2001).................................................................................................1

*Szulik v. Tagliaferri*,
966 F. Supp. 2d 339 (S.D.N.Y. 2013)...........................................................................5, 12

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
531 F.3d 190 (2d Cir. 2008)............................................................................................21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)...........................................................................................................4

iv

*In re Time Warner Inc. Sec. Litig.*,
  9 F.3d 259 (2d Cir. 1993).................................................................................................17

*United States v. Bongiorno*,
  2006 WL 1140864 (S.D.N.Y. May 1, 2006) ...................................................................5

*United States v. Kelley*,
  551 F.3d 171 (2d Cir. 2009)........................................................................................5, 12

*Vladimir v. Bioenvision Inc.*,
  606 F. Supp. 2d 473 (S.D.N.Y. 2009).............................................................................19

**Other Authorities**

DISCLOSURE AND REMEDIES UNDER THE SECURITIES LAWS, §§ 20:7, 20:53 (Mar.
  2020 ed.) .........................................................................................................................24

Rule 10b-5(a)/(c)...........................................................................................................4, 13

Rule 10b-5(b) ............................................................................................................15, 16, 23

Co-Lead Plaintiffs Paul C. Kraft and Linda E. Kraft JTWORS and Randall Dobler ("Co-Lead Plaintiffs"), file this opposition to Defendants' motion to dismiss.[1]  ECF Nos. 45-47.

## I.    INTRODUCTION

AMID was a limited partnership ("MLP") in the midstream oil business with publicly listed units.  Defendants defrauded investors as part of a scheme wherein the owner of AMID's general partner, ArcLight, bought AMID from Plaintiffs and the Class on the cheap.

Defendants claim this action merely alleges "disagreements over management decisions." MtD 1.  This badly misconstrues the claims, which allege that Defendants cut AMID's distribution to manipulate its price down, lied about the reasons for the distribution cuts, and hid ArcLight's plans to buy AMID.  Such conduct violates the securities laws.[2]  This is a modern take on an old scheme that the Second Circuit has explicitly held to violate federal securities law:

> [D]efendants manipulated the market price of [the issuer's] stock, keeping [its] dividends to a minimum, in order to force minority stockholders to sell out to [defendant] at depressed values. . . .  In *Cochran v. Channing Corp.*, 211 F.Supp. 239 (S.D.N.Y. 1962), it was held that manipulation of market price and purposeful reduction of dividends in order to buy out minority stockholders cheaply was actionable under Rule 10b-5. . . .  [D]eception may take the form of nonverbal acts: In *Cochran* . . . it consisted of reducing dividends in order to drive down the price of the corporation's stock.  And it need not be deception in any restricted common law sense; one of the central purposes of federal securities legislation would otherwise be seriously vitiated. . . .  **The complaint alleges a manipulative scheme**.

*Mut. Shares Corp. v. Genesco, Inc.*, 384 F.2d 540, 546 (2d Cir. 1967) (emphasis added).

---

[1] The motion to dismiss brief ("Motion") is cited as "MtD __."  ECF No. 46.  The Amended Complaint ("AC"), ECF No. 32, is cited as "¶_."  Terms are defined as in the AC.

[2] The Second Circuit has held that "deception" about mismanagement is actionable and that finding otherwise "misinterprets" the holding in *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462 (1977), which merely found that pleading mismanagement alone does not violate federal securities laws.  *Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank,* 250 F.3d 87, 99 (2d Cir. 2001); *see also Freudenberg v. E\*Trade Fin. Corp.*, 712 F.Supp.2d 171, 192 (S.D.N.Y. 2010) ("[W]here the conduct involves deception related to the mismanagement—and not mismanagement alone—the claims are actionable.") (citation omitted).

## II.    SUMMARY OF FACTUAL BACKGROUND

ArcLight ran and controlled AMID, many of the Individual Defendants were appointed to AMID's Board in connection with their affiliation to ArcLight, and several were senior ArcLight employees.[3]    Plaintiffs, like most investors in MLPs, are retirees who purchased AMID because of the distribution, which they depended on as retirement income.  ¶¶23-24, 61.  Defendants knew this and referred to AMID's units as "yield-oriented securities."  ¶56.  AMID's partnership agreement reflected this by setting a "minimum quarterly distribution" mandating that AMID distribute "all" available cash.  ¶¶55-63.  This policy could "not be modified" without amending the partnership agreement, even though the mandatory distribution could "significantly impair [AMID's] ability to grow."  *Id.*  This was the investment AMID's unit holders signed up for.

AMID was healthy and posted strong results.  In Defendants' words, AMID's 4Q17 and 1Q18 results were, respectively, "***unprecedented***" and "***record setting***."  ¶¶64-83.  But in the Spring of 2018, ArcLight became interested in and began discussing a "take private transaction" to buy AMID.  ¶134.  As acquirer, ArcLight was motivated to secure a cheap buyout.  ¶¶139-41.

However, AMID was already committed to a major merger to acquire an industry rival, Southcross ("SXE"), which deal was announced well before ArcLight became interested in acquiring AMID.  ¶¶38-40.  One of the customary closing conditions for this deal, required the refinancing of Southcross' debt, but as AMID's management explained, this was not an onerous task, as it could be completed with "a variety of mechanisms . . .  on a short-term or bridge basis."  ¶¶44-48, 81.  Despite this, Defendants knew that closing this merger would significantly dilute ArcLight's control over AMID and make it far more difficult for ArcLight to acquire the

---

[3] Defendant Erhard is a partner at and employee of ArcLight (¶33); Defendant Revers is the Managing Partner of and Co-Founder of ArcLight (¶35); Defendant Taylor is a principal at ArcLight (¶37).  AMID's public filings state that each of Defendants Bergstrom, Erhard, Revers, Taylor, and Sutton serve on the Board in connection with their affiliation with ArcLight.  ¶¶31–37.

post-merger entity on the cheap.  ¶¶110-14.  Defendants also knew that AMID's distribution was the "most important" factor in making the deal attractive to Southcross investors.  ¶43.

Defendants engaged in a simple scheme to secure a cheap buyout.  For the first time in its history, on July 27, 2018, AMID's distribution was cut – by a huge 75%.  ¶94.  Defendants did not so much as hold a conference call to describe this fundamental change to the nature of investing in AMID.  ¶95.  Instead, they sowed panic with a non-sensical assertion that the Cut was made to "provide capital for strategic growth opportunities" *unrelated* to the Southcross merger.  *Id.*  It is *now* known that AMID's performance continued to be strong during 2Q18, with revenue growing 36% and 7% from the prior year and prior quarter, respectively.  ¶¶90-91.

As Defendants planned, immediately after this announcement, AMID's price fell about 43%.  ¶94.  As Defendants also planned, by the trading day after the First Cut, SXE terminated the merger and AMID's price fell another 7.58%, for a combined decline of 63.55%.  ¶¶108-11.  This drove down the price ArcLight would need to offer to acquire AMID, and by ending the SXE merger ArcLight cleared a path to buying AMID, since it avoided having its control diluted.

About two weeks later, taking advantage of the depressed price, ArcLight bought enough units to close a buyout without a vote, but falsely denied its plan to do so in SEC Filings.  ¶¶115-16.  About a month later, it was negotiating a buyout with AMID's Conflicts Committee.  ¶119.  Then, on December 21, 2018, AMID said it was indefinitely cutting its entire distribution, further depressing its price by 30%.  ¶¶126-31.  ArcLight then reduced its buyout price by 26%, and the Committee accepted that offer — *a 61% discount* to AMID's price prior to the scheme.  ¶131.

The Motion tries to revise history by inventing a "liquidity crunch."  MtD 3-4.  As discussed below, this theory is implausible.  In truth, AMID was so flush with cash, that it remitted enough to ArcLight (in asset purchases and buybacks) to fund the *entire* buyout.  ¶49.

## III.   LEGAL STANDARDS FOR ANALYZING ALLEGATIONS & INFERENCES

"Even under the PSLRA, the usual rules . . . pertain: the well-pleaded allegations of the complaint are deemed true and all inferences are drawn in favor of the pleader." *In re EVCI Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 92 (S.D.N.Y. 2006); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (courts must "accept all factual allegations" as "true"); *Giunta v. Dingman*, 893 F.3d 73, 78-79 (2d Cir. 2018) (in reviewing a motion to dismiss, courts must "draw[ ] all reasonable inferences in the [plaintiff's] favor").

Plaintiffs must allege a "strong inference" of scienter, but this does not require "smoking-gun" proof. *Tellabs*, 551 U.S. at 313-14, 323-24 . Circumstantial evidence is sufficient. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). The relevant analysis is a "comparative inquiry" and the complaint must be considered "in its entirety" to determine if Plaintiffs' inferences are "at least as compelling as any opposing inference." *Tellabs,* 551 U.S. at 323-24. A "tie . . . goes to the plaintiff." *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012).[4]

## IV.   DEFENDANTS' WRONGDOING

### A.   The Actionable Scheme – Rule 10b-5(a)/(c)

Defendants mainly attack the AC by arguing that Plaintiffs lack "documentary proof." *See* MtD 12. However, the question is ___not___ whether Plaintiffs proffered a "smoking-gun" or any other "genre" of evidence, but a "***comparative inquiry***" of whether the fraud Plaintiffs plead is "at least as compelling as any opposing inference." *Tellabs,* 551 U.S. at 323-24.

---

[4] The *Tellabs* majority addressed the sufficiency of circumstantial evidence and the standard used to compare inferences in discussing a hypothetical posed by Justice Scalia's concurrence: Scalia asked, "[i]f a jade falcon were stolen from a room to which only A and B had access" from this could it be said that there was a 'strong inference' that B was the thief." The six-justice majority opinion found that even these sparse circumstantial facts would support a "strong inference" and would be "certainly strong enough to warrant further investigation" (*i.e.*, discovery). *Tellabs*, 551 U.S. at 324 n. 5.

### 1.    The Allegation of Defendants' Scheme is Highly Plausible

The allegation advanced by Plaintiffs is simple and fully consistent with the particularly pled facts in the AC summarized in Section II.  Defendants engaged in a scheme to artificially depress AMID's price so ArcLight could buy AMID on the cheap.  The scheme began with the First Cut and continued through the announcement that ArcLight had secured the buyout without a shareholder vote.  While devious, this scheme has precedent.  *E.g.*, *Genesco,* 384 F.2d at 546 (crediting allegation that controller depressed price by cutting the dividend to buy out the company on the cheap); *Cochran*, 211 F. Supp. at 243 ("One who causes a reduction of dividend in order to more cheaply purchase the shares of a corporation is ***most certainly*** employing a device to defraud and is engaging in a course of business which operates as a fraud upon the seller of those securities."); *In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *26 n.13 (Del. Ch. Aug. 27, 2015) ("[R]esearch has found a correlation between management-led buyouts and lowered guidance, increased reserves, and other measures that reduce the apparent performance of a company during periods before the announcement of the buyout.").

Defendants' only direct attack on the *plausibility* of these allegations is to argue that the Merger included some of the hallmarks of a legitimate deal process, like the use of an investment bank, and a committee.  MtD 12.  However, the total absence of a deal process would have been astoundingly suspicious—it is no defense that Defendants exerted some effort to present a façade of legitimacy.  *See United States v. Kelley*, 551 F.3d 171, 176 (2d Cir. 2009) ("a scheme to defraud may well include later efforts to avoid detection"); *United States v. Bongiorno*, 2006 WL 1140864, at *5 (S.D.N.Y. May 1, 2006) ("fraud" covers "ingenious efforts"); *Szulik v. Tagliaferri*, 966 F. Supp. 2d 339, 366 (S.D.N.Y. 2013) (effort to "cover[] their tracks" supports scienter); *S.E.C. v. Life Partners Holdings, Inc.*, 41 F. Supp. 3d 550, 561 (W.D. Tex. 2013) (a "smart" inside trader, may not sell at the "most opportune time" to "avoid more suspicion").

5

### 2.    Defendants' Competing Inference is Implausible

Defendants' alternative conclusion rests on arguing that there was no scheme because the publicly stated reason for the First Cut was truthful (MtD 6-7), *i.e.*, that it was made to "reduce leverage" and "provide capital for strategic growth opportunities." ¶95.  This explanation is internally inconsistent, implausible, and certainly not more plausible than the AC's conclusions.

### (a)    The First Cut Conflicts with AMID's Business Model

While many companies give management discretion to set dividends at whatever rate they believe to be desirable for shareholders, AMID took a vastly different approach.  Its partnership agreement "***requires*** [management] to distribute . . . all available cash quarterly" and specified a "minimum quarterly distribution" of $0.4125 per unit.  ¶¶58, 63.  AMID's annual reports stated that the obligation to make these distributions could "limit [its] ability to grow." ¶62.  This made it clear that it would be inappropriate to cut the distribution to pursue growth. Yet, the explanation that the First Cut was done to "provide capital for strategic growth opportunities" ***directly*** contradicted these previous assurances and policies.[5]

Defendants knew the units were "yield-oriented," that the First Cut would devastate their price, and that AMID's investors were largely retirees who relied on the distribution for income. ¶¶56-63.  Defendants also knew the First Cut would depress AMID's price.  It is unusual for managers to take action that they expect will depress a security's price; it is implausible to do so contrary to prior assurances, while fundamentally changing the security that investors signed up for; and it is astonishing to do so without even hosting a conference call to explain.  ¶95.

---

[5] That the explanation was implausible, did not reveal the scheme or mitigate the fraud, but did sow fear and panic.  *Cf. Maverick Fund L.D.C. v. Comverse Tech., Inc.,* 801 F. Supp. 2d 41, 52-53 (E.D.N.Y. 2011) (parties may "still" be "defrauded" unless disclosures "reveal the full scope of the fraud"). Defendants wisely do not attempt to make a "truth on the market" defense, which defense would fail unless, "no rational jury could find that the market was misled." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000).

**(b)      The Liquidity Crisis is a Retroactive Fabrication**

Defendants now try to portray the First Cut as "a result of . . . challenges" in AMID's business which led to a "liquidity crunch."  MtD 3-4.  This is mere revisionist history—the First Cut was announced as a strategy to fund "organic growth projects across all core segments," ***not*** as a step to overcome a "liquidity crunch."  ¶95.  For this reason alone, the Motion's explanation is implausible.  The two "challenges" mentioned in the Motion also offer Defendants no support.

**First**, Defendants argue that the 2017 tax reform reduced interest in MLPs.  MtD 3-4. Defendants cite nothing showing tax reform's effect on AMID and nothing to support the Motion's claim that "MLPs faced a volatile market" in the months before the First Cut.  Even more importantly, Defendants do not even try to explain how tax changes and supposed resulting market volatility resulted in a "liquidity crunch."[6]

In contrast, the AC described AMID's "***unprecedented***" 4Q17 results, "***record setting***" 1Q18 results, and continued strong 2Q18 performance.  ¶¶64-92.  Defendants do not address those allegations and do not actually deny that AMID's performance was strong—instead, they vaguely point to supposed industry trends.  MtD 3-4.  In contrast, the AC described AMID's presentations on May 23-24, 2018, in which Defendants described "record throughput" and boasted of "12% year-over-year EBITDA growth."  ¶84.  That presentation also assured investors that "AMID ***will remain positioned*** to execute on the opportunities it generates."  ¶85. The AC also described ***positive*** regulatory developments in 2Q18, including a July 19, 2018, policy change by AMID's main regulator, which the leading industry publication said would

---

[6] Plaintiffs are unaware of any part of the tax change that would cause AMID to expend additional cash. At most, one might *speculate* that if tax reform decreased the valuation of pass-through units (*see* ¶60) this could decrease the price AMID would receive in selling equity, ***but*** this could not ***cause*** a liquidity crunch.  Even so, AMID was not constrained in raising cash, and no facts are pled in the AC supporting this notion, and the Court should not rely on Defendants' speculation.  *See* Section IV(A)(2)(b).

"cue" a "rally." ¶87(a).  In the time between the release of AMID's "record setting" 1Q18 results (¶74) and the First Cut, the major index tracking AMID and its peers "showed that the industry grew by a rapid 6.61%." ¶87(b).  When AMID eventually disclosed its 2Q18 results, it was forced to admit strong performance.  ¶¶88-90 (year-over-year, AMID grew revenue by 36%, reduced net losses by 70%, and grew adjusted EBITDA by 15%); ¶91 (since the prior quarter, AMID grew revenue 7%, reduced net losses by 38%, and held adjusted EBITDA roughly flat).

This point is highlighted by the fact that, at the time, Defendants did not even try to justify the First Cut in terms of lacking sufficient distributable cash to pay the required distribution.  ¶102.  Even after taking affirmative steps to reduce distributable cash, AMID still ended 2Q18 just $840,000 short of the entire amount needed to pay the full distribution, at most justifying a 3.9% cut to the mandatory distribution, rather than the 75% cut AMID made.  ¶103.[7]

**Second**, Defendants' claim that a "liquidity crunch" was caused by an inability to "rely on external capital to fund its business."  MtD 3-4.  The logic of this argument fails, as Defendants cannot explain the connection between "external capital" and a "liquidity" crisis.  The argument also lacks factual support and merely cites a Form 14C issued before the Merger closed, nearly a year ***after*** the First Cut, which asserted a lack of access to capital in conclusory terms, without any facts showing that capital was unavailable, steps taken to try to access or assess the availability of capital, or any experts relied upon to draw the stated conclusion.  MtD 3 (citing ECF No. 47-1).  The Court cannot take judicial notice of this filing for the truth of this retroactive self-serving claim.  *Finn v. Smith Barney*, 471 F. App'x 30, 32 (2d Cir. 2012).

---

[7] For example, AMID historically made distributions to preferred units with a mix of cash and "in kind" units, but in 2Q18 it chose to pay entirely in cash, spending about $2 million more than it normally would have.  ¶105.  So, at most they were 3.9% short was a self-imposed limitation.  This further disproved the supposed liquidity crunch – the point of an "in-kind" payment option is to manage liquidity.  Notably, "distributable cash" refers to cash *after* setting aside operating expenses and other reserves; distributing all "distributable cash" is expected under the partnership agreement.  ¶58.

Furthermore, in the year or so prior to the First Cut, AMID regularly raised and used capital in ways that undermine Defendants' narrative. ¶49. For example, it bought a $32 million interest in the Viosca Knoll Gathering System (¶49(a)); bought a $39.1 million interest in Panther Operating Company, (¶49(b)); sold Pinnacle Propane for $170 million (¶49(c)); and raised $125 million issuing notes (¶49(h)). Clearly AMID was capable of generating capital, and its liberal use of cash was not the behavior of a business in a liquidity crisis. ¶51.

AMID **_also_** spent an incredible amount of cash buying assets **_from ArcLight_**, prior to the First Cut. It spent $125.4 million buying an interest in Delta House from ArcLight (¶49(d)); $30 million buying a pipeline from ArcLight (¶49(f)); and $49 million buying another pipeline from ArcLight (¶49(g)). It spent $37 million retiring preferred units held by ArcLight ¶49(e), which obliterates the notion that AMID was unable to access capital—one way it could have easily "accessed" capital was simply by not giving away capital it already owned to ArcLight.

The *coup de grâce* to Defendants' false narrative is that through these transactions, AMID remitted over $242 million before the First Cut, which was more than what ArcLight paid to take AMID private. ¶49. Far from being cash strapped, AMID was so flush with cash, that it chose to send ArcLight enough cash for ArcLight to fund the Merger using only that money, effectively buying back everything it had sold to AMID, **_and_** all the other assets AMID owned.

### (c)    The SXE Merger Undermines Defendants' Explanation

Defendants try to brush the Southcross Merger under the rug—only mentioning it once and only in the background facts part of the Motion. *Compare* MtD 4 *with* ¶¶5-6, 9-10, 17, 38-49, 64, 68-69, 75, 80-82, 85-86, 95, 108-114, 144. Nearly all the allegations about the deal are **_unopposed_** and cannot be attacked on reply. *Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993).

### (i)    The Undisputed Facts About the SXE Merger

On November 1, 2017, AMID announced it was acquiring SXE, a rival oil MLP. ¶38.

9

The "SXE Merger" was a major acquisition for AMID—SXE would contribute about a third of the post-merger entity's value. ¶40. SXE investors would be given AMID units for their Southcross units. ¶42. The deal announcement stated that "AMID expects the proposal to be attractive" due to AMID's quarterly distribution. *Id.* The CEO of SXE said AMID's distribution was "perhaps [the] ***most important***" factor making the deal appealing to SXE investors. ¶43.

The SXE Merger included customary closing conditions, requiring regulatory approval, approval by SXE investors, and repayment of outstanding SXE debt. ¶44. If AMID failed to provide financing to repay SXE's debt, Southcross could terminate the agreement and require AMID to pay a $17 million fee. ¶48. However, as the AC explained—and as Defendants did not deny—the debt repayment requirement is not onerous and can be satisfied by refinancing.[8]

The specific facts of the SXE Merger would make securing financing especially easy. As AMID stated, the SXE Merger would have "***immediately***" resulted in cash flow growth and was set to be "***immediately accretive***" to distributable cash flow. ¶45. Thus, the AC alleged that "AMID should not only have been able to easily refinance the Southcross Debt, but likely should have been able to do so at terms more favorable than it obtained for its existing debt." ¶46.

During AMID's 1Q18 results call, still well before the First Cut, Defendant Bourdon explained that the SXE Merger was approved by SXE investors and by regulators. ¶¶74-75, 80. This cleared the way to close the deal. Bourdon stated that AMID had arranged to sell non-core assets to repay the SXE debt, and Kalamaras clarified that assets sales were merely one option, assuring investors that "there are a variety of mechanisms that we could [use to] fund [the debt repayment] on a short-term or bridge basis." ¶81. Thus, the AC alleged that "the discussion of bridge loans was an accurate acknowledgement that AMID could simply take out short-term

---

[8] This term is a customary requirement because banks demand to be repaid before a change in control over the borrower. It is not about reducing overall indebtedness or "paying" down the debt. ¶¶44–48.

10

financing to get the deal closed, if its permanent plans were taking longer than expected." ¶82.

On Friday, July 27, 2018, without first closing the SXE Merger, Defendants abruptly announced the First Cut. ¶¶94-95. That Sunday, Southcross terminated the merger causing AMID to owe a $17 million breakup fee. ¶108. As the AC alleged—and the Motion did not deny—upon announcing the First Cut, it was certain that Southcross would terminate the SXE Merger, both because the "most important" aspect of that merger was AMID's distribution, and because the announcement of the First Cut was certain to depress AMID's stock price, making the receipt of a fixed set of AMID units for each SXE unit particularly unattractive. ¶109.

Additionally, ending the SXE Merger served ArcLight by (1) avoiding the substantial dilution of its ownership and control of AMID that would have occurred in the SXE Merger;[9] (2) further depressing AMID's price, making a cheaper buyout look reasonable; (3) avoiding the creation of a much larger and more expensive entity; and (4) avoiding the purchase of SXE assets that likely would not compliment ArcLight's portfolio. ¶¶110-14 (explaining each point).

### (ii)    Analysis of the Cut and the SXE Merger

Given the undisputed fact that the First Cut would cause SXE to terminate the merger, it makes no sense to make the First Cut without first closing the deal— unless, of course, the goal was to tank the deal to set the stage for a buyout. In its one passing mention of the SXE Merger, the Motion says the deal was not closed because AMID lacked financing, due to the liquidity crunch. MtD 4. This argument immediately fails because there was no liquidity crunch. *See* Section IV(A)(2)(b). Neither citation in the Motion actually supports Defendants' narrative.

**First**, the Motion cites ¶108, which states that SXE could cancel the deal if a "Funding Failure" occurred. This deal term from the 2017 contract with SXE could not possibly state facts

---

[9] The SXE Merger was a unit-for-unit conversion meaning that ArcLight's control of AMID would be substantially diluted as new units were issued to former SXE unitholders. ¶112.

11

about a liquidity crisis AMID was facing in 2018. That there was a contractual "funding failure" merely shows that Defendants chose not to put funding in place or chose not to notify SXE that it had put such funding in place. Either of these options is perfectly consistent with the AC and its allegation that ArcLight benefited from not closing the deal. **Second**, Defendants cite their own Form 14C (issued before the buyout closed, nearly a year *after* the First Cut) for the self-serving and purely conclusory assertion that the SXE Merger was terminated due to lack of financing on "acceptable" terms. No details are provided, and a self-serving conclusory assertion carries no weight in judging the pleadings. *See Finn*, 471 F. App'x at 32; *see also Kelley*, 551 F.3d at 176 ("A scheme to defraud may well include later efforts to avoid detection."); *Szulik*, 966 F. Supp. 2d at 366 (effort to "cover[] their tracks" supports scienter).

Defendants' self-serving and retroactive explanation cannot be squared with statements before the First Cut that AMID could finance the deal, including with a short-term bridge loan. ¶82. At the time of the First Cut, Defendants did not describe any sort of trouble with the SXE Merger or indicate that financing was no longer available—rather they said the First Cut would provide "capital for strategic growth opportunities" related to "organic growth projects across all core segments," in the Gulf region, *i.e.*, projects not related to funding the SXE Merger. ¶95.

To put a finer point on the issue, when Southcross terminated the SXE Merger, AMID was required to pay a $17 million fee. ¶108. The First Cut "saved" AMID $16.4 million in reduced distributions. ¶10. Thus, rather than saving "capital for strategic growth opportunities," AMID was losing capital by making the First Cut prior to closing the SXE Merger. Again, it may be tempting to look at these numbers and surmise that AMID may have been saving the money in order to pay the fee, but this would be inconsistent with the stated reasons for the First Cut. Thus, to entertain Defendants' theory, the Court would need to conclude Defendants were

12

lying, but then give them the benefit of the doubt that their lie was for a speculative, benevolent purpose — "we lied, but not like you think," is less plausible than the allegations in the AC.

### 3.    Defendants' Scheme Violates Rule 10b-5(a)/(c)

Under Rule 10b-5(a)/(c) ("(a)/(c)") Plaintiffs' must plead "the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants," but "need not plead manipulation to the same degree of specificity as [in] a plain misrepresentation claim." *ATSI*, 493 F.3d at 102. The AC meets this standard by alleging a scheme whereby Defendants made the Cut to depress AMID's price, lied about the reasons for doing so, and hid the buyout plan, so ArcLight could acquire AMID cheaply, which conduct depressed the price of AMID's units. *See* Section IV(A).

Defendants' main response is a straw man based on the absurd concept that the AC merely alleges the scheme was manipulative because they failed to disclose it was manipulative. MtD 19-20. Of course, this is not true. The scheme was manipulative because it was aimed at artificially affecting AMID's unit price and also because it involved lies and omissions.

It is long-settled that this scheme is actionable: "One who causes a reduction of dividend in order more cheaply to purchase the shares of a corporation is ***most certainly employing a device to defraud*** and is engaging in a course of business which operates as a fraud upon the seller of those securities." *Cochran*, 211 F.Supp. at 243 (emphasis added); *Genesco*, 384 F.2d at 545-46 (in *Cochran,* "deception . . . consisted of reducing dividends in order to drive down the price of the corporation's stock"); *O'Neill v. Maytag*, 339 F.2d 764, 768 (2d Cir. 1964) (same).

Defendants also cherry picks quotes[10] from "market manipulation" cases about what types of "trading" activity constitutes manipulation. MtD 19-20. This is misdirection, since

---

[10] For example, Defendants say manipulation requires "false pricing signals." MtD 19–21. That phrase relates to distinguishing legal trades from manipulative trades. Inflating "demand" with fake buy orders sends "false price signals." The term cannot map cleanly onto (a)/(c) cases outside those alleging

(a)/(c) "encompass much more than illegal trading activity: they encompass the use of 'any device, scheme or artifice,' or 'any act, practice, or course of business' used to perpetrate a fraud on investors." *In re Glob. Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 336 (S.D.N.Y. 2004) (auditor liable for role in accounting fraud scheme); *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 1223844, at *11 (S.D.N.Y. Mar. 27, 2013) (actionable scheme consisted of inflating financials and stock price with unsustainable RMBS business).

Recent cases reaffirm the breadth of (a)/(c).  *Lorenzo v. S.E.C.* rejected formalistic limits on (a)/(c), holding that the sections of Rule 10b-5 do not govern distinct "spheres" and that a "scheme" is just a "plan."  139 S. Ct. 1094, 1101-02 (2019).  Likewise, the Second Circuit teaches that sometimes the "only factor" distinguishing "legitimate" and "improper" (a)/(c) conduct is intent to defraud – as is shown here.  *See ATSI,* 493 F.3d at 102.  The breadth of (a)/(c) claims is well-illustrated by *S.E.C. v. China Ne. Petro. Holdings Ltd.*, which held:

> [It is alleged that] defendants raised money under false pretenses and then channeled the proceeds to corporate insiders.  The misstatements and omissions . . . were essential both to the plan's commencement and its concealment, and we acknowledge that without [them], the plan could not have succeeded. However, the SEC has competently pled the existence of a larger scheme, one that went beyond mere misrepresentations to investors, whereby defendants enriched themselves and their families at shareholders' expense.  While the misstatements and omissions . . . furthered that scheme, they do not comprise the scheme in its entirety. Therefore, we find that the SEC has adequately pled the existence of a fraudulent scheme.

---

manipulative trading by Defendants – unlike here.  Though the scheme did send false signals: it hid news of a buyout, and implied performance issues that did not exist.  Cuts to these "yield-oriented" units also signaled that investors' cash would be "locked up" - instead of being distributed (as it always had been) on a quarterly basis - and as a result investors' retirement income would be impaired indefinitely.  This falsely conveyed what appeared to be a fundamental change in AMID - transforming its units from yield-oriented securities into a struggling, growth chasing, and low-yield investment.  In reality, investors' cash would not be "locked up," as the plan was always to cash investors out through the Merger.   If investors knew this cashout was on the horizon, they would not have feared that they would be indefinitely parted from their retirement savings, and the unit price would not have fallen.

27 F. Supp. 3d 379, 392 (S.D.N.Y. 2014).

### 4.     ArcLight is Liable for the Fraudulent Scheme

The Motion also argues that Defendant ArcLight—but not the other Defendants—cannot be liable under (a)/(c), because ArcLight did not make any "representations."  MtD 20-21.

**First**, this argument fails on the facts.  Five of the Individual Defendant's sitting as directors on AMID's Board were controlled by ArcLight, and three were senior employees of ArcLight.  ¶¶31-37.  It was alleged (and not denied) that they were "***operating as agents of ArcLight***."  ¶141.  It is a "fundamental principle" of "the law of agency and corporations" that the "acts of agents" are "presumptively imputed to their principals."  *Kirschner v. KPMG LLP*, 938 N.E.2d 941, 950 (N.Y. 2010).  The actions of these Defendants are imputed to ArcLight, rendering it liable for the scheme as a direct participant that acted through its agents.[11]

**Second**, this argument fails on the law.  Legions of cases hold that a scheme participant need not make misrepresentations to be liable.  *E.g.*, *Lorenzo,* 139 S. Ct. at 1101; *Glob. Crossing*, 322 F. Supp. 2d at 335 (holding auditor liable as schemer "even absent a fraudulent statement"; collecting cases).  To the extent that Defendants' case — *Fezzani v. Bear, Stearns & Co.,* 716 F.3d 18 (2d Cir. 2013) —  remains good law after *Lorenzo*, it must be circumscribed to its context of (a)/(c) claims about manipulative ***trading***, not other schemes – like here.  In any event, its holding that a mere financier is not liable is irrelevant to the instant case, where: (1) the scheme was conducted for ArcLight, (2) a key step in the scheme was ArcLight buying voting control of AMID; and (3) the climax of the scheme was ArcLight's purchase of AMID.

### B.     THE AC STRONGLY ALLEGES VIOLATIONS OF RULE 10b-5(b)

---

[11] This point is emphasized by the fact that AMID's partnership agreement disclaimed fiduciary duties to AMID, replacing them with specific contract rights and conflict resolution processes.  ¶52-54.  ArcLight employees running AMID wore a single hat, serving as ArcLight agents.

15

In addition to alleging a fraudulent scheme, the AC alleges actionable false statements and omissions.  The Motion's attacks on these allegations are unavailing.[12]

### 1.       July 27, 2018 – The First Cut

**First**, as the AC explained, statements in the July 27, 2018, press release were misleading because they falsely explained the reasons for the First Cut.  ¶97.  For example, Defendants stated the First Cut was part of a new strategy intended to "provide capital for strategic growth opportunities."  *Id.*  Whether these statements are false is resolved by Section IV(A), which shows the AC strongly alleged the true reason for the First Cut was to depress AMID's price.

**Second**, the AC alleged the press release was misleading because it purported to disclose a major new strategy without stating the other fundamental change in AMID's strategic position, *i.e.*, that its controller was planning to take it private.  ¶98.  This hid the key context and information needed to understand its real strategic position.  "Upon choosing to speak, one must speak truthfully about material issues."  *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) (by discussing "hedging strategy" defendant had duty to be "accurate and complete").

There is no dispute that (before the First Cut) by the Spring of 2018, ArcLight began discussing a "potential take private transaction" to acquire AMID.  ¶134.  Defendants quibble with whether this constituted a "plan" or some lesser degree of interest, but that semantic issue is beside the point.  The interest was clearly concrete enough for ArcLight to formally discuss it

---

[12] The Motion claims that defense counsel struggled to understand the AC, which they vaguely blame on supposed "puzzle pleading."  MtD 10.  It defies belief that counsel was truly puzzled, especially given the concise 20-paragraph introduction explaining the fraud.  Rather, counsel appears to have realized the case's strength and now seeks to misdirect with criticisms about drafting style.  Courts reject accusations of puzzle pleading where, like here, a complaint "identifies statements and omissions, describes relevant predicate events, and alleges how those events make the statements and omissions false or misleading." *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 2020 WL 248729, at *5 (S.D.N.Y. Jan. 15, 2020). Notably, *CBS* distinguished Defendants' case on this point, and stated that Defendants' case dealt with a 280-page complaint that presented a "Sisyphean task."  *Id.* (citing *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32 (2d Cir. 2012).  The AC is more than 75% shorter, at 61 pages.

and material enough to serve as a leading fact in the description of the origins of the deal in the Merger information packet. *See SEC v. Saltsman*, 2016 WL 4136829 *17 (E.D.N.Y. Aug. 2, 2016) (duty of completeness violated where party failed to disclose potential use of proceeds from equity offering even though this use was merely a "possibility"). Even where undisclosed information does not "negate[] the public statements" it must be disclosed where it would place "statements concerning strateg[y] . . . in a materially different light." *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 268 (2d Cir. 1993); *e.g., Sapirstein-Stone-Weiss Foundation v. Merkin*, 950 F.Supp.2d 621, 627 (S.D.N.Y. 2013) (once defendants "chose to disclose . . . overall 'strategy, [they] had a duty to be both accurate and complete.'") (citation omitted); *S.E.C. v. Goldman Sachs & Co.*, 790 F.Supp.2d 147, 162 (S.D.N.Y. 2011) (duty of completeness violated where "investment interest" was disclosed without disclosing other related investment interest).

**Third**, the First Cut was misleading because, in the context of AMID's business (where distributions were mandatory) investors were left with the false impression that something dire was occurring (¶99), when in fact AMID's performance was strong. *See* Section IV(A)(2)(b). *Id.* Defendants attempt to reframe this argument more narrowly, noting that the press release mentioned "capital market constraints," and then arguing that these constraints were real. MtD 12-14. However, the supposed capital constraints were not real (s*ee* Section IV(A)(2)(b)), which clearly means the press release was actionably false and misleading.

Even *assuming arguendo* that there were "capital constraints," Defendants' argument still fails because it is a clever attempt at rewriting history. The press release did not imply any sort of "liquidity crunch" as Defendants now imply—but instead (falsely) noted "capital constraints" as a supposed reason to cut the distribution *to* fund growth opportunities. The notion of "capital constraint" was not a primary reason for investor panic. Rather, panic was caused because the

17

75% slash to the distribution of a Partnership with a mandatory distribution, without comment on AMID's performance, with a non-sensical explanation, without a conference call, and given the pending Southcross Merger, clearly left investors with, *inter alia*, a mistaken impression that AMID's performance had collapsed. *See also supra* at 13-14 n.10 (describing negative signals). Of course, its performance had remained strong. *See* Section IV(A)(2)(b). Falsity is "measured not by literal truth, but by the ability of the material to accurately inform rather than mislead." *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990); *Greenapple v. Detroit Edison Co.,* 618 F.2d 198, 205 (2d Cir. 1980) (if the method of presentation or "gloss" placed on information distorts significance of facts, it is misleading).

### 2.      August 20, 2018 – ArcLight Discloses Its AMID Unit Purchases

Despite having cut AMID's distribution just over two weeks prior, ArcLight bought a large block of AMID units on August 15, 2018, at discounted prices, benefiting from the First Cut. ¶115. Not only did this purchase save ArcLight millions, but it meant that it secured voting control of AMID, so it could close the Merger without a vote. ¶116. ArcLight knew nonpublic information (*e.g.,* its own plan and that the stated reasons for the First Cut were false). Five days later, ArcLight filed a Form 13D, disclosing its unit purchases and stating that it ***did not*** have any "***plan or proposal***" to acquire additional units. ¶118. This was false and misleading because it failed to disclose that ArcLight was interested in and had plans and a proposal to acquire AMID.

Defendants' only response – stated three ways – is to deny the plan to acquire AMID. MtD 14-15. This fails since the scheme was clearly such a plan. *See* Section IV(A). Moreover, the AC alleges facts that, even standing alone, are sufficient to infer ArcLight's plan: (1) prior to the purchase, ArcLight was discussing a "potential take private transaction" – meaning it had a plan or *at least* a "proposal" (¶134); (2) it bought just enough shares to hold voting control, so it could push a deal through (¶116); and (3) just weeks later it approached AMID about the buyout.

18

Defendants' alternative inference that – despite admitting that it was already discussing a buyout transaction, at the time of purchasing voting control – it was not planning the buyout that it actually acted on a mere month later, is far less plausible than the AC's inference.  Defendants' argument relies exclusively on a purely semantic distinction between a "plan" and something less.  MtD at 14-15.  At most this is a factual question—it is premature to guess at whether a jury would find ArcLight's interest and discussions to be a "plan."  But even this factual inquiry is a straw man, because falsity is "measured not by literal truth, but by the ability of the material to accurately inform rather than mislead."  *McMahan,* 900 F.2d at 579.  Denying the existence of a "plan or proposal" was misleading, given ArcLight's ***interest*** in buying AMID.

Defendants' cases are not to the contrary, which they seem to acknowledge by addressing their argument only to "omissions," despite the fact that the AC alleges the disclosure was false.  *See* MtD at 14-15.  *Amida Cap. Mgmt. II, LLC v. Cerberus Cap. Mgmt.*, L.P., 669 F. Supp. 2d 430, 438 (S.D.N.Y. 2009), addressed if the party needed to amend a prior 13D filing, "in light of subsequent events" that could affect the likelihood of a previously announced merger closing.  The court stated that its decision was not grounded in the materiality standards (applicable to evaluating filings that are actually made), but one about freestanding statutory disclosure duties.  It held that Section 14D only imposed a freestanding duty to amend where a "definite" plan was formed.  *Id.* at 440.  *See also* MtD 15.  Defendants' other case, *Vladimir v. Bioenvision Inc.*, 606 F. Supp. 2d 473, 491 (S.D.N.Y. 2009) addressed roughly the same conclusion.[13]  A distinction between the duty to amend and the duty of accuracy when speaking makes sense since requiring amendments to reflect every minor change to a party's plans would be extremely burdensome.

---

[13] Defendants also cite *Azurite Corp. v. Amster & Co.*, 52 F.3d 15, 17 (2d Cir. 1995), which addressed if a 13D amendment needed to disclose a change in the filer's plans, and found such disclosure was not needed where there was no basis to conclude the plans had changed until ***after*** that amendment, when the issuer made a major announcement, causing the investor to meet with attorneys to discuss a proxy contest.

### 3.    September 28, 2018 – Deal Announcement

On September 14, 2018, less than two months after the First Cut, ArcLight approached AMID's independent directors about the Merger.  ¶119.  On September 28, 2018, AMID announced that its Board "received an unsolicited non-binding proposal" from ArcLight to acquire the Partnership.  ¶123.  By coming forward and saying AMID "received an unsolicited bid" from ArcLight, Defendants conveyed this as a new development, while hiding that ArcLight had been discussing taking AMID private since the Spring of 2018.  ¶124.  Defendants respond merely that Defendants had no "duty" to disclose this information.  MtD 16.  This is irrelevant since the statements made were misleading by omission.  *See McMahan,* 900 F.2d at 579.

### 4.    December 31, 2018 – The Second Cut

On December 31, 2018, AMID announced that it had renegotiated its credit facility and indefinitely suspended the remaining 25% of its distribution as a term of that agreement.  ¶128. AMID's stock price fell another 30% and ArcLight reduced its buyout offer by 26%, further highlighting the benefit ArcLight received from the depression of AMID's price.  ¶¶130-31.

There is no indication that the dividend cut was a necessary concession to the lenders— especially given AMID's continued strong financial performance.  *See* Section IV(A)(2)(b).  In fact, after the First Cut, AMID continued raising capital by selling $333 million in non-core assets (¶50), more than 20x the cash "saved" through the First Cut (¶103).[14]  The announcement of the Second Cut was deceptive in that it failed to disclose that the slashed distribution was a prelude to ArcLight taking AMID private, and instead falsely conveyed that it was a necessary component of the renegotiated credit facility.  ¶129.  Defendants' response is again to deny the scheme, but this fails due to the AC's strong allegations.  *See* MtD 17; Section IV(A).

---

[14] Similarly, AMID paid Defendant Bourdon a rich exit package, paying his full-year salary, accelerating his equity and paying him as a consultant, just after announcing the Merger (¶32); AMID was not illiquid.

## V.       THE AC STRONGLY ALLEGES SCIENTER

The Motion ***does not deny*** that scienter is adequately pleaded as to ArcLight based on its motive and opportunity to close the Merger at an unfairly low price.  *See* ¶139; MtD 21; *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000) ("motive and opportunity" sufficient to allege scienter).  It has already been established that the First Cut was made to fraudulently depress AMID's price in furtherance of a scheme for ArcLight to acquire AMID.  *See* Section IV(A).  The only remaining question is whether GP[15] and the Individual Defendants acted with scienter.

**First**, the Motion does not challenge the allegation that scienter was adequately pled as to AMID and GP under the core operations doctrine.  *Compare* ¶144 ("The matters alleged herein are at the core of AMID's business.") *with* MtD 21-25 (no mention of this allegation).  "The 'core operations doctrine' permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business, even without specific allegations that senior management had actual knowledge."  *In re Avon Sec. Litig.*, 2019 WL 6115349, at *20 (S.D.N.Y. Nov. 18, 2019) (crediting core operation allegations).

**Second**, closely related to the core operations doctrine is the rule that entity-defendants are imputed with the scienter of management, regardless of whether it is proven which specific managers had scienter.  The AC alleged that the "distributions at issue, the true reasons for cutting the distributions, and the Southcross Merger were dealt with at the managerial level, and directly involved AMID's senior management," (¶144), which the Motion did not deny.  This is sufficient to plead scienter at this stage.  *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("[I]t is possible to raise the required [scienter] inference with regard to a corporate defendant without doing so with regard to a

---

[15] AMID and GP have identical scienter.  ¶25 ("AMID does not have any employees of its own and acts through [GP], who employs people . . .  for AMID, including its executive officers and directors.").

21

specific individual defendant."); *Solow v. Citigroup, Inc.*, 827 F.Supp.2d 280, 291 (S.D.N.Y. 2011) ("The Plaintiff is not required to identify specifically the individuals at Citigroup who acted with scienter in order to plead scienter with respect to Citigroup.").

**Third**, the AC alleges that Individual Defendants "had the same motive as ArcLight because they served on the Board due to their connection to ArcLight and were therefore operating as agents of ArcLight." ¶141.  Defendants argue that the mere desire for continued employment cannot establish motive.  MtD at 23-24.  This ignores the context at issue here.  The AC does not merely allege that a desire for continued employment motivated the Individual Defendants; it alleges that these individuals serve as *ArcLight's agents*, expressly served in connection with their affiliation with and (and in some cases) employment at ArcLight.  It was the literal job of these Defendants to advance ArcLight's interests—of course they shared its motives.  *See supra* at 15 n.10 (explaining Defendants wore a "single hat" serving ArcLight).

**Fourth**, the AC plainly alleged that the "Individual Defendants were directly involved in the decision to cut the distribution and, due to their management-level positions at AMID and ArcLight, they were able to and did control the information disseminated by AMID about that decision." ¶142.  Here, Defendants have no answer and do not even attempt to address this argument.  *See* MtD at 23 (disputing whether Individual Defendants had motive but not disputing their knowledge or involvement).  Defendants have knowledge of their own activities and the transactions that involve them.  *E.g., In re Braskem S.A. Sec. Litig.*, 246 F.Supp.3d 731, 764-65 (S.D.N.Y. 2017) (knowledge alleged where defendants "were directly involved" in alleged conduct); *Buxbaum v. Deutsche Bank A.G.*, 2000 WL 33912712, *19 (S.D.N.Y. Mar. 7, 2000) (scienter alleged where defendant was "was personally involved" in takeover discussions).

**Fifth**, the AC also alleged that "[t]o the extent any Individual Defendant was not directly

22

involved in these issues of monumental importance, their non-involvement evidences . . . reckless disregard." ¶144.  Again, Defendants have no answer.  *Novak,* 216 F.3d at 307 (scienter may be alleged based on "circumstantial evidence of conscious misbehavior or recklessness").

**Sixth**, the Motion downplays Defendant Revers' involvement by stating that scienter cannot be inferred entirely from senior positions.  MtD 24-25.  However, in addition to his positions as ArcLight's co-founder and Managing Partner (¶35), it is alleged that he was on the ArcLight investment committee that discussed its interest in buying AMID in the Spring of 2018. ¶¶135, 143.  It is implausible that the committee which discussed the take-private plan, would not have included Revers, a member of that committee and a director at AMID, in the discussion. Due to his management level roles at ArcLight and GP/AMID, Revers' scienter can be imputed to them.  *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 667 (S.D.N.Y. 2017) ("Courts routinely impute to the corporation the intent of officers and directors.").

## VI.    THE AC STRONGLY ALLEGES LOSS CAUSATION

Defendants only challenge loss causation as to the Rule 10b-5(b) claim, ***conceding*** loss causation is adequately pled as to (a)/(c).  MtD 17-19; *Knipe*, 999 F.2d at 711 (new arguments in reply are not allowed).  The attack on Rule 10b-5(b) loss causation is superficial and misplaced.

"Allegations of loss causation are evaluated under [Rule 8(a)'s] notice pleading standard."  *In re Fairway Grp. Holding Corp. Sec. Litig.*, 2015 WL 249508 at *16 (S.D.N.Y. Jan. 20, 2015).  In addition to this low standard, a "securities fraud plaintiff's burden is not a heavy one."  *Speakes v. Taro Pharm. Indus., Ltd.*, 2018 WL 4572987, at *10 (S.D.N.Y. Sept. 24, 2018); *cf. Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015) ("we note that Plaintiffs' burden is not a heavy one").  The allegations far surpass Plaintiffs' burden to provide "some indication of the loss and the causal connection."  *Speakes,* 2018 WL 4572987, at *10 (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)).

**First**, Defendants quote from cases dealing with price **inflation** and assert the AC cannot fit within that language.  MtD 17-19.  For example, Defendants state that because the AC does not allege that "the market reacted negatively to a corrective disclosure" that Plaintiffs "must" show a "materialization of the risk concealed by the fraudulent statement."  *Id.*  By this logic, no case could ever be brought by defrauded **sellers**, but it is hornbook law that defrauded sellers have valid claims.  A plaintiff defrauded into selling is entitled to "out of pocket" losses equal to "the fair value of the security he sold minus the fair value of the consideration he received."  Jacobs, DISCLOSURE AND REMEDIES UNDER THE SECURITIES LAWS, §§ 20:7, 20:53 (Mar. 2020 ed.) (*citing Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 154-55 (1972)).

Defendants' effort to force this defrauded seller case into a "price inflation" box utilizes, so called "*Dura* loss," cases.  *Dura* asked if an inflated purchase price alone constitutes a loss and held that it does not—because, for example, the truth may never come to light and correct the price.  *Dura*, 544 U.S. 336.  This logic simply does not map onto defrauded seller cases, because the loss is suffered as one sells at less than fair value—no future event is needed.

**Second**, Defendants relegate the AC's leading loss causation argument to a footnote. MtD 19 n.5.  The AC stated that the fraud "depressed the price of the CUs" and that as a result "Co-Lead Plaintiffs and Class Members selling their shares received less than the fair value of those shares."  ¶145.  For example, the announcement of the First Cut immediately led to a 42.86% depression of AMID's unit price and Plaintiffs and class members sold their units while the price was depressed, suffering economic loss.  ¶94.  It does not get more direct than that.

**Third**, given the simple, direct, and unimpeded loss causation theory addressed above, the Court need look no further than that point.  However, the AC's alternative loss causation theory firmly withstands Defendants' challenges.

24

The AC alleged that, practically speaking, but-for the false explanation, Defendants could not have made and announced the First Cut—meaning AMID's price would not have been depressed, causing losses. ¶149. This is because, disclosing the true reason for the First Cut would have revealed that it was a conflicted transaction that could not be allowed without shareholder or Conflicts Committee approval, which was not sought or obtained. *Id.*

Defendants attack this theory as indirect (MtD 18-19), but (1) as just explained, the First Cut (and its announcement) would not have been possible without the lies, and (2) the announcement was aimed at depressing AMID's price and directly did so. This two-step analysis does not require the Court to "connect a number of dots," as Defendants contend."[16] MtD 19. Further, "the chain of causation is a matter of proof at trial," and not a proper basis for a motion to dismiss. *Loreley Fin., LLC*, 797 F.3d at 187 (internal citation omitted).

## VII.    SECTION 20(a) CLAIMS

Control person claims require a primary violation, control, and culpable participation. *Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 415 (S.D.N.Y. 2019), which are all pled in the AC (*see* Sections IV–VI), and Defendants do not deny that the Individual Defendants were control persons and culpable participants. MtD 25; ¶¶25-37, 175-79.

## VIII.    CONCLUSION

For these reasons, the Court should deny the Motion. Plaintiffs also request any dismissal be without prejudice. *See Loreley Fin.*, 797 F.3d at 190 ("without . . . a ruling," plaintiffs may not be in a "position to weigh the "practicality" or "means" of amending).

---

[16] In another sense, these two dots can be compressed to a single point—Defendants hid from investors the "positive" fact that the devastating First Cut violated the partnership agreement. This was "positive," in that a reasonable investor choosing between (a) bad news or (b) bad news with possible legal remedy (*e.g.*, a suit for violating the partnership agreement), would choose option (b). Therefore, if Defendants made the First Cut and disclosed the true reasons, the price signal to the market would have been less negative due to the preferability of option (b).

DATED:  June 4, 2020                              Respectfully submitted,

**LABATON SUCHAROW LLP**

*/s/ Carol C. Villegas*
Carol C. Villegas
David J. Schwartz
Jake Bissell-Linsk
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
cvillegas@labaton.com
dschwartz@labaton.com
jbissell-linsk@labaton.com

*Counsel for Co-Lead Plaintiffs Paul C. Kraft and Linda E. Kraft JTWROS, and Randall Dobler, and Lead Counsel for the Class*