LB26KRAO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

PAUL C. KRAFT and LINDA E.
KRAFT, et al,

                    Plaintiffs,

          v.                          19-CV-9398(LJL)

THIRD COAST MIDSTREAM, LLC, et
al.,

                    Defendants.

------------------------------x
                                      New York, N.Y.
                                      February 11, 2021
                                      11:30 a.m.

Before:

                    HON. LEWIS J. LIMAN,

                                      District Judge

                         APPEARANCES

LABATON & SUCHAROW, LLP
     Attorneys for Plaintiffs
BY:  JAKE E. BISSELL-LINSK


KIRKLAND & ELLIS LLP (NYC)
     Attorneys for Defendants
BY:  STEFAN H. ATKINSON

LB26KRAO

(Telephone Conference; case called)

THE COURT:  Good morning.  This is Judge Liman.

Who do I have on who will be addressing the Court for plaintiffs?

MR. BISSELL-LINSK:  This is Jake Bissell-Linsk from Labaton & Sucharow.

THE COURT:  Say your last name again, sir.

MR. BISSELL-LINSK:  Bissell, B-i-s-s-e-l-l, hyphen, Linsk.

THE COURT:  Good morning.

Who do I have who will be addressing the Court for defendants?

MR. ATKINSON:  Good morning, your Honor.  This is Stefan Atkinson from Kirkland & Ellis.

THE COURT:  Good morning, Mr. Atkinson.

So we're here for oral argument on defendants' motion to dismiss.  I have read carefully the complaint and the papers by both sides.  I have also reviewed the materials that have been submitted, including materials submitted last night.  I am prepared to hear first from plaintiffs' counsel and then from defense counsel.

I would ask each counsel before they speak to clearly identify themselves for the record.  Please speak clearly and loudly for the benefit of the court reporter and for my benefit.

LB26KRAO

At the end of the session today, I am going to ask defendant to stay on the line and to order a copy of the transcript on an expedited basis.  You should not expect that I will render a decision at the end of the day today.  The transcript will be helpful to me in thinking through the issues.

Finally, I would ask each side to expect that they will have about 20 minutes for argument.  Just highlight for me, if you would, the chief points that you want me to focus on, any key cases that you want me to focus on, and any key allegations.

Let me hear first from defense counsel, Mr. Atkinson, and then I will hear from plaintiffs' counsel.

MR. ATKINSON:  Thank you, your Honor.

The amended complaint in this --

THE COURT:  Mr. Atkinson, if that is you speaking, my first instruction was for counsel to identify themselves for the record.

MR. ATKINSON:  That is my bad.  I apologize, your Honor.

Stefan Atkinson from Kirkland on behalf of all of the defendants.

The amended complaint in this case fails to state a claim.  First, plaintiffs market manipulation claim, Count Two of the complaint, runs directly into case law foreclosing it

LB26KRAO

for a few reasons.  Plaintiffs' focus their manipulation claim on the first and second distribution cuts, but the terms of the distribution cuts were fully disclosed and the Second Circuit has held, including in the *Wilson v. Merrill Lynch* case, 671 F.3d 120, that the market is not manipulated when that is the case.  The court said, *The market is not misled when a transaction's terms are fully disclosed.*  So plaintiffs try to pivot and say that the manipulation wasn't necessarily the cut, the terms of which again were fully disclosed, but that defendants didn't disclose in connection with the cuts that they were engaging in a manipulative scheme; but this is circular and merely identical to the argument rejected by Judge Cogan in *Brady* and then affirmed by the Second Circuit in *Onel*. As the Second Circuit put it, Alleging "manipulation via the failure of the defendants to disclose the full nature or extent of the alleged scheme to investors at its outset, falls short of stating a claim for manipulation."  Your Honor plaintiffs have failed to identify any particularized fact demonstrating the existence of any scheme -- no confidential witness statements, no internal company documents, nothing concrete to support the claim.  The manipulation claim fails.

Plaintiffs' other claim under Rule 10b-5(b) has a case law problem too, your Honor.  Plaintiffs leading argument on this claim is again that defendants failed to disclose the existence of the alleged scheme; but again plaintiffs failed to

LB26KRAO

allege actual facts supporting their "suspicion" that a scheme existed.  As Judge Holwell held in the *AXIS* case, "If the complaint fails to"-- this a quote, your Honor -- "allege facts which would establish an illegal scheme, then the securities law claims premised on the nondisclosure of the alleged scheme, are fatally flawed."  That is 456 F. Supp. 2d, 576.

Independently, plaintiffs also have a fatal loss causation problem on their 10b-5(b) claim.  They simply cannot meet the Second Circuit's established loss causation test because they identify no corrective disclosures or materialization of any concealed risk and because the theory of causation that they do attempt to plead false short of establishing the direct connection that courts require.

THE COURT:  Counsel, with respect to the misstatement claim, what is your view as to why the plaintiffs have not stated a claim with respect to the July 28th press release and the statement that the reduction of the distribution was to allocute capitol for growth opportunities and promote flexibility?  Haven't the plaintiffs pled sufficient facts to establish, whether or not there was a deeper plan, the distribution was not cut for those reasons?

MR. ATKINSON:  Well, your Honor, if you look at the July press release, which I believe is at Exhibit 2 of our motion to dismiss, the partnership announced: "A revised capital allocation strategy that is intended to significantly

reduce leverage, provide capital for strategic growth opportunities, and create long-term value," and then the partnership continues: "As part of the revised capital allocation strategy, the partnership has determined that the most prudent sources of accreted growth capital are proceeds from the sale of non-core assets and the retention of an increased portion of operating cash flow through the reduction of its common unit distribution."

Now, you are correct, your Honor, that the plaintiffs allege that these statements were not true; but unfortunately I think for the plaintiffs' case, the disclosures that both preceded and succeeded that press release are full of references to these fundamental problems that the partnership was faces -- the high leverage issue and the problem accessing capital. Most importantly the issues with the leverage and cash flow were disclosed kind of repeatedly throughout this period.

So, for example, I will take the leverage issue. The partnership's leverage ratio was 4.68 at the close of the third quarter in 2017. That is in the amended complaint at paragraph 46. The leverage ratio rose and was 5.2 percent thereabouts at the close -- or 5.2 at the close of the fourth quarter of '17. It was 5.2 at the close of the first quarter of '18. It was 5.4 at the close of the second quarter of '18. This was all before this press release.

LB26KRAO

THE COURT:  Are those facts all reflected either in the complaint or the documents incorporated by reference?

MR. ATKINSON:  They are, your Honor.  The 4.68 number is at paragraph 46 of the complaint.  The 5.2 number is at paragraph 78 of the complaint.  The 5.2 number from the first quarter of 2018 is at Exhibit F to our letter of yesterday, which we describe in the letter as being the document we attach as being cited in the complaint at several paragraphs.  The 5.24 number from the second quarter of 2018 is from Exhibit G to our letter of yesterday.  And then finally the 5.23 number, that was the leverage ratio following the press release at the close of the fourth quarter of 2018, that is at paragraph 46 of the amended complaint.

Yes, your Honor, these are either directly referenced in the amended complaint or they are directly referenced in documents the plaintiffs relies on in its amended complaint and therefore are incorporated by reference therein.

THE COURT:  Help me with a factual question.  The plaintiff alleges that the partnership agreement requires the partnership to make a distribution each quarter of .4125 dollars per units.

Everybody who is not speaking should put their phones on mute.  The only people who should not be on mute are Mr. Atkinson and myself.

Mr. Atkinson, according to the complaint the

LB26KRAO

partnership agreement required the partnership to make a minimum quarterly distribution of .4125 dollars per unit.  Can you walk me through how it is that the partnership was able to reduce that quarterly distribution consistent with the agreement?

MR. ATKINSON:  Sure, your Honor.  And I will take that in two parts.

First, and I will say jus off the bat, your Honor, we do not agree with that reading of the partnership agreement or of the partnership's disclosures.  So I will start with the disclosures just quickly.  They are a little simpler and then we'll get into the limited partnership agreement, which we attached as Exhibit C, as in Charlie, of our letter yesterday.

Starting with the disclosures.  In the partnership's 10(k) for the year 2017, which was issued in the first part of 2018 and which is attached as Exhibit 6 to our motion to dismiss and was incorporated by reference in the complaint, the partnership included about a half a page of disclosures under the header We May not Have Sufficient Cash from Operations to Enable Us to Pay Distributions to Holders of our common Unit. That is at ECF page 58 of that filing; page 28 of the underlying SEC document.  If your Honor reads that, there are several paragraphs of detail supporting this disclosure, including the following statement:  *There is no guarantee that unit holders will receive quarterly distributions from us  Our*

LB26KRAO

*distributions are determined each quarter by the board of directors of our general partner based on the board's consideration of the foregoing factors* -- I will read those two you -- *as well our financial position, earnings, cash flow, current and future business needs and other relevant factors at that time.  We may reduce or eliminate distributions at any time we have insufficient cash available for distributions,* and then it continues.

With respect to the cash available for distribution, the 10(k) names the following factors and it makes clear that these factors are not exclusive --

THE COURT:  Counsel, I can read the document.  I am sensitive to your time.  You have told me where to look.

Explain to me your view of the partnership agreement.

MR. ATKINSON:  Of course.

So, your Honor, the partnership agreement expressly allows the partnership to reserve cash and reduce distribution for future capital expenditures to comply with a debt instrument and generally to "provide for the proper conduct of the business."  If you go to Section 1.1 of the LPA, which again was Exhibit C to our letter of yesterday, as part of the definition of the term "available cash" the LPA makes clear that the GP can reserve cash "to provide for the proper conduct of the business of the partnership group including --

THE COURT:  I think I have got it.  So is the notion

LB26KRAO

that the quarterly distribution was to be drawn from the available cash and drawn from the available cash up to .4125 but if there was not "available cash" then there couldn't be a quarterly distribution?

MR. ATKINSON:  That is correct.

Additionally, just to add to that, your Honor, available cash also, the definition there, authorizes the GP to reserve, that is not distribution, cash to comply with any loan agreement.  There are disclosures and allegations in the complaint about how the second cut in particular was decided upon as part of a negotiation with the creditors relating to concerns about our leverage ratio.  So that is correct.  There is no disclosure and there is no provision of the LPA that guarantees distribution.  To the contrary, there is quite a stark warning that distributions are not guaranteed, including based on the judgment of the GP.  And the definition of available cash in the LPA provides further contractual support for the concept that investors cannot rely kind of no matter what on continued distributions.

Remember, this is sort of relevant to your Honor's first question.  We were disclosing significant leverage ratios throughout this period including disclosing that our credit agreement set a maximum leverage ratio of five.  That was raised to 5.5 during a short period when the partnership was in discussions and under agreement with Southcross about a

LB26KRAO

potential acquisition. The idea that distributions could be cut to comply with a loan agreement is in the contract, in the LPA, which of course was disclosed to investors, and then the leverage issues including the cap on leverage set out in the credit agreement was as well.

THE COURT: Okay.

MR. ATKINSON: So, your Honor, I think where I was in my sort of roadmap was I was finishing the loss causation argument. The final big-picture argument we have in addition to the problems with the manipulation and the 10b-5(b) claims in particular is a scienter concern, and that is the problem infects the entire complaint, but it is related to what I have said and what we said in our papers. Plaintiffs simply do not plead particularized facts specific to any of the individual defendants to raise a strong inference of scienter. An entity, as your Honor well knows, cannot intend to deceive investors or act recklessly unless someone at that entity actually has a required state of mind.

You can comb, your Honor, every paragraph of this complaint and you will not find any specific facts showing that any defendant actually intended to mislead or recklessly misled investors. The closest the plaintiffs come is mentioning Mr. Revers, who is one the individuals defendants. Mr. Revers was on ArcLight's investment committee at the time.

THE COURT: Can't I infer -- it may not get the

LB26KRAO

plaintiffs everywhere and you will tell me why it doesn't -- that Mr. Revers knew as of the Spring of 2818 prior to the announcement of the first cut that ArcLight was exploring strategic alternatives including a potential take-private transaction?

MR. ATKINSON:  Yes, your Honor.  I think it is fair to infer based on the allegation that Mr. Revers was aware of the initial discussions that are disclosed as having happened at ArcLight in the Spring of 2018 about a potential transaction with the partnership.  As you forecasted, your Honor, that doesn't get the plaintiffs to scienter.  There are two reasons. The first is even if Mr. Revers knew that ArcLight was considering a take-private, that does not mean that he knew that ArcLight was going to engage in fraud to do so, right. The question that is presented to your Honor in this and every securities case is did the individuals have malintent.  Did the individuals intend to deceive or were they reckless in receiving investors?

Knowing that ArcLight was considering a potential acquisition with AMID does not mean that Mr. Revers knew that there was some nefarious scheme to drive down the price and to take actions to cut distributions in order to acquire the partnership on the cheap.  So it is an element of the analysis, that is, his knowledge of a potential dealer or at least of consideration of a potential deal.  They need to show with

LB26KRAO

particularized facts that Mr. Revers and the other individual defendants, of course, actually were aware of the fraud or reckless in not being aware of the fraud.  We spent a lot of time both during the briefing and preparing for this argument, your Honor, trying to see whether there were actual facts suggesting that, and there just aren't any.

Besides the Revers allegation, the plaintiffs talk about how some of the individual defendants, though not all of them, were on the GP and had been appointed by ArcLight, but the case law is clear that under the *Novak* case from the Second Circuit, and others, that simple employment is not sufficient again to tie the individuals to the alleged fraud.  Our contention, your Honor, is that they just have not gotten over the hump -- the high hump -- that the courts have set under the PSLRA for establishing a strong inference of scienter here. The complaint as a general matter is quite general.  It does not -- as I said before, there are no confidential witnesses here.  There are no internal reports.  There are no allegations of government investigations.  The types of things that plaintiffs who are successful in these sorts of claims often bring forward, just do not exist in this case.

One more point, your Honor, aware of my time and your time, the cases the plaintiffs present to the Court as supposedly analogous to the case here are simply not -- they just certainly -- they just are not relevant.  The plaintiffs

LB26KRAO

cite the *China Northeast* case, which was an SEC action where the SEC had alleged all kinds of very specific details concerning the defendant's operations, including critically that the defendant in that case had not disclosed transactions that it was undertaking.  Therefore, in that case the Court concluded that the plaintiff had surpassed the hurdle of *Wilson*, the Second Circuit case.  Here, there is no allegation that any transaction was not disclosed.  It all folds back on itself.  It is all about explaining the real reasons supposedly for these transactions.  The *Wilson* court has said that the market is not misled if the transactions are fully disclosed.  So *China Northeast* is just not on point.

The other cases that they rely on are cases from the 1960s that predate the PSLRA by 30 years and that are expressly decided under the Supreme Court decision in *Conley v. Gibson*, which was a decision as your Honor knows concerning a pleading where the standard was much, much lower than it is here.  In *Conley* the standard was that a complaint states a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim, which would entitle him to relief."  Needless to say, the particularity requirements, not to mention the plausibility requirements of *Twombly*, supersede that standard and make it such that these cases from many years ago just are not on point.  The court was not called upon to do the same rigorous analysis of the pleadings that courts today

LB26KRAO

in securities cases are called upon.

One final point on that, your Honor, and then I am happy to answer any further question, in the *Onel* case, which I mentioned to you a few minutes ago, this was a decision from the Second Circuit that affirmed Judge Cogan's grant of a motion to dismiss in a very similar case, Footnote 3 of *Onel* and *Onel* by the way, your Honor, is 806 Fed. Appx. 64, in Footnote 3, the court distinguishes some of the manipulation cases that the plaintiff in that case had cited.  And at the very end of that footnote, the court said, *To the extent plaintiff contends that Sharett*, which was one of the cases that the plaintiff there had relied on, a case by the way that the plaintiff here does not cite, *stands for a broader proposition concerning the viability of market manipulation claims against similar schemes without more specific allegations of nondisclosure, we cannot agree that such a reading withstands our precedence, including AXIS*, another Second Circuit case, *and Wilson.*

THE COURT:  Okay.  Thank you, Mr. Atkinson.  I will give you five minutes at the end to respond to any arguments of plaintiffs' counsel.  That has been very helpful.

Let me turn now to plaintiffs' counsel.

MR. BISSELL-LINSK:  Your Honor, I would first like to begin by briefly summarizing our allegations and then I would like to explain our view that the complaint alleges a

LB26KRAO

fraudulent scheme and why that view is more plausible than the competing inference.  While defendants--

THE COURT:  Before you get started, there are a number of documents that have been provided to me as incorporated by reference.  They do seem to be incorporated by reference, but they were just submitted last night and I want to make sure that you don't have an objection on the grounds that they either were not incorporated by reference or that they are not authentic.

MR. BISSELL-LINSK:  Thank you, your Honor.

We don't have any objection to them as inauthentic and we don't have any objection to the Court looking at those documents under the guise of judicial notice.  We object to the idea that they are appropriately subject to judicial notice.  For that proposition, I would say *Goldman v. Belden*, which is a Second Circuit case which states that merely because documents were "to some extent quoted but limited quotation does not constitute incorporation by reference."  So while these are documents that we occasionally refer to -- I am not trying to stop you from speaking.

THE COURT:  Let's just take it piece by piece.  It is a pretty fundamental part of your complaint, the quotes from the preliminary information statement about the Spring of 2018 discussions, but the sentence that you quote is part of a bigger paragraph that talks about development in the industry

LB26KRAO

and at the partnership with respect to access to capital.

Are you really saying that you can rely upon that one sentence from the preliminary information statement and I cannot look at the rest of the preliminary information statement to put that, and particularly the background of the merger, sentence in context?

MR. BISSELL-LINSK:  That's not quite what I am trying to say.  Our view is that it is appropriate for the Court to consider the entire document as -- subject to judicial notice. And under a *Tellabs* standard you certainly can consider the totality of facts that are available.  That is a proxy statement who made that statement.  The thing that I am concerned about is sort of under a narrower and strict reading of the corporation by reference doctrine.  Under a strict reading of the incorporation by reference doctrine, I have some concern that you could treat it as though every sentence in that preliminary statement is something that we affirmatively alleged as true in the complaint and that is what I am trying to distinguish from.  It is not as though we think every letter of that document is true just because we quote one passage from it.

THE COURT:  I understand your argument to be in part how I can concede statements in documents that are incorporated by reference.  Am right about that?

MR. BISSELL-LINSK:  The way I would say it I don't

LB26KRAO

believe that incorporation by reference is the right way of getting to these documents.  I think they are subject to judicial notice, but I don't believe that we have incorporated the entirely of those documents merely because we quote from them.

THE COURT:  Do you have authority for the proposition that you can quote a portion of a document as having a misstatement and that you are not incorporating the entire documents by reference?

MR. BISSELL-LINSK:  Yes.  I think that is what that *Goldman* case that I cited stands for is the idea that some quotation of the document.  Just to take the example that you are saying, in almost every securities case there is an allegation that a document contained a misstatement and that document is quoted from and it doesn't follow from that that plaintiffs are therefore conceding that the entirety of that document is true otherwise that would be sort of be self-defeating in many instances.  As another example often a complaint will cite a corrected disclosure and that corrected disclosure will explain this is what went wrong but it will provide what plaintiffs alleged to be a false explanation of what went wrong and they will plead information to explain.

THE COURT:  You have plenty of time, counsel.

Just speak slowly.  Because if you don't speak slowly, the court reporter is not going to get it down and then I won't

LB26KRAO

have it available to me later on.

MR. BISSELL-LINSK: Understood. Apologies.

That was sort of the end of my thought. It is often the case that documents are cited by a plaintiff and it is not the case that plaintiffs are intending that the entirety of that document is the truth.

THE COURT: Continue with your argument.

MR. BISSELL-LINSK: Thank you.

So while defendants' briefing tries to isolate the question of which sort of view of the facts is more plausible to the issue of scienter, it is our view -- and I will explain it below -- that the fraudulent -- if the fraudulent scheme is well pled, the defendants' remaining arguments quickly fall apart.

So I want briefly to recite the facts, and I can tell you have reviewed the case carefully, but I think it is helpful to put everything in context, which is that AMID was a partnership that was largely held by retirees and marketed as offering yield-oriented securities. Under the mandatory terms of the partnership, it was required to distribute all available cash. Understanding the argument that defendants had put forward, we don't disagree with that interpretation of the partnership just that the sense of this investment was very much one where investors were signing up for a stable yield-oriented security.

LB26KRAO

Like many master limited partnerships, AMID had no employees of its own and was run entirely by a general partner, which was owned and controlled by defendant ArcLight.  AMID was healthy and posted strong results.  In defendants own words, its fourth quarter 2017 and first quarter 2018 results were respectively unprecedented and record-setting.

THE COURT:  Counsel, make arguments to me that don't twist the facts a little built.  Those statements that you are quoting were statements about operating results, but you don't have statements that you are relying upon that the balance sheet was strong or that they had available cash to make the investments that they decided to make.

MR. BISSELL-LINSK:  Our view is that they had not indicated that they had a problem with liquidity.  Defendants have now retroactively tried to point to the leverage ratio of the company to sort of invent the idea that it was a facing a liquidity crisis, but that was not a message that had been delivered previously.  They had certainly disclosed their leverage ratio, but they at no point were making indications that there was a problem with that leverage ratio.  They had made certain statements about the fact that they had funding plans for the future and how they thought they were most likely to fund future acquisitive activities, but that was never indicated under the guise of:  We cannot afford to pay our bills.

LB26KRAO

Ultimately when defendants came forward with the distribution cut, if you look at that press release it certainly talks about reducing leverage and it talks about doing so to fund growth activities. In no way does that press release state *We don't have the money to pay our bills*. That is an after-the-fact fabrication that defendants have put forward. It is not what they said at the time and it is not something they said previously.

So it is in that light that we think that the operating results of the company are relevant for establishing the fact that there is no reason to think this was a company that was in distress and their operating results don't suggest that.

THE COURT: Counsel, is it your view that the decision to agree to the Southcross merger was fraudulent?

MR. BISSELL-LINSK: No, not at all. We think that the Southcross merger was agreed to prior to the Spring of 2018 when defendants became interested in taking the company private. So that was something that was hanging over the company as they went forward thinking about their plans to try to privatize the company. Now, at a certain point we believe that they decided it would be worthwhile to sort of take a step that would jeopardize or almost certainly destroy that merger but not that the merger was entered into for fraudulent reasons. We think the merger was entered into legitimately

LB26KRAO

well before defendants became interested in the buying the company.

THE COURT:  Tell me what your theory is as to what changes that creates a motive to commit fraud that didn't exist prior to or at the time of the Southcross merger.

MR. BISSELL-LINSK:  So, I don't have discovery yet into what happened internally at Arclight that led them to become interested in buying the company, but there is no question that they say they became interested in the Spring of 2018.  So taking that statement at face value, they weren't particularly interested in buying the company before then and then they become interested in buying the company after that merger is already signed off.

THE COURT:  Assume for me the following facts: -- and the question is going to be whether if those are the facts as they come out you could make a case of fraud or a fact finder could find fraud -- that the company decided that it was a cheaper way to get capital to invest in the future by retaining the earnings that it had generated, not paying those earnings out either to ArcLight or to the other common unit holders, cheaper to do that than by raising capital in the public markets by issuing more common units which would dilute obviously the existing common units and that there were investment opportunities that were worthwhile so that it could invest in assets that would generate profits in the future even

LB26KRAO

though it might result in there being less distributable cash at present.

If that decision was made, would that be fraudulent for AMID managers to make that decision?

MR. BISSELL-LINSK:  So if I understand correctly, you are asking that question in the context where there is not simultaneously an interest in buying the company by ArcLight. This is just management made a standalone decision that the best way to grow --

THE COURT:  Yes.

MR. BISSELL-LINSK:  It is our view that based just on those facts that that wouldn't state a claim for fraud.  Now, there would be perhaps a claim under the partnership agreement but that is not a claim we would be litigating.

THE COURT:  So then what is it about the ArcLight interests that gets you over the hump?

MR. BISSELL-LINSK:  It is our view, and I think the facts strongly suggest that our view is correct, that the distribution cut was made not just to retain cash for future business opportunities but with an eye toward ArcLight buying the company and in fact as part of scheme to intentionally depress the price so that ArcLight could buy the company on the cheap.  And that is a completely different set of facts that management making a decision, right or wrong, to retain cash for growth opportunities.

LB26KRAO

And that is where the *Mutual Shares v. Genesco* case comes, which I understand defendants have tried to distinguish and I am happy to talk through that; but that case explicitly held -- the Second Circuit explicitly held stating that in *Cochran v. Channing* it was held that the manipulation of a market price and purposeful reduction of dividends in order to buy out minority stockholders cheaply was actionable under 10b-5. In holding that it said, *Deception make take the form of non-verbal acts. In Cochran consisted of reducing dividends in order to drive down the price of the corporation stock. It need not be deception in any restricted common law sense. One of the central purposes of the federal securities legislation would otherwise be vitiated.*

Defendants try to distinguish that case by focusing on pleading standards. I think that really misses the point. Our point isn't we've only pled what was pled in those cases or anything like that. My point is the underlying scheme at issue here is an actionable scheme under 10b-5(a) and (c), and that is what those cases hold. We're not using those cases to establish anything about pleading burdens or anything; but that if we have met our pleading burdens, we have pled something that amounts to an actionable scheme under 10b-5(a) and (c), and the Second Circuit has held that expressly.

THE COURT: Two questions. One is what is the false pricing signal that is conveyed after the first cut?

LB26KRAO

MR. BISSELL-LINSK:  So it is our view that there are sort of two things that is going on.  The most important one is that defendants are withholding from the market the fact that they are intending to buy the company and that that contextualizes the distribution cut.  In other words, if you came to the market and you said, Hey, we're cutting the distribution you right now but we're doing so because we're planning to take the company private in the near term and so we don't see a reason to be distributing the cash because as the new owners will want that cash for all sorts of investment opportunities, that is a completely different message and in fact a much more positive message than the message that they put forward which was, we're making a radical shift from sort of how we previously viewed this business entity withholding the fact that an acquisition is on the horizon and really terrifying these retiree investors who need the yield from these investments into thinking the instruments essentially will never pay out that yield.

THE COURT:  Isn't that a misstatement claim, a claim dependent on the notion that AMID was required to disclose that it was going to be purchased by ArcLight?

MR. BISSELL-LINSK:  It is our view that the two are intertwined on these facts, and there is a lot of authority for the idea that you can have a misstatement claim side by side with the scheme claim.  So we certainly do believe that we

LB26KRAO

plead misstatements.  Altogether the course of conduct here amounted to a fraudulent scheme, and the *Cochran* case and the *Genesco* case really stand for that.  They show that in those cases it was -- in one of those cases it was withheld that there was a plan to buy the company out and that it was a combination of the course of conduct of cutting the distribution and that sort of withholding of information that amounted to a fraudulent scheme.

THE COURT:  If I find that there was no obligation to disclose the Spring 2018 discussions, either because AMID didn't know about them or because they were not inconsistent with anything that was said that didn't render what was said misleading, then wouldn't the scheme claim fall with the misstatement claim?

MR. BISSELL-LINSK:  I will take that in two parts.  I think if there was no plan to take the company to -- to take the company private and that if the distribution cut was made sort of entirely unrelated to that, then that would show that there wasn't a fraudulent scheme and it would undermine the scheme claims.  We would still argue, as we have, that sort of describing an entirely -- what we view as an entirely new strategy for this company in such a radical way, there was a duty to disclose the other extremely relevant context for that fact, which was that that is taking place against the backdrop of Arclight having a plan or an interest if buying the company.

LB26KRAO

So I think the answer is if there was no plan to buy the company, then, yeah, we don't have a case; but I think our facts are more than strongly alleged that there was a plan to buy the company and that is what we're here trying to argue.

THE COURT:  Continue.  I interrupted you.

MR. BISSELL-LINSK:  Okay.  So what I was just saying is that the performance of the company was unprecedented and record-setting and that the market didn't know that ArcLight had a plan to take the company private or at least was interested in doing so.  In July without telling investors that they planned to take the company private, they abruptly cut the distribution driving the price down 43 percent and immediately affected and destroyed the pending merger with Southcross.  And then just two weeks later, defendants began quietly buying up additional units of AMID at a depressed price giving them just enough ownership to execute a take-private transaction without a public vote.  Their filings at that time denied any plan to buy the company.

THE COURT:  I would think that the purchase of the common units by ArcLight would only help the unit holders here, the class that you are purporting to represent.

MR. BISSELL-LINSK:  I guess I am not following that train of thought.

THE COURT:  ArcLight is putting more money into the company as opposed to walking away from it.

LB26KRAO

MR. BISSELL-LINSK:  Sure.  They are not buying shares in an offering.  They are buying shares on the secondary market.  They didn't buy a terribly large number of shares. The key point here is that in such a short time period after the distribution cut, they bought just enough shares to tip themselves up to having an ownership stake sufficient to execute this deal, which we think is very strong circumstantial evidence of the fact that this was all done as part of a common course of conduct to buy the company.  That is where we see that as relevant.

THE COURT:  Okay.

MR. BISSELL-LINSK:  Then less than a month after these purchases and just six weeks after the distribution cut, defendants formally offered to buy the company and they then orchestrate a second cut and eventually buy the company at a 55 percent discount to where it was trading prior to the distribution cut.  So it is our view that altogether these facts strongly allege that this was all part of a fraudulent scheme.  I would like to walk through our view of why we think that inference is the overwhelmingly strong inference on these facts.

THE COURT:  Let me interrupt you for a second.  I am going to let you do that.  But since you mentioned the second cut, is it your theory that agreeing to the amendment to the credit agreement, AMID's decision to do that, was fraudulent?

LB26KRAO

MR. BISSELL-LINSK:  Essentially, yes, that it was doing so as part of our fraudulent scheme -- with full candor --

THE COURT:  How does that work?  Would it really have been better for the common unit holders to just not have the availability for credit facility or do they just give away money to the banks?  I am not sure I see that in your complaints.

I should not money to the banks, but value to the banks.

MR. BISSELL-LINSK:  What defendants say in their release is that they have renegotiated the credit facility and as part of that they have agreed to not make any further distributions.  What they don't say and what I have seen no evidence of is that they needed to do so or that they did so on terms that were favorable.  So I think if you are following along with us up until agreeing that the first distribution cut was part of this course of conduct, it seems very clear that the second distribution cut was just a continuation of that course of conduct.

What I was about to say before is that it is really our view that the second distribution cut appears to be incredibly suspicious if you are agreeing with us that the first distribution cut has been plausibly alleged or strongly alleged to be part of this course of conduct.  Otherwise, if

LB26KRAO

you just looked at it fully in isolation without knowing the facts relevant to the first distribution cut, I don't think we would have the facts to allege that that in itself was fraudulent.

THE COURT:  Okay.

MR. BISSELL-LINSK:  I wanted to walk through the facts that we think help to establish that this was all done fraudulently, and defendants place a lot of emphasis on our need to put forward supposedly documentary evidence; but the Supreme Court has held in *Tellabs* that circumstantial evidence is clearly sufficient to establish scienter -- a strong inference of scienter.  I think there is a hypothetical in the *Tellabs* opinion that we cited in our opinion that is highly relevant to that fact, which is the Court says if it can be determined that someone stole a jade sculpture from a room and that only two people had access to the room it was stolen from that those facts alone would be sufficient to raise a strong inference at the pleading stage that one of those two people -- that either of those two people was the one who stole sculpture.  I think that really highlights that defendants are really trying to turn this need for documentary evidence into something that is far afield from what the Supreme Court had required to plausibly allege or strongly allege scienter in a fraudulent scheme at the pleading stage.

Looking at the specific facts we have as to this, the

LB26KRAO

first one is that the supposed liquidity crisis was not the reason defendants stated at the time of the distribution cut. It is entirely an after-the-fact fabrication. Rather, the press release stated that distribution cut was made to reduce leverage and provide capital for strategic growth opportunities. There was no mention of any liquidity crisis.

Second, even now defendants present no evidence of a liquidity crisis. In their opening brief they pointed to the 2017 tax reform laws without any explanation of how those laws would affect AMID's liquidity.

Third, AMID had a record-breaking strong performance, as I previously discussed, which further suggests that there is no reason to think their performance deteriorated to create any sort of liquidity crisis.

Fourth, in the period just before the July cut, AMID did not behave as if it were in a liquidity crisis. The July cut saved AMID just 16.4 million and in contrast AMID had spent many times that amount buying assets from third-parties in the year before the cut and had voluntarily remitted over $242 million in cash to ArcLight in the year prior through purchases. Furthermore, AMID had demonstrated that it could easily raise capital. It had sold assets for millions of dollars -- hundreds of millions of dollars and it had issued notes for over a hundred million dollars. So altogether that is not painting the picture of a company that is in any sort of

LB26KRAO

liquidity crisis as defendants have argued.

Finally, in what I think is really one of the most important facts in this case is the Southcross merger. Defendants' briefing paid almost no attention to that deal, but we think it is one of the most significant facts in the case. As we discussed earlier, the deal had been locked up from before the time ArcLight became interested in buying the company, and defendants had repeatedly said that it would be immediately accreted, that they would have no trouble -- no problem closing the deal and getting the financing that they needed, and just months before the time frame one of AMID executives had said that the deal could even be funded on a brief basis if needed.

However, when they cut the July distribution cut, they didn't say anything about the Southcross merger. They instead chose to proceed with the first cut and stated they were doing so to chase other strategic opportunities without first closing the Southcross merger, but they knew that not closing the Southcross merger first and making the distribution cut would destroy the Southcross deal. They had previously publicly stated and Southcross's leadership had publicly stated that the distribution was the most important factor making that merger attractive, and immediately after the cut Southcross calls off the deal.

Here is the real kicker on this point: The breakup

fee and the merger was $17 million.  The July cut was supposed to have saved $16.4 million.  So the July cut didn't even save cash.  It actually resulted in Southcross immediately losing cash.  Keep in mind defendants didn't say, We have to make this distribution cut because we're having trouble closing the Southcross deal and we need the money to pay a potential breakup fee.  They said the exact opposite, that unrelated to the Southcross deal they were identifying lucrative alternative opportunities for growth in that they wanted to cut the distribution for that purpose.  It is our view that that is such a nonsensical explanation in context that it weighs extremely heavily as a circumstantial matter against defendants' supposed explanation for the situation.

So it is sort of our view in summary that you have to weigh the inference that a private equity firm succumbed to the conflict of interest to unfairly acquire AMID against a theory of liquidity crisis that is inconsistent with contemporaneous public statements, unsupported by the pleadings based on sort of illogical theory of 2017 tax reform, at odds with AMID's strong results, inconsistent with AMID'S actual conduct of buying assets and remitting cash and raising capital, and illogical in the face of AMID's pending merger with Southcross. If plaintiffs' theory is more plausible or if it is a tie, then we have plausibly and strongly alleged that there was a fraudulent scheme here and we should get discovery into

LB26KRAO

investigating the actual details of that scheme.

So the defendants have raised a multitude of more specific arguments of a pleading standard than in the technicalities of scienter and loss causation.  I am happy to walk through all those arguments, but I wanted to pause for a moment to see if there is somewhere you wanted me to start in walking through those.

THE COURT:  I don't have anymore questions.  I know I have interrupted you a lot.  I have read your papers.  If you could spend maybe five minutes on just any key cases you want me to read or key paragraphs of your complaint that you want me to focus on and then I am going to give your adversary five minutes and then we'll have to conclude this.  Focus me on key cases and key allegations.

MR. BISSELL-LINSK:  Sure, your Honor.

So the first point I would like you to look to is this matter of the pleadings standard for a manipulative scheme and the requirement of particularity.  That is under the *ATSI* case, which we both site in our briefing.  The full citation to that is 493 --

THE COURT:  I have the citation.

MR. BISSELL-LINSK:  Got it.

So that case says that *to plead a fraudulent scheme one must plead the nature, purpose and effect of the fraudulent conduct in the roles of the defendants,* and we have done that.

LB26KRAO

We have explained that ArcLight and the directors and officers of GP intentionally manipulated AMID's unit price down by cutting the distribution and making related false statements for the purpose of allowing AMID to buy the company on the cheap and that members of AMID senior management furthered that scheme through their involvement in the distribution cut, the issuing of false explanations, and withholding information.

Defendants turn our burden into the requirement to plead documentary evidence, but we've explained the basis of our view for why that statement is false.  That is the particularity requirement -- explaining in detail why we think that is false.  If they don't think that that detail makes out a plausible or compelling claim, that is an inquiry that has to do with the strength of the allegations not whether or not we pled with particularity and that is the standard that should be evaluated under *Tellabs*, which is why we have directed the Court to think about this through the lens of have we alleged this strongly or not.

I just want to say one more thing on the *ATSI* case, which is that that case says that *in a scheme claim, one need not plead manipulation to the same degree of specificity as in a plain misrepresentation claim.*  Now, I am not sure that that line makes a specific difference here.  I think we have pled with the requisite specificity under either standard, but defendants attempt to say that a scheme claim needs something

LB26KRAO

higher than a regular misstatement claim.  That it needs documentary proof is really the opposite of what is established by the Second Circuit.

The one other point I wanted to make was the reference to the *China Northeast Petroleum* case that defendants talked about.  I think that case is certainly worth reading because what it establishes is that there were undisclosed transactions going on at that company as defendants have noted.  But what the Court did in that case is infer that from the totality of the circumstances, including those undisclosed transactions, that there was a fraudulent scheme.  There was nothing like a spoking gun e-mail or documentary evidence or a confidential witness saying defendants were doing these transactions in furtherance of a scheme.  So that case really actually goes to show that where you have strong circumstantial evidence supporting the inference of a fraudulent scheme that that is sufficient at the pleadings stage.

Those are the two final points I wanted to make.

THE COURT:  Thank you.  That is very helpful.  Your whole argument has been helpful.

Let me turn back to Mr. Atkinson.

You have got five minutes, sir.

MR. ATKINSON:  Thank you, your Honor.

Just a few brief points.  First, your Honor, I didn't hear plaintiffs' counsel mention a single time in their

LB26KRAO

argument today or a single time in their briefing on this motion the *Brady* case or the *Onel* case. Our contention is those are directly on point. They come out against the plaintiffs' position here and of course they are very resent Eastern District and Second Circuit decisions. I will note, too, in light of counsel's reference to the potentially lower standard to plead manipulation, that lower standard of course was referenced expressly in the *Brady* decision.

Second, the plaintiff keeps sliding past the requirement to plead with particularity evidence that ArcLight in fact had a plan to acquire the partnership by July of 2018. The only evidence that the plaintiffs present in support of that allegation is the internal preliminary discussions that were happening at ArcLight in the Spring of 2018. They, of course, then use the benefit of hindsight to say, Well, a transaction ultimately was agreed to so there must have been a plan. But if your Honor looks closely at the complaint, as I know your Honor has done, there is actually no factual support for the claim that Arclight had a plan to acquire AMID, let alone a plan to drive down the unit price in order to acquire AMID in July of 2018. And I will direct your Honor to the *Vladimir v. Bioenvision* case that is cited in the brief. This is a Judge Stein case from 2009. *It would be as serious an infringement of these regulations* -- meaning Section 13(d) and other SEC regulations --

LB26KRAO

THE COURT:  I have read the case.  I have read the case.

MR. ATKINSON:  Thank you, your Honor.

The jade sculpture analogy just doesn't hold here, your Honor.  That analogy assumes that a jade sculpture was stolen.  There is no actual quote/unquote theft pled here.  It is a suspicion that the plaintiff claims to have, but the analogy simply just doesn't hold.

Southcross issue, your Honor, it also doesn't make sense here.  The plaintiffs say in their amended complaint that the first cut was merely certain to result in termination of the Southcross merger.  Not so.  Your Honor, as you know, you need cause for termination.  Reducing distributions is not cause for termination.  And it was fully disclosed that the reason the deal was terminated was that AMID could not obtain acceptable financing for the deal.

Second, the merger was in trouble way before the distribution cut.  This is right from the amended complaint, paragraph 48.  The merger was announced in November of '17 with an outside date of June and then the parties moved the outside date two weeks to June 15th.  That is paragraph 48 and paragraph 86 of the amended complaint.  By the date of the distribution cut, we were a month and a half past that extended outside date.  So the idea that we cut distributions in order to get them to terminate not only is it unsupported and not

LB26KRAO

only does distributions not give Southcross the ability to terminate, but it is also inconsistent with the timeline in the plaintiffs' own complaint, which is that Southcross and AMID were having trouble closing this deal for months before that.

Finally on Southcross, your Honor, plaintiffs say, "The Southcross merger termination resulted in a termination fee that exceeded the cash saved by the first cut proving the stated reason for the cut falls."  I have to confess I do not understand this allegation.  Perhaps plaintiffs are implying that someone decided a cut would cause Southcross to terminate and then made a calculation that the cash saved in the cut would offset the termination fee that AMID would have to pay. Now, there is no fact in the complaint anywhere showing that to be the thinking, nor is that even expressly alleged, but even if it were true, your Honor, why would AMID cut the distributions at all?  There would be no savings because all of the savings would have to go right back to Southcross.  The theory is just simply not plausible.

Finally, your Honor, plaintiffs have said today and they said in their briefing that the problems facing AMID were all a big surprise.  I will just direct your Honor to the 10(k) I referenced earlier, Exhibit 6 to our motion to dismiss, specifically the risk factor at ECF page 54.  It says, *Our current and future indebtedness levels may limit our flexibility in obtaining additional financing and in pursuing*

LB26KRAO

*other business opportunities*, and then it goes on for several paragraphs with detail about how the very high leverage issue, the very high leverage ratios, the high levels of indebtedness could impact the company going forward. So this was not a surprise. It was disclosed six months before the July press release and investors were well aware of the challenges facing the partnership.

THE COURT: Thank you very much, Mr. Atkinson.

There was an argument that Mr. Atkinson made that plaintiffs' counsel failed to address in its oral argument a couple of cases that defense counsel is relying on. I am going to read those cases. Given the time constraints that I put on each side and the questions that I asked took up some amounts of time, I am not drawing an inference from the fact that counsel didn't argue or address a particular case in oral argument. I am going to read the papers, I am going to read the cases, and I am going review the transcripts.

I will take the matter under advisement and you'll get a decision shortly.

Thank you very much. Excellent argument on both sides.

Mr. Atkinson, you will stay on the phone and order a copy of the transcript from the court reporter.

My many thanks to the court reporter.

Have a good day everybody. Stay safe and stay

LB26KRAO

healthy.

oOo