UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------X
                               :

PAUL C. KRAFT, *et al.*,            :

                               :

                  Plaintiffs,    :

                               :               19-cv-9398 (LJL)

        -v-                :

                               :           OPINION AND ORDER

THIRD COAST MISTREAM, *et al.*,   :

                 Defendants.   :

                               :

--------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Defendants, Third Coast Midstream, LLC f/k/a American Midstream Partners, L.P.

("AMID" or the "Partnership"), American Midstream GP, LLC ("GP"), Arclight Capital

Partners, LLC ("ArcLight"), and the individual defendants identified below (together

"Defendants"), move, pursuant to Federal Rule of Civil Procedure 9(b) and 12(b)(6), to dismiss

the amended complaint, at Dkt. No. 32 ("Amended Complaint" or "Am. Compl.") filed against

them by Plaintiffs Paul C. Kraft and Linda E. Kraft JTWROS and Randall Dobler ("Plaintiffs").

The Complaint is brought by Plaintiffs individually and on behalf of a putative class of all

persons who purchased common units ("CUs") issued by AMID during a class period from July

27, 2018 to July 23, 2019 (the "Class Period").

      Plaintiffs were purchasers and holders of common units ("CUs") of a master limited

partnership ("MPL") that ultimately was taken private by a large shareholder in 2019.  They

complain that AMID made various decisions that had the effect (which they claim was intended)

of driving down the price of the CUs to make the business less costly to acquire.  Because

Plaintiffs do not allege any actionable misstatements, omission, or loss causation, the claims do

not make out manipulative scheme liability as it has been defined by the Second Circuit and the Supreme Court, and there are no well-pled allegations of scienter as to AMID or any individual Defendant, the complaint is dismissed without prejudice.

## BACKGROUND

### A.    The Relevant Parties

Defendant AMID was, until approximately July 23, 2019, a publicly-traded MLP in the "midstream" oil business.  Am. Compl. ¶¶ 1, 25.[1]  It was formed in 2011 to own, operate, develop and acquire a diversified portfolio of midstream energy assets.  *Id*. ¶ 25. The midstream sector involves the transportation, storage, and wholesale marketing of oil, natural gas, and natural gas liquids.  *Id*. ¶ 55.

Defendant GP is AMID's general partner.  *Id*. ¶ 28.  It provided AMID with all of its employees and management.  *Id*. ¶¶ 4, 28.

Defendant ArcLight is an infrastructure firm focused on investing in North American energy assets.  *Id*. ¶ 29.  Directly and through affiliates, it was a very large shareholder in AMID. *Id*. ¶¶ 4, 29, 116.  Entities that are affiliated with and controlled by ArcLight own and control GP.  *Id*. ¶¶ 28-29.  On July 23, 2019, AMID completed its merger with affiliates of ArcLight and AMID ceased to be publicly traded.  *Id*. ¶ 25.

The complaint names as individual defendants persons who served either as directors or as officers of AMID.  As a general matter, the directors all were appointed in connection with

---

[1] An MLP is a term often used to describe publicly traded LP's, especially in the energy industry. *See id*. ¶ 25 n.4.  MLPs enjoy a tax advantage compared to corporations, as they are able to distribute profits to their unitholders without being taxed at the entity level.  This advantage was diluted with the cut in the federal corporate income tax rate effectuated by passage in 2017 of the Tax Cuts and Jobs Act, discussed further *infra*.

their affiliation with ArcLight.  AMID's CEO and CFO, at the relevant times, are not alleged to have been appointed by or be affiliated with ArcLight.

Stephen W. Bergstrom ("Bergstrom") was a director of GP and its President and CEO from 2013 until December 2015.  *Id*. ¶ 31.  From 2015 until July 23, 2019, he remained a director of GP.  He was appointed to the GP Board in connection with his affiliation with ArcLight. Id. ¶ 31.

Lynn L. Bourdon LLL ("Bourdon") was AMID's Board Chairman, President, and CEO, until his resignation from AMID effective May 3, 2019.  *Id*. ¶ 32.

John F. Erhard ("Erhard") was a director of GP from April 2013 until at least July 23, 2019 and was appointed to the Board in connection with his affiliation with ArcLight.  He is a partner at ArcLight, where he has been employed since 2001.  *Id*. ¶ 33

Eric T. Kalamaras ("Kalamaras") was AMID's Chief Financial Officer.  *Id*. ¶ 34.

Daniel R. Revers ("Revers") was a director of GP from April 2013 until at least July 23, 2019 and was appointed to the Board in connection with his affiliation with ArcLight.  He is Managing Partner and a co-founder of ArcLight.  *Id*. ¶ 35.

Joseph W. Sutton ("Sutton") served as director of GP from May 2013 until at least July 23, 2019 and was appointed to the Board in connection with his affiliation with ArcLight  *Id*. ¶ 36.

Lucius H. Taylor ("Taylor") was a director of GP from April 2013 until at least July 23, 2019 and was appointed to the Board in connection with his affiliation with ArcLight.  Since 2007, Taylor has been employed by ArcLight and currently serves as a principal of the fund.  *Id*. ¶ 37.

The plaintiffs are purchasers and former holders of AMID's common units ("CUs"), equity securities that traded on the New York Stock Exchange, and that were one of two classes of securities issued by AMID.  *Id*. ¶ 1, 26.  They seek to bring this action on behalf of all persons who were invested in AMID's CUs until July 23, 2019 when those securities ceased to be publicly traded.  *Id*.  In addition to CUs, AMID also issued preferred units ("PUs") which were held entirely by ArcLight and its affiliates.  *Id*. ¶ 27.  PU holders enjoyed distribution and liquidation preferences entitling them to priority over the CUs, as well as conversion rights entitling the holders of the PUs to shares of CUs upon conversion.  *Id*.

In addition to holding all of the PUs, ArcLight and its affiliates were a substantial holder of AMID CUs.  Prior to August 15, 2018, ArcLight controlled almost 14 million CUs.  After August 15, 2018, ArcLight and its affiliates owned 15.39 million CUs and PUs that were equal to 24 million CUs on a fully converted basis, giving it majority control of the CUs.  *Id*. ¶ 116 n.23.

## B.    Pre-Class Period Events

The essence of Plaintiffs' claim is that AMID and ArcLight orchestrated a purported scheme to engage in misrepresentations to drive down the price of its CUs so that ArcLight could acquire AMID on the cheap.  Critical to Plaintiffs' claim is the nature of AMID's CUs.  Plaintiffs allege the CUs were designed to be yield-oriented securities which were attractive by virtue of the regular distributions they provided to the holders of those securities.  *Id*. ¶ 56.  The CUs had a track record of paying a distribution of $0.4125 per unit every quarter from AMID's initial public offering in 2011 until the third quarter of 2018, which is when the class period begins.  *Id*. ¶¶ 26, 76, 94.  Under AMID's partnership agreement, "Available Cash that [wa]s deemed to be Operating Surplus" was to be distributed first to the GP and then to the CU holders until they received a minimum quarterly distribution of $0.4125 per unit.  Dkt. No. 52-3 ("Partnership

Agreement") at 128.  That provision, however, was subject to an important qualification.

"Available Cash" is defined as "cash on hand at the end of a quarter after the payment of our

expenses and the establishment of cash reserves and . . . cash on hand resulting from Working

Capital Borrowings made after the end of the Quarter . . . Less the amount of any cash reserves .

. . established by the [GP] to: (i) provide for the proper conduct of the business of [AMID]

(including reserves for future capital expenditures [and] for anticipated future credit needs of

[AMID] . . . )" *Id.* at 5.[2]

Both leading up to and during the Class Period beginning on July 27, 2018, AMID had

strong operating results, announced positive results and had strong performance, and engaged in

a number of transactions that demonstrated its ability to raise capital and its willingness to spend

capital for acquisitions that it believed to be accretive.  Am. Compl. ¶¶ 49, 74-91.  At the same

time, however, events in the broader marketplace made it more difficult for AMID to raise

capital from the equity capital markets and presented challenges to its ability to generate the cash

to invest in the businesses it believed would be profitable.  The statements regarding the

difficulty of raising capital from the equity capital markets and the challenges that such difficulty

posed to AMID's balance sheet serve to put in context the statements quoted by Plaintiffs from

the same conference calls.

---

[2] Plaintiffs only quote a portion of the Partnership Agreement.  The terms of that Agreement,
however, which is incorporated by reference, govern over Plaintiffs' inaccurate description of it.
*See Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 383 (S.D.N.Y. 2020), *aff'd*,
2021 WL 745310 (2d Cir. Feb. 26, 2021) ("If a document relied on in the complaint contradicts
allegations in the complaint, the document, not the allegations, control, and the court need not
accept the allegations in the complaint as true.") (internal quotation marks and citation omitted).

As to its operating results, AMID announced year-over-year operating losses decreased by approximately seventy (70) percent in 2Q18, while year-over-year revenues and adjusted EBITA in the same period increased by approximately thirty-six (36) percent and fifteen (15) percent respectively.  *Id.* ¶ 90.

From mid-2017 until mid-2018, AMID engaged in a number of transactions, buying gathering systems and pipelines and selling businesses that it believed to be non-core.  Am. Complaint ¶ 49.  The transactions demonstrated that AMID was interested in growth and was able to generate the capital necessary to fund that growth.  *Id.*

At the same time, Congress's passage in 2017 of the Tax Cuts and Jobs Act, Pub. L. No. 115–97 (2017) ("Jobs Act") eliminated one of the most important advantages for an MLP and increased AMID's cost of capital, making it more difficult for AMID to fund its growth and transformation.  *See* Dkt. No. 52-1 ("Preliminary Information Statement") ¶¶ 18-19.  Plaintiffs allege that one of the principal attractions of AMID for public investors was its ability to make sizable and stable distributions and to do so without being taxed at the entity level, as is the case for corporations.  Am. Compl. ¶¶ 56-61.  An investor in a business that operates in the corporate form is taxed twice on distributions—once at the corporate level and a second time at the individual level when dividends are distributed.  The feature is disincentive to investing in corporations and raises their cost of capital.  As a general matter, the effective tax on shareholders on the residual earnings to which their shares entitle them is higher as a result of the double-tax.

Businesses that operate through limited partnerships avoid double-taxation; "the MPL, as a pass-through entity, is not subject to corporate income tax," and as such, profits are only taxed once, "according to the[] individual rate [of the investors] only on dividends received."  Robert

K. Cowan, *Different Name, Same Result: Why Master Limited Partnerships Are Unlikely to Finance Our Green Energy Future*, 98 Tex. L. Rev. 357, 368 (2019).  The Jobs Act, however, reduced the relative benefit of that structure to investors in an MLP and thus reduced the relative attractiveness of investing in an MLP as opposed to investing in a corporation.  Congress "lowered the U.S. federal corporate income tax rate from 35% to 21%, reducing the benefit of [an MLP] pass-through structure."  Dkt. No. 52-1 at 18; *see* Cowan, *Different Name, Same Result*, 98 Tex. L. Rev. at 394 (by lowering the corporate tax rate, the Jobs Act "significantly reduces the key advantage held by MLPs").  As the Preliminary Information Statement later explained, coinciding with the 2017 tax regulation as well as other regulatory and market developments, AMID's access to capital in the public equity markets became more expensive, leading the Partnership to increase its leverage to fund growth and capital expenditures:

> [I]in the past several years, the Partnership has been unable to access capital in the public equity markets in any material amount, or on terms reasonably acceptable to the Partnership, which has contributed to the Partnership's elevated leverage levels and limited the sources of capital available to the Partnership to fund growth capital expenditures.  The Partnership has accessed external capital through the issuance of debt securities and its secured credit agreement, although even those sources were limited in 2018.  Furthermore, the Partnership determined that issuing common units or preferred equity at then-current market terms may negatively impact the market price of the common units and the Partnership's distribution coverage ratio and create further limitations on financing options.

*Id.* at 18-19.

In AMID's 1Q18 earnings call, Bourdon and Kalamaras thus touted the Partnership's strong performance but also discussed "challenging equity capital markets" and the Partnership's leverage that had put "short-term pressure on [the Partnership's] balance sheet" at that time.  *See* Dkt No. 52-6 at 8-9.

The complaint alleges two important developments for AMID's business in 2017.  First, as later described on a November 27, 2017 earnings call, AMID was undergoing a transition to

adopt a new capital allocation strategy that involved the divestment of non-core assets to generate cash which the Partnership would then use to invest into higher growth businesses.  The policy was adopted "to be net accretive to both our distributable cash flow and our balance sheet."  Dkt No. 52-4 at 5; *see also id*. 2-3.  The opportunity to invest in new businesses was characterized as exciting.  AMID's CEO Bourdon stated: "this train is leaving the station.  I hope as investors you are as excited as we are about our future and if you stay with us or you get onboard quick, because we have an exciting and successful journey ahead of us and we're not waiting around."  *Id*. at 7; Am. Compl. ¶ 64.

Second, presumably as part of that strategy and among its transactions, on November 1, 2017, AMID announced that it had entered into an agreement to acquire Southcross Energy Partners, L.P. ("Southcross"), another midstream limited partnership with assets complimentary to AMID's assets, in an equity-for-equity merger (the "Southcross Merger").  Am. Compl. ¶ 38.  AMID promised to provide Southcross (1) a 15% stake in the GP, diluting the ArcLight affiliates that previously owned 100% of the GP; (2) 3.4 million AMID CUs; (3) 4.5 million new Series E convertible PUs, entitled to a single vote with the CUs; and (4) options to acquire 4.5 million AMID CUs, with an $18.50 strike price that would expire in 2022.  As a term of the Series E convertible PUs, their holders would be entitled to a minimum of $15 per unit, in the event of any merger by AMID after their issuance.  *Id*. ¶ 41.  Public unit holders of Southcross would receive 0.160 AMID CUs for each Southcross common unit.  This would result in 3.5 million new AMID CUs going to Southcross unit holders.  *Id*. ¶ 42.  AMID was required to satisfy the closing conditions by June 15, 2018; the merger was valued at $815 million, and, if AMID was able to close, would have created a partnership that AMID said would have an enterprise value of $3 billion.  *Id*. ¶¶ 40, 108.

The Southcross Merger also included certain closing conditions, including approval by regulators, approval by Southcross investors, and the repayment of $130 million of estimated Southcross Holdings' net debt and approximately $517 million of Southcross net debt (together, the "Southcross Debt").  *Id.* ¶ 44.  Under the merger agreement entered into by the parties, the "Outside Date" for the merger was June 1, 2018, which was later extended to June 15, 2018.  *Id.* ¶ 48, 86.

The announcement of the Southcross Merger stated that the deal (1) would "accelerate the transformation of AMID, furthering asset density and full value-chain participation within core operating areas," (2) "Expand[] AMID's onshore gathering, processing and transmission services in the highly economic Eagle Shale play and in the Southeast U.S. gas transmission market," (3) "Expand[] AMID's commercial and operational capabilities across a high-quality asset platform," and (4) be "[i]mmediately accretive to 2018 distributable cash flow per unit." *Id.* ¶ 39.  AMID stated that it expected the transaction to be attractive to the holders of Southcross common units "as it will permit them to participate in the future anticipated growth of AMID's businesses, including the benefit of AMID's cash distributions on common units, currently paying $1.65 per common unit annually," *id.* ¶ 42, and that the Southcross common unit holders would benefit from AMID cash distributions as "perhaps [the] most important" factor making the transaction attractive to them.  *Id.* ¶ 43.

On March 12, 2018, AMID announced its 4Q17 results and strategy.  Those results included AMID's execution on its strategy to make investments to optimize its raising of capital "from noncore assets and reinvesting this cash in higher-growth areas," Am. Compl. ¶ 65; Dkt. No. 52-5 at 4, both to make acquisitions to transition into a fully integrated midstream company

that would increase earnings in the future and to protect and improve its balance sheet.  Dkt. No.
52-5 at 2.

   During that earnings call, AMID's CFO Kalamaras stated that "[d]uring the fourth
quarter and the entirety of 2017, our accomplishments are simply unprecedented."  Am. Compl.
¶ 65; Dkt. No. 52-5 at 4.  He also stated that the Company had reduced borrowing under its
revolving credit facility, and that the Company was "well positioned [for a] materially higher
2018 and 2019 EBITDA and distributable cash flow."  Am. Compl. ¶ 66; Dkt. No. 52-5 at 6.  He
concluded: "as we continue through 2018, we'll have a partnership with more focus and scale in
our core operating areas and an asset footprint that allows us to capture meaningful growth
opportunities."  Am. Compl. ¶ 66; Dkt. No. 52-5 at 6.

   On the same call, AMID's CEO and board chairman Bourdon discussed the prospect of
"a tremendous set of organic investment opportunities as we move into 2018."  Am. Compl. ¶
67; Dkt. No. 52-5 at 7.  He also spoke positively about the Southcross Merger.  The merger had
not yet closed, but Bourdon spoke optimistically about its prospects of closing in the second
quarter of 2018, including describing the transaction as "highly strategic" and a "game-changer"
and stating that he could not "stress enough the strategic value we see in this transaction" and
that the transaction was on "course" for the second quarter closing.  Am. Compl. ¶¶ 68-69; Dkt.
No. 52-5 at 2.

   On May 15, 2018, AMID held its 1Q18 earnings call.  As with the 4Q17 earnings call,
Bourdon and Kalamaras touted the Partnership's performance.  Bourdon explained that the
"strong first quarter . . . was driven by a combination of continued solid performance from
[AMID's] core operating businesses and positive contributions from [its] 2017 organic capital
project and acquisitions" and that AMID "expect[ed] this momentum to carry forward, as we

progress through the rest of 2018 and into 2019." Am. Compl. ¶ 74.  Bourdon also provided an update on the Southcross Merger, stating that it had been approved by Southcross unit holders and that certain regulatory approvals had been obtained, and that the transaction was still planned to close in the second quarter. *Id*. ¶¶ 75, 80-81; 52-6 at 7.

However, both Bourdon and Kalaramas alluded to the difficulty of raising capital. Bourdon referenced "challenging equity capital markets" for the Partnership, stating that "[i]n order to fund these growth projects, we will continue to rely on creating internal capital, particularly in light of the challenging equity capital markets."  Dkt No. 52-6 at 7.   Bourdon added:

> As you well know, we have not tapped the equity markets for the past 3 years despite having completed or announced over $1.8 billion in accretive growth transactions.  And depending on different investment opportunities, we may consider divesting other super-high-valued assets in order to invest in lower-multiple-priced assets that have higher growth potential, increase our asset density, simplify the business and enhance our balance sheet.

Dkt No. 52-6 at 7.

For his part, Kalamaras stated that, "over the past few years, we have substantially transformed our business with minimal [spend in] equity.  As such, this has put short-term pressure on our balance sheet, as our growth opportunity has simply outpaced our ability to create internal cash.  And this has placed the partnership capital structure leveraging liquidity above our targets." Compl. ¶ 79; Dkt No. 52-6, at 9.

During the question and answer portion of the call, an analyst expressed concern about the closing of the Southcross Merger, noting that the parties had planned for a 2Q18 closing but that one of the asset sales AMID was working on to fund the repayment of the Southcross Debt was planned to close only in 3Q18.  Am. Compl. ¶ 81.  The analyst asked about where AMID would obtain the financing to close the transaction.  Kalamaras responded that while he could not

"comment on forward capital markets transactions," "there are a variety of mechanisms" that could be used to fund the Southcross transaction "on a short-term or bridge basis . . . until we've put our permanent financing plans in place.  In a few weeks, we'll come out with a broader strategy around all of that, so I'd ask you to wait for that."  *Id.*  Kalamaras also responded to a question about a set of assets other than Southcross, by stating: "we've put about as much leverage on the balance sheet that we would prefer to" and concluded that "I think our view . . . is that we're looking at ways to reduce leverage, not ways to add to it."  Dkt No. 52-6 at 12.

Plaintiff alleges that AMID's answers assured investors that "AMID had flexibility in financing the Southcross Merger and that it was not concerned with its ability to do so."  Am. Compl. ¶ 82.

Plaintiffs also allege AMID made positive announcements in May and June 2018.  In May 2018, AMID published slides from an industry conference boasting of AMID's "financial strength" and commenting on its "strong first quarter results driven by meaningful growth cross core segments" and its EBITDA growth.  *Id.* ¶ 84.   The presentation also included a slide on the Southcross Merger and on AMID's planned divestitures of "marine terminals," as well as other non-core assets it was considering selling.  *Id.* ¶ 85.  On June 18, 2018, AMID announced that it had successfully reached an agreement to sell the marine terminals for $210 million which would be used to pay down its revolver and that the outside date for closing the Southcross Merger had been extended to June 15, 2018.  *Id.* ¶ 86.  A number of other factors suggested that the midstream industry was doing well in the second quarter of 2018, including regulatory developments, strong peer performance, and strong underlying industry metrics.  *Id.* ¶ 87.

### C.       The July 27, 2018 Announcement

On July 27, 2018, AMID announced that it had decided to hold additional cash and to decrease its distribution to CU holders from $0.4125 per quarter, or $1.65 annually, to $0.1031

per quarter, a 75% drop ("First Distribution Cut").  Am. Compl. ¶ 91.  According to the press release announcing the revised capital allocation strategy ("July 2018 Press Release"), AMID had "determined the most prudent sources of accretive growth capital are proceeds from the sale of non-core assets and the retention of an increased portion of operating cash flow through the reduction of its common unit distribution."  *Id*. ¶ 95; Dkt. No. 47-2 at 2.  The strategy was "intended to significantly reduce leverage, provide capital for strategic growth opportunities, and create long-term value" and that its management team and Board had evaluated "numerous strategies to maximize long-term value" and had concluded "[e]quity capital market constraints for master limited partnerships and the availability of equity capital at acceptable costs and in sufficient quantities, warrants retaining an increased portion of operating cash flow to support growth of the Partnership."  The release stated "[t]ogether, cash flow retention and asset sales will enable the Partnership to reallocate capital to meaningful growth opportunities, while promoting balance sheet flexibility, substantially reducing indebtedness and minimizing the need to raise external equity capital" and that the Partnership and Board of Directors would "continue to evaluate its distribution policy as it executes its plans for growth, deleveraging, and capital access."  *Id*. ¶ 95.

The July 2018 Press Release went on to announce that it had identified non-acquisition related growth opportunities ranging from $200 to $300 million through 2020; that, based on first half 2018 results, AMID expected to generate annualized EBITDA between $190 and $200 million; that it was progressing with plans to deleverage with the sale of its marine products terminals for $210 million and its refined products terminals for $138.5 million; that it had identified other non-core assets worth between approximately $350 and $400 million that it

could potentially sell; and that the reduction in the common unit distribution would generate approximately $65 million of additional, non-dilutive capital per year.  Dkt. No. 47-2.

In the wake of the announcement, the price of CUs dropped from $11.55 on July 26, 2018 to $6.60 on July 27, 2018.  *Id*. ¶ 94.

Also, in the wake of the announcement, on Monday July 30, 2018, Southcross announced that on July 29, 2018, it had formally terminated its merger with AMID which it had the right to do because AMID had not completed the closing before the June 15, 2018 "Outside Date" for closing designated by the parties.  *Id*. ¶ 108.  As a result of the termination, AMID was required to pay a termination fee of $17 million to Southcross.  *Id*.  Plaintiffs allege that at least one of the closing conditions that was not satisfied was AMID's obligation to fund the acquisition.  *Id*. After Southcross announced that it was terminating the merger, the CU price dropped from a closing price on July 27, 2018 of $6.60 to $6.10 on July 30, 2018, and $5.30 on July 31, 2018.

### D.    ArcLight's purchase of AMID

On August 15, 2018, ArcLight purchased 597,728 CUs at an average price of $6.16, as it disclosed on August 17, 2018.  *Id*. ¶ 115.  Those purchases, when added to CU conversion-value of ArcLight's PU holdings, gave ArcLight control of the majority of AMID CUs.  *Id*. ¶ 116. Had ArcLight purchased the same number of securities on July 26, 2018, before the First Distribution Cut and termination of the Southcross Merger, it would have had to pay approximately $3.22 million more.  *Id*.  On August 20, 2018, ArcLight and its affiliates filed a Form SC 13 D/A ("ArcLight 13D") with the SEC, in which they disclaimed "any specific plan or proposal to acquire, transfer or dispose of Units," but reserved the right to change their intentions and to purchase additional units.  *Id*. ¶ 118.

Under the Partnership Agreement governing AMID, a merger had to be approved by the vote or written consent of a majority of votes (with CUs and PUs voting as a single class).  *Id*.

¶ 53. However, the decision to engage in a transaction with ArcLight or any other decision where there would be a potential conflict of interest between GP and AMID, had to be approved by AMID's conflicts committee ("Conflicts Committee"), comprised of independent directors (none of whom is named here as a defendant), who would determine the resolution or course of action of the GP. *Id.* ¶ 54.

On September 14, 2018, a representative of ArcLight contacted the chairman of AMID's Conflicts Committee and informed him and Bourdon that ArcLight was considering a potential buyout. *Id.* ¶ 119. On September 26, 2018, the Conflicts Committee held a call to discuss the potential offer and, on September 27, 2018, an affiliate of ArcLight named Magnolia Infrastructure Holdings, LLC delivered a non-binding offer to GP to acquire all of the issued and outstanding publicly held CUs of AMID that were not directly owned by MIH or its affiliate for $6.10 in cash. *Id.* ¶ 121.

On September 28, 2018, AMID announced in a press release ("September 2018 Press Release") that affiliates of ArcLight had made an offer, which it described as unsolicited and non-binding, to acquire the remaining CUs of the Partnership that it did not already own in exchange for $6.10 per CU. The September 2018 Press Release stated, in part, that AMID had "[r]eceived an unsolicited non-binding proposal from affiliates of [ArcLight]," and that "[t]he proposed transaction is subject to a number of contingencies, including the approval of the Conflicts Committee . . . the approval of holders of a majority of the outstanding common units of the Partnership, and the satisfaction of any conditions to the consummation of a transaction set forth in any definitive agreement concerning the transaction." *Id.* ¶ 123. It continued, "[t]here can be no assurance that definitive documentation will be executed or that any transaction will materialize on the terms described [in the press release] or at all." *Id.*

Thereafter, the Conflicts Committee retained financial advisors and legal counsel and evaluated the proposed transaction.  Dkt. No. 52-1 at 19-20.  On or about December 21, 2018, with the assistance of the financial advisors and legal counsel, AMID's Conflicts Committee determined to accept ArcLight's offer of $6.10 per CU when it learned that AMID had entered into a renegotiated credit facility requiring AMID to withhold all distributions until certain requirements under the credit facility were met.  *Id.* ¶ 126.

That same day, AMID's creditors consented to an amendment to AMID's credit facility, effective as of December 27, 2019, that provided for leverage covenant relief sufficient to avoid AMID defaulting under the credit facility.  "In order to induce the requisite lender consent for such amendment, the Partnership was required to pay an amendment fee and agree to an additional restricted payment test for distributions, resulting in the inability to declare or pay cash distributions to the Partnership's unitholders, including [to ArcLight and its affiliates], until the Partnership's consolidated total leverage ratio [was] reduced to less than 5:00:1:00."  Dkt. No. 52-1 at 23; *see* Dkt. No 52-3 at 2-3.

After the Conflicts Committee had determined to accept the offer, however, on December 21, 2018, ArcLight withdrew it based on the eroding market conditions and AMID's recent financial performance.  *Id.* ¶ 127; Dkt. No. 52-1 at 23.

On December 31, 2018, AMID filed a form 8-K with the SEC announcing the amendment to its credit facility effective December 27, 2018, and summarizing the terms of that amendment.  Among other things, the Form 8-K disclosed that the amendment limited AMID's ability to declare or pay cash distributions until it achieved a specified and reduced leverage ratio, Am. Compl. ¶ 128, and that "therefore" AMID did not expect to make any cash

distributions on its CUs or PUs with respect to the fourth quarter of 2018 ("Second Distribution Cut").  *Id.*

Upon this disclosure, AMID's price dropped further, from a closing price of $4.33 on December 28, 2018 to a closing price of $3.03 on December 31, 2018.  *Id.* ¶ 130.

On January 2, 2019, ArcLight revised its buyout offer to $4.50 per CU, down from $6.10 in the September offer.  *Id.* ¶ 131.  On March 16, 2019, the Conflicts Committee, acting with the assistance of a financial advisor and legal counsel, recommended to the AMID board that it accept the offer from ArcLight to buy AMID at a price of $5.25 per CU, determining that acceptance of the offer was in the best interests of AMID and of the holders of the CUs other than ArcLight and its affiliates.  *Id.* ¶ 132; Dkt No. 52-1 at 4, 30.[3]  The board accepted that recommendation, also determining that the merger was in the best interests of AMID and its unaffiliated CU holders.  Dkt No. 52-1 at 30.  On March 18, 2019, AMID announced that it had reached a deal.  It also announced that under the Partnership Agreement a vote of the CU holders was not required because ArcLight controlled a majority of the votes and provided written consent approving the deal.  Am. Compl. ¶ 133.

On April 24, 2019, AMID published its preliminary information statement regarding the merger.  *Id.* ¶ 134; Dkt. No. 52-1 ("Preliminary Information Statement").  Plaintiffs focus on the following statement in the preliminary information statement:

---

[3] Although the complaint states that the Conflicts Committee made its recommendation on March 17, the Preliminary Information Statement—which controls—says the recommendation and decision were actually made on March 16.

As a result of these developments and market conditions, in spring 2018, ArcLight began to consider a potential strategic transaction involving the Partnership, including a potential take private transaction, and discussed such strategic alternatives internally with the ArcLight investment committee.

¶ 134; Dkt. No. 52-1 at 19.  That statement came at the end of a paragraph that read as follows:

In addition, in the past several years, the Partnership has been unable to access capital in the public equity markets in any material amount, or on terms reasonably acceptable to the Partnership, which has contributed to the Partnership's elevated leverage levels and limited the sources of capital available to the Partnership to fund growth capital expenditures.  The Partnership has accessed external capital through the issuance of debt securities and its secured credit agreement, although even those sources were limited in 2018.  Furthermore, the Partnership determined that issuing common units or preferred equity at then-current market terms may negatively impact the market price of the common units and the Partnership's distribution coverage ratio and create further limitations on financing options.

Dkt. No. 52-1 at 18-19.

The Preliminary Information Statement also disclosed as part of the background of the

merger the following:

- "The landscape for master limited partnerships ('MLPs') has changed considerably since 2015.  The Tax Cuts and Jobs Act enacted at the end of 2017 lowered the U.S. federal corporate income tax rate from 35% to 21%, reducing the benefit of an MLP pass-through structure. . . . Between . . . April 15, 2013, and the last trading day before the Merger Agreement was announced on March 15, 2019, the Alerian MLP Index, a leading gauge of energy MLPs whose constituents represent 85% of total energy MPL market capitalization, declined by approximately 44%."  Dkt. No. 52-1 at 25.

- Southcross's termination of the merger was "as a result of the transactions contemplated by [the Merger Agreement] not being contemplated by June 15, 2019, which was due to the Partnership's inability to obtain financing on terms reasonably acceptable to the Partnership."  *Id.* at 26.

- "In light of the general MLP market landscape, the Partnership's inability to obtain additional capital from either the public equity or debt markets on commercially reasonable terms and the recent events negatively impacting the Partnership specifically, in mid-September 2018, an affiliate of ArcLight engaged Kirkland & Ellis LLP ('Kirkland') to provide advice regarding a potential strategic transaction involving the Sponsor Entities' investment in the Partnership, including organic growth projects, related party or third party acquisitions and a sponsor take private transaction. Representatives of ArcLight also contacted Merrill Lynch, Pierce, Fenner & Smith

Incorporated ('BofA Merrill Lynch') and Potter Anderson & Corroon LLP to assist with the review and evaluation of such strategic alternatives." *Id.* at 26.

The Conflicts Committee gave a number of reasons for determining that the merger should be approved, including its conclusion that the merger consideration provided greater value to the unaffiliated CU holders than the long-term value of AMID as a publicly traded partnership; that the merger consideration was ArcLight's final offer and a premium to the trading price prior to the approval of the merger; that the merger consideration provided liquidity to the unaffiliated CU holders when AMID was "prohibited from making distributions to unitholders as a result of [AMID] failing to meet certain financial covenant ratios under the Existing Partnership Credit Facility;" and the "Conflicts Committee's belief that the state of the MLP equity capital markets will continue to make it difficult for the Partnership to obtain equity financing to fund acquisitions and growth capital expenditures." Dkt. No. 52-1 at 32.

On July 23, 2019, the merger was closed and AMID was taken private by ArcLight. Am. Compl. ¶ 136.

## PROCEDURAL HISTORY

This action was instituted by filing of a complaint on October 10, 2019, Dkt. No 1, which was amended on February 18, 2020, Dkt. No. 32. Defendants filed the instant motion to dismiss on April 4, 2020, Plaintiff's opposition was filed June 4, 2020, and Defendant's reply was filed July 1, 2020. The Court heard oral argument on February 11, 2021.

## STANDARD OF REVIEW

On a 12(b)(6) motion to dismiss, the court must accept as true all factual allegations in the complaint and draw all possible inferences from those allegations in favor of the plaintiff. *See York v. Ass'n of the Bar of the City of New York*, 286 F.3d 122, 125 (2d Cir. 2002), *cert. denied*, 537 U.S. 1089 (2002). This requirement "is inapplicable to legal conclusions." *Ashcroft*

19

*v. Iqbal*, 556 U.S. 662, 678 (2009).  Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  A complaint must offer more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action" or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007).  The ultimate question is whether "[a] claim has facial plausibility, [i.e.] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]."  *Twombly*, 550 U.S. at 556; *see also Matrixx v. Siracusano*, 563 U.S. 27, 46 (2011).

The PSLRA imposes additional requirements on a plaintiff bringing a private securities fraud action.  Plaintiffs must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).  Plaintiffs cannot plead "the materiality of the alleged misstatements or omissions . . . in a conclusory or general fashion."  *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 626 (S.D.N.Y. 2005) (citation omitted).  Rather, "they must demonstrate with specificity why and how" the statements were false and misleading.  *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 564 (S.D.N.Y. 2018), *aff'd sub nom. Ark. Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019) (citation omitted).

In addition, because plaintiffs bring their claims for securities fraud, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite

state of mind." 15 U.S.C. § 78u-4(b)(2).  Under this heightened pleading standard for scienter, a "complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  In determining whether a strong inference exists, the allegations are not to be reviewed independently or in isolation, but the facts alleged must be "taken collectively." *Id.* at 323.

## DISCUSSION

Plaintiffs bring claims for Defendants' false statements and omissions under Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78j(b) ("Section 10(b)"), and under Rule 10b-5(b) promulgated thereunder, 17 C.F.R, § 240.10b–5(b), against all Defendants.  They also bring a claim against all Defendants that Defendants employed devices, schemes, and artifices to defraud and/or engaged in acts, practices, and a course of business that operated as a fraud or deceit under Section 10(b) and Rule 10b-5(a) and (c), promulgated thereunder, 17 C.F.R, § 240.10b–5(a) & (c).  Finally, Plaintiffs bring a control person claim against the Individual Defendants under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t ("Section 20(a)").

Defendants argue that (1) the Complaint does not state a claim under Rule 10b-5(b) because it fails to allege an actionable misstatement or omission and fails to plead loss causation, (2) that it does not state a claim under Rule 10b-5(a) or (c) because it does not allege a manipulative act or that ArcLight made any representations, (3) that the complaint fails to sufficiently allege scienter, and (4) that the control person allegations against the individual defendants should be dismissed because no Section 10(a) claim has been adequately pled.

A.      **Alleged misstatements and omissions**

To state a claim under Rule 10b-5(b), a plaintiff must allege that the defendant "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (quoting *In re IBM Sec. Litig.*, 163 F.3d 102, 106 (2d Cir. 1998)).

Federal Rule of Civil Procedure 9(b) "requires that in all averments of fraud . . ., the circumstances constituting fraud or mistake shall be stated with particularity." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004).  To state fraud with particularity, plaintiffs must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.*  Where "a plaintiff alleges that a statement is false or misleading based on information and belief, the plaintiff must state facts sufficient to support that belief." *In re Tempur Sealy Int'l Inc. Sec. Litig.*, 2019 WL 1368787, at *6 (S.D.N.Y. Mar. 26, 2019).

Plaintiffs allege Defendants made false or misleading statements or actionable omissions in the following four filings: (1) the July 2018 Press Release; (2) the ArcLight 13D; (3) the September 2018 Press Release; and (4) the December 2018 8-k.  The Court considers each allegation in turn.

1.      **The July 2018 Press Release**

In the July 2018 Press Release, AMID announced that for its second quarter of 2018, its board had declared a quarterly cash distribution of $0.1031 per common unit or $0.4125 per common unit annualized, as part of a revised capital allocation strategy.  Am. Compl. ¶ 95.  The distribution was a departure from the $0.4125 distribution quarterly AMID had paid in each of the previous 27 quarters.  Am. Compl. ¶ 76.  The press release stated, inter alia:

> [AMID] today announced a revised capital allocation strategy that is intended to significantly reduce leverage, provide capital for strategic growth opportunities, and create long-term value. As part of the revised capital allocation strategy the Partnership has determined the most prudent sources of accretive growth capital are proceeds from the sale of non-core assets and the retention of an increased portion of operating cash flow through the reduction of its common unit distribution.

Dkt. No. 47-2 at 1.

The release also stated "[e]quity capital market constraints for master limited partnerships and the availability of equity capital at acceptable costs and in sufficient quantities, warrant[ed] retaining an increased portion of operating cash flow to support growth of [AMID]." *Id*.; Am. Compl. ¶ 95. It stated that the Partnership had "determined that the most prudent sources of accretive growth capital [were] proceeds from the sale of non-core assets and the retention of an increased portion of operating cash flow" from reduction of the distribution and that "cash flow retention and asset sales [would] enable the Partnership to reallocate capital to meaningful growth opportunities, while promoting balance shift flexibility, substantially reducing indebtedness and minimizing the need to raise external equity capital." Dkt. No. 47-2 at 1.

Plaintiffs complain that the July 28 Press Release was false and misleading in several respects. Plaintiffs allege that the reason provided for the reduction of the distribution was false because the distribution was not cut to allocate capital to growth opportunities or promote flexibility but was "cut as part of ArcLight's then-undisclosed plan to acquire AMID." Am. Compl. ¶ 97. Thus they allege AMID was not managing the Partnership for investors over the long-term but planning to take the Company private at a lower cost to ArcLight. *Id*. ¶ 97. Plaintiffs also allege AMID omitted to disclose ArcLight's interest in acquiring AMID and the discussion that had occurred regarding ArcLight's interest in acquiring AMID. *Id*. ¶ 98. Finally, Plaintiffs allege that the July 28 Press Release implied that AMID's financial situation was dire when, in fact, operationally, it was strong. *Id*. ¶ 99. In essence, Plaintiffs make two claims: the

July 28 Press Release was false because it ascribed management's reasons for the reduction in the distribution to capital allocation when it was actually motivated by the plan for ArcLight to acquire AMID, and second, it falsely implied that AMID's financial situation was dire.  Neither is sufficient to state a claim for relief.

Plaintiffs do not allege facts sufficient to demonstrate that AMID's objective in reducing the distribution was other than what AMID claimed it to have been.  *See Rombach*, 355 F.3d at 174 ("To succeed on [a securities fraud] claim, plaintiffs must do more than say that the statements [at issue] were false and misleading; they must demonstrate with specificity why and how that is so"); *Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000) (the PSLRA "impose[s] the additional requirement [that] whenever Plaintiffs allege, on information and belief, that defendants made material misstatements or omissions, the complaint must 'state with particularity all facts on which that belief is formed'") (quoting 15 U.S.C. § 78u–4(b)(1)).  Plaintiffs' assertion appears to be grounded on ArcLight's August 2018 purchase of CUs and its September 28, 2018 announcement that "in spring 2018, [it] began to consider a potential strategic transaction involving the Partnership, including a potential take private transaction, and discussed such strategic alternatives internally with the ArcLight investment committee."  Am. Compl. ¶ 134.

A plaintiff, however, "may not cherry pick certain public statements for its complaint and divorce them from the universe of disclosed information to plausibly allege fraud."  *In re Synchrony Fin. Sec. Litig.*, 2021 WL 560204, at *8 (2d Cir. Feb. 16, 2021); *see ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (on a motion to dismiss, a court may "consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed

with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit"); *Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 131 (D. Conn. 2007), *aff'd*, 312 F. *App'x* 400 (2d Cir. 2009) ("[W]hen a complaint quotes documents only in part and omits critical portions of the documents, it is permissible for the court ruling on a motion to dismiss to consider the full texts of the quoted documents.").  Plaintiffs ask the Court to accept the truth of the language in the Preliminary Information Statement regarding when ArcLight first began to consider a "potential strategic transaction."  *See* Am. Compl. ¶ 134.  However, the context of the paragraph from which Plaintiff excerpts that sentence makes clear that beginning even before the Spring of 2018, AMID was experiencing difficulty raising capital in the equity markets to fund growth projects.  *See* Dkt. No. 52-1 at 18-19.  Such difficulty was described in the Preliminary Information Statement as originating "several years" prior to the take-private transaction, during which "the Partnership ha[d] been unable to access capital in the equity markets in any material amount, or on terms reasonably acceptable . . . [which] contributed to . . . elevated leverage levels and limited sources of capital available to the Partnership to fund growth capital expenditures."  Dkt. No. 52-1 at 18-19.[4]

The same paragraph in the Preliminary Information Statement also makes clear that, although ArcLight "began to consider" a take private transaction in Spring 2018, Am. Compl. ¶ 134, it did not even engage legal or investment banking representation to advise on a potential transaction until mid-September 2018; it was not until then that it sought advice about such a transaction, and even then it sought advice only "regarding a potential strategic transaction . . .

---

[4] That is also precisely what Bourdon and Kalamaras said on AMID's May 15, 2018 1Q18 earnings call, which addressed "pressure on the balance sheet" in the form of leverage, as well as "challenging equity capital markets," which meant that the company would need to "continue to rely on creating internal capital."  Dkt. No. 52-6 at 7.

including organic growth projects, related or third party acquisitions and a sponsor take private transaction." Dkt. No. 52-1 at 19.

Thus, even crediting that AMID was aware in July 2018 that ArcLight was considering making a bid to acquire the Partnership as one of several potential transactions, it by no means follows that the decision to reduce the distribution for the second quarter and to change AMID's capital allocation strategy was made for any reason other than what it said in the July 2018 Press Release: it needed capital to invest in the business and in acquisitions and it was less expensive for AMID to acquire that capital by selling non-core assets and retaining available cash than by distributing that cash and raising new cash through the equity markets. *See Novak*, 216 F.3d at 312. Plaintiffs have not alleged any facts to establish that the reasons AMID gave for why it cut distributions were false. Plaintiff would have the Court accept its theory that AMID was acting for alternative, undisclosed and nefarious reasons, on speculation alone. That is insufficient to meet the pleading requirements of Rule 12(b)(6), *see Twombly*, 550 U.S. at 555, let alone the heightened pleading standard to state a claim for securities fraud under Rule 9 and the PSLRA, *see Rombach*, 355 F.3d at 174; *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75 (2d Cir. 2001) (a securities fraud plaintiff must "plead with particularity sufficient facts to justify" their belief "concerning the false or misleading nature of defendant's statements") (citing *Novak*, 216 F.3d at 313-14); *In re AXIS Cap. Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 586 (S.D.N.Y. 2006) (addressing alleged misrepresentations to cover up a fraudulent scheme, and concluding that the "bald allegations of a scheme" itself were "far too conclusory to satisfy the requirements of Rule 9 and the PSLRA.").

In addition, AMID was the entity that made the decision to reduce the distribution and Plaintiffs make no allegations that anyone in AMID's management involved in the decision to

reduce the distribution or change the capital allocation strategy even knew in July 2018 that ArcLight was considering making a take private offer for AMID.

Plaintiff's theory is thus pure "fraud by hindsight," imputing knowledge and motive to AMID and its officers and directors based solely on events that subsequently transpired that allegedly harmed Plaintiffs. *Novak*, 216 F.3d at 309 ("Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them.").

Plaintiffs rest their allegation of falsity on the contention that AMID could not have made the cut in the distribution to save capital because, as it turned out, AMID had to pay the savings it made from the distribution cut to Southcross as a termination fee. Am. Compl. ¶ 10 (payment of the termination fee "baldly undercuts AMID's explanation for the First [Distribution] Cut, as cutting the distribution prior to closing the Southcross Merger, literally cost AMID cash flows."). That allegation, however, asks the Court to accept the implausible and economically irrational. *See Ashland Inc. v. Morgan Stanley & Co.*, 700 F. Supp. 2d 453, 469 (S.D.N.Y. 2010), *aff'd*, 652 F.3d 333 (2d Cir. 2011) (dismissing a securities fraud claim where "[e]ven assuming that the [complaint] had alleged facts supporting [plaintiff's theory] of the case, those allegations would be economically irrational"); *see also Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 710 (2d Cir. 2010) (affirming dismissal of a securities claim where "[p]laintiffs have offered no plausible explanation for why [Defendant] would believe that [the challenged action] would be in its self-interest"). There is no allegation of fact that before the First Distribution Cut, AMID or any of its officers and directors wanted Southcross to terminate the merger or knew it would do so. AMID had agreed to and announced the merger to great fanfare just months earlier, in November 2017. Am. Compl. ¶ 38. As late as May 15, 2018, AMID management was still

stating that the Southcross Merger was on track to close in the second quarter of that year.  *Id.* ¶¶ 75, 80-81; Dkt. No. 52-6 at 7.  Plaintiffs allege the merger would have been "'immediately accretive' to distributable cash flows," and thus would benefit all PU and CU holders, including—importantly—ArcLight.  Am. Compl. ¶ 9; *see id.* ¶¶ 42-43.  ArcLight was apparently AMID's largest single shareholder[5]—it would have had the most to gain from an increase in the value of its shares.  Crediting Plaintiff's allegations, ArcLight controlled the general partner of AMID and therefore presumably could have stopped the merger in November 2017 or any month thereafter if it believed that the merger was not in its best interests or if—as Plaintiffs ask the Court to surmise—it was concerned that its ownership of AMID would have been diluted by the transaction.  *Id.* ¶ 112.  The interests of the non-ArcLight CU holders would have been equally diluted by the transaction (if not more so).  Plaintiffs make no allegation why—if the transaction was deemed to be in the interests of all of AMID's shareholders (including ArcLight) up to July 2018—ArcLight would have deemed it not to be in its own interests.  Thus, there is no explanation why in July 2018, ArcLight would suddenly want AMID to make a decision that would cause Southcross to terminate the merger and thereby decrease the value of the Partnership.

Nor do Plaintiffs make any allegation why ArcLight would have wanted to cut distributions in 2018 if it knew in advance that Southcross would exercise its right to terminate the transaction after the announcement of the cut and that AMID would incur a termination fee that exceeded the cost-savings resulting from the First Distribution Cut.  *See* Compl. ¶ 10.  As a

---

[5] The complaint does not explicitly state that ArcLight and its affiliates were then AMID's largest shareholder but it does not refer to any larger shareholder and its allegations regarding the transactions that made ArcLight a majority shareholder imply that even before that point ArcLight was AMID's *largest* shareholder.  Am. Compl. ¶¶ 4, 28-29, 115-118.

CU holder, ArcLight was one of the largest, if not the largest, single beneficiary of the distributions.  If monies that could have been paid to the CU holders went to Southcross instead in the form of a termination fee, that hurt ArcLight just as much as it hurt the other CU holders.

Finally, there are no well-pled allegations from which the Court can draw a reasonable inference that Southcross terminated the merger because of AMID's decision to make the First Distribution Cut as opposed to, for example, because of what the decision to institute the First Distribution Cut signaled (if it paid attention to the decision at all)—that the Board had determined that it needed the capital for its growth plans and could not obtain the capital elsewhere more cheaply.  Although Plaintiffs allege that the Southcross was attracted to AMID's quarterly distributions, Am. Compl. ¶ 43, there is no allegation that Southcross would have preferred AMID to continue making distributions even when retaining the cash would have served a business interest and fund growth opportunities.  Southcross no doubt was as attracted by AMID's prior ability to make the distributions while retaining a healthy leverage ratio—an ability that was called into question by the changes in the equity marketplace—as by AMID's willingness to use cashflow to make distributions.  There is no reason why Southcross would have been disappointed in the First Distribution Cut itself.  Those distributions were not destined for Southcross.  The cash that AMID saved by the cut could only have benefitted Southcross and its shareholders in connection with their future interests in AMID.  The reasonable inference from the Complaint and incorporated materials is that Southcross terminated the transaction for the reasons that were stated—even with the First Distribution Cut, AMID was not able to satisfy the conditions of closing.

The only plausible inference from the facts alleged in the Amended Complaint then is that AMID cut the distribution for the reasons that it stated—it needed the capital for the

Southcross Merger and for the other transactions that it contemplated as accretive to AMID and its shareholders in the long run.

Plaintiffs' allegation that the July 28 Press Release misleadingly represented that AMID's financial situation was dire fares no better in stating a claim for relief.  As Plaintiffs themselves seem to admit, *see* Dkt. No. 48 at 17-18, the July 28 Press Release did not state that AMID's financial situation was "dire."  It stated that the equity capital markets had become expensive for AMID and that it was more efficient and cheaper for AMID to generate the capital it needed by retaining cash and selling non-core assets than by going to the equity capital markets.  *See* Am. Compl. ¶ 95.  For the reasons already provided, that representation was in no way inconsistent with the facts as pleaded by Plaintiff.

2.      The ArcLight 13D

Plaintiffs also allege that the August 20, 2018 ArcLight 13D was false and misleading because it disclaimed "any specific plan or proposal to acquire, transfer or dispose of Units," and omitted ArcLight's true reasons for the purchase of CUs—which, according to Plaintiff, was to gain a majority share of CUs in order to facilitate ArcLight's later acquisition of AMID—and made no mention of ArcLight's interest in buying AMID.  *Id.* ¶ 118.

Pursuant to Section 13(d) of the Exchange Act, any person who "acquir[es] directly or indirectly the beneficial ownership of any [regulated equity security]" and is "directly or indirectly the beneficial owner of more than 5 per centum" of such security must "within ten days after such acquisition" file certain disclosures with the SEC.  15 U.S.C.A. § 78m(d)(1).  Schedule 13D, promulgated by the SEC, provides the specific itemized disclosures that are required to satisfy Section 13(d).  *Rosen v. Brookhaven Cap. Mgmt. Co.*, 113 F. Supp. 2d 615, 630 (S.D.N.Y. 2000)*;* 17 C.F.R. § 240.13d–101.  Item 4 of Schedule 13(D) is headed "Purpose of Transaction."  17 C.F.R. § 240.13d–101.  It requires the filer to:

(1) state the purpose of the acquisition of the covered securities, including any purpose to acquire control and (2) certain specifically listed "plans or proposals" which relate to or would result in (a) the acquisition or disposition of additional shares; (b) any change in the board of directors or management; or (c) any material change in the business or corporate structure of the issuer.

*Vladimir v. Bioenvision Inc.*, 606 F. Supp. 2d 473, 491 (S.D.N.Y. 2009), *aff'd sub nom.*, *Thesling*

*v. Bioenvision, Inc.*, 374 F. App'x 141 (2d Cir. 2010) (internal quotation marks and citation

omitted); *see* 17 C.F.R. § 240.13d–101.

The language Plaintiffs challenge on the ArcLight 13D is included in a paragraph of

ArcLight's response to Item 4.  The paragraph at issue reads, in full:

> Although [ArcLight does not have] any specific plan or proposal to acquire, transfer or dispose of Units, consistent with its investing purpose, [ArcLight] may, either directly or through one or more affiliates, from time to time or at any time and subject to price, market and general economic and fiscal conditions and other factors, acquire or seek to acquire additional Units in the open market, in privately negotiated transactions or otherwise, or dispose of or seek to dispose of all or a portion of Units now owned or hereafter acquired.  In addition, [ArcLight] may, either directly or through one or more affiliates, from time to time or at any time and subject to price, market and general economic and fiscal conditions and other factors, consolidate or seek to consolidate assets held by [ArcLight], including acquiring assets owned by, or selling assets to, the Issuer, or make changes or seek to make changes to the capital structure of the Issuer.  [ArcLight] reserves the right to change its intention with respect to any or all of the matters required to be disclosed in this Item 4.

Dkt. No. 47-4 at 13.  ArcLight's answer to Item 4 went on to state:

> Also, consistent with their investment intent and ongoing evaluation of their investment in the Issuer and alternatives to such investment, including a potential consolidation, acquisition or sale of assets or Units or changes to the Issuer's capital structure, [ArcLight] may engage in communications with, without limitation, one or more unitholders of the Issuer, one or more officers of AMID GP and/or one or more members of the board of directors of AMID GP regarding the Issuer, including but not limited to a potential consolidation, acquisition or sale of assets or Units or changes to the Issuer's capital structure.  During the course of such communications, [ArcLight] may advocate or oppose one or more courses of action.

*Id.*

31

Plaintiffs allege that the statement is false because in spring 2018, and thus well before the August 2018 purchases of CUs, "ArcLight began to consider a potential strategic transaction involving the Partnership, including a potential take private transaction, and discussed such strategic alternatives internally with the ArcLight investment committee." Am. Compl. ¶ 134. According to Plaintiffs, because a take private transaction was a possibility under "consideration," it was a plan that had to be disclosed under Schedule 13. Plaintiffs' allegation rests on a misreading of the disclosure required by Section 13(d).

ArcLight can be liable under Section 10(b) for a failure to disclose information on the ArcLight 13D Form only if Schedule 13D required that information to be disclosed. *Azurite Corp. v. Amster & Co.*, 52 F.3d 15, 18 (2d Cir. 1995) ("[I]f a plan need not be disclosed under Item 4 [of Schedule 13D], such an omission does not support a section 10(b) claim founded solely upon an alleged section 13(d) violation."); *see Amida Cap. Mgmt. II, LLC v. Cerberus Cap. Mgmt., L.P.*, 669 F. Supp. 2d 430, 438 (S.D.N.Y. 2009).

Section 13 and Rule 13D thus require disclosure only of plans or proposals that are "fixed," or that are "decided upon or intended." *Azurite Corp.*, 52 F.3d at 19. Plans that are "tentative" or "inchoate", that constitute "vaguely formed thoughts for the future" or that are consistent with the filer keeping "options open" need not be disclosed. *Id.* "Premature disclosures" of information not required to be disclosed "would run counter to the aims of Section 13(d) as '[i]t would be as serious an infringement of these regulations to overstate the definiteness of the plans as to understate them.'" *Bioenvision*, 606 F. Supp. 2d at 491 (quoting *Elec. Specialty Co. v. Int'l Controls Corp.*, 409 F.2d 937, 948 (2d Cir.1969)); *see also Transcon Lines v. A. G. Becker Inc.*, 470 F. Supp. 356, 377 (S.D.N.Y. 1979) ("Though the offeror has an obligation fairly to disclose its plans in the event of a takeover [on Schedule 13D], it is not

required to make predictions of future behavior, however tentatively phrased, which may cause the offeree or the public investor to rely on them unjustifiably.") (quoting *Susquehanna Corp. v. Pan Am. Sulphur Co.*, 423 F.2d 1075, 1085-86 (5th Cir. 1970) (tender offer context)).

Plaintiffs here do not allege that as of August 2018 ArcLight had a "a course of action [that was] decided upon or intended." *Azurite*, 52 F.3d at 18. It alleges only that a take-private transaction was part of a "preliminary consideration, exploratory work or tentative plan," which is not required to be disclosed on a Schedule 13D. *Id*. At 16; *see id*. at 18 ("a 'plan'" that requires disclosure on Schedule 13D is "something more definite than vaguely formed thoughts for the future"). In particular, while the ArcLight 13D was filed in August 2018, ArcLight only engaged legal and investment banking representation in September 2018, and even then it sought only "advice regarding a potential strategic transaction" that included the possibility of a take private transaction but also, alternatively, "organic growth projects [and] related party or third party acquisitions." Dkt. No. 52-1 at 19. If a take-private transaction was a possibility, so too was a further investment of cash in exchange for CUs or PUs (diluting the plaintiffs), a loan (further subordinating the Plaintiffs), or that ArcLight would decide simply to abandon its investment or find another buyer. It could not have been lost on the Plaintiffs that ArcLight was considering its possibilities—it was the largest single owner of AMID and had the most to lose. ArcLight was not required by 13D to disclose the possibility that it would offer to acquire AMID in exchange for cash any more than it was required to disclose any of these other possibilities. *See Bioenvision*, 606 F. Supp. 2d at 491-92 (holding that allegations that defendant had a discussion regarding an acquisition was not sufficient to allege an adequately definitive plan or purpose and require disclosure); *Rosen*, 113 F. Supp. 2d at 630 ("[D]isclosure is required of

definite intentions and matters fully determined, and not predictions of future behavior, or of

tentative or inchoate plans.") (citation omitted).

### 3.     The September 2018 Press Release

Plaintiffs' challenge to the September 2018 Press Release are of the same ilk as their

allegations with respect to the July 2018 Press Release and the ArcLight 13D.  The September

2018 Press Release stated that AMID had:

> [r]eceived an unsolicited non-binding proposal from affiliates of [ArcLight] . . .
> directed to members of the GP board, pursuant to which ArcLight would acquire
> all common units of the Partnership that ArcLight and its affiliates do not already
> own in exchange for $6.10 per common unit.  If approved, it is currently expected
> that the transaction would be consummated through a merger of the Partnership
> with a subsidiary of ArcLight.

Dkt. No. 47-5 at 2.

The Press Release went on to state that "[t]he proposed transaction is subject to a number

of contingencies, including the approval of the Conflicts Committee . . . the approval of holders

of a majority of the outstanding common units of the Partnership, and the satisfaction of any

conditions to the consummation of a transaction set forth in any definitive agreement concerning

the transaction."  *Id*.  It continued, "[t]here can be no assurance that definitive documentation

will be executed or that any transaction will materialize on the terms described [in the Press

Release] or at all."  *Id*.

Plaintiffs claim that the September 2018 Press Release was materially misleading

because it failed to disclose that ArcLight had been considering acquiring AMID since the spring

of 2018 and that its ultimate offer to acquire AMID was not unsolicited because, given

ArcLight's control over GP, Am. Compl. ¶ 24, the "party making the offer is also the party to

whom the offer was effectively made."  *Id.* ¶ 124.

Plaintiff's claims with respect to the September 2018 Press Release fail for reasons similar to those for which the other allegations fail. Defendants were not required to state in the September 2018 Press Release that ArcLight considered a take-private transaction, among other potential transactions in the spring of 2018. Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives*, 563 U.S. at 44. "An omission of information not affirmatively required to be disclosed is . . . actionable only when disclosure of such information is 'necessary to make [] statements made, in the light of the circumstances under which they were made, not misleading.'" *Lopez v. CTPartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 23 (S.D.N.Y. 2016) (quoting *Matrixx Initiatives*, 563 U.S. at 44); *see* 17 C.F.R. § 240.10b-5(b). The September 2018 Press Release did not purport to do more than give a brief summary of the pending offer made by ArcLight and the process investors should expect going further. It did not purport to say anything about the history of the transaction and when ArcLight first gave thought to making an offer.

Plaintiffs' argument that AMID falsely described the ArcLight offer as "unsolicited" also fails. Plaintiff premises its claim that the statement was false on the fact that ArcLight controlled the GP of AMID; it argues that, therefore, the offer could not have been unsolicited. But every purchaser and seller of AMID CUs knew or could have known that ArcLight controlled the GP. That was prominently disclosed and Plaintiffs here do not contend they were ignorant of it. AMID need not have reiterated the point at the cost, if it did not, of buying a securities lawsuit. *See In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 577 (S.D.N.Y. 2013) ("Where allegedly undisclosed material information is in fact readily accessible in the public domain, a defendant may not be held liable for failing to disclose this information.") (internal quotation marks and citation omitted). Nor was AMID required to adopt the view, which

Plaintiffs here espouse, that the offer was solicited.  Plaintiffs do not dispute the description of

the facts in the Preliminary Information Statement—they rely on its truth for their complaint:

"[o]n September 14, 2018, a representative of ArcLight contacted . . . the Chairman of the

Conflicts Committee and informed him and [Bourdon] . . . that [ArcLight was] evaluating

potential strategic transactions involving the Partnership, including a potential sponsor take

private transaction."  Dkt. No. 52-1 at 19.  In these circumstances, a statement that the ArcLight

offer was solicited—when it would not be accepted until when and if the Conflicts Committee

decided to accept it—would be the misleading statement.[6]

### 4.      The December 2018 8-K.

Finally, Plaintiffs challenge AMID's December 31, 2018 Form 8-K announcing the

amendment to its credit facility.  That release described the terms of the amendment, and stated

that "[a]s a result of the amendment . . . the Partnership is not permitted to declare or pay any

cash distributions until its Consolidated Total Leverage Ratio is reduced to less than 5.00:1.00."

Dkt. No. 47-3 at 3.  It stated that "[t]herefore, the Partnership does not expect to make any cash

distributions on its common units or preferred units with respect to the fourth quarter of 2018."

*Id*.[7]

---

[6] In their opposition brief, Plaintiffs do not press the argument that the statement in the
September 2018 press release was "unsolicited" was false on grounds that ArcLight controlled
GP, and the Court deems that argument abandoned.  Instead, it argues that by characterizing the
offer as "unsolicited," the press release characterized the offer as "a new development, while
hiding that ArcLight had been discussing taking AMID private since the Spring of 2018."  Dkt.
No. 48 at 20.  However, not only is that claim not pleaded, but describing an offer as
"unsolicited" plainly has nothing to do with *when* discussions about that offer began—rather, it
concerns *which party* began those discussions.

[7] The amendment to the credit facility also restricted AMID from exercising its right to
"purchase, redeem or otherwise acquire Equity Interests in an amount not to exceed $50,000,000
in ten aggregate" during any period in which the "Consolidated Total Leverage Ratio is greater
than or equal to 5.00:1.00.  *Id*.

Plaintiffs allege that the December 2018 8-K was misleading because it omitted the fact that the suspension of the distribution was in furtherance of the scheme for ArcLight to acquire AMID.  Am. Compl. ¶ 129.  The basis for the allegation of falsity appears to be that the price of AMID's CUs predictably collapsed upon the announcement and that (equally predictably) ArcLight revised downward its buyout offer thereafter.  *Id.* ¶ 130-131.

This allegation fails for much the same reasons that Plaintiffs' other allegations fail.  It is premised on a scheme the existence of which is not supported by allegations of fact but only surmise—and illogical surmise at that.  It also assumes, but does not allege facts to support, that AMID (or ArcLight) wanted the lenders to limit AMID's ability to operate itself and agreed to the new terms demanded by the lenders contrary to the self-interests of AMID, simply to drive down the price of AMID CUs.  But the agreement AMID announced relieved AMID of its breach of covenant with its lenders and permitted AMID to continue to access credit.  In consideration for such relief, AMID consented to restricting distributions so long as its leverage ratio was above a certain range.  *See* Dkt. No. 52-1 at 23 (the amendment was agreed to by AMID because it "provid[ed] for leverage covenant relief sufficient to avoid default," and the lenders agreed to it only because it required AMID to "pay an amendment fee and agree to an additional restricted payment test for distributions" until AMID's leverage fell below 5.00:1.00).  The only plausible inference is that AMID agreed to the amendment, and therefore announced it, because AMID needed relief from the covenant breach and its lenders negotiated for restrictions on the distribution of cash in exchange for that relief.  There are not factual allegations to the contrary.  Plaintiffs may not like the fact that AMID had to agree to amend the credit facility to obtain relief or that AMID did not pay a distribution in its fourth quarter, but the fact that AMID took or announced action which predictably resulted in a drop in the price of its CUs does not

37

make that action or announcement *ipso facto* fraudulent.  Nor does the fact that ArcLight reduced

its offer price in response.  Indeed, given the drop in the price of the CUs, it might have been

illogical for ArcLight to have done any differently.  As to the statements the 8-K did include,

Plaintiff does not allege that they were false.  The complaint provides no basis to believe that

AMID's ability to declare or pay a cash distribution was not limited by the amendment or that

the suspension was the result of anything other than the limitations on AMID's rights under the

credit agreement.  There is thus no plausible allegation that any statement in the 8-K was false or

misleading.

### 5.    Loss causation

Plaintiffs also have not adequately alleged that they suffered losses as a proximate result

of the misstatements and omissions they allege.  Under the PSLRA, "the plaintiff [has] the

burden of proving that the act or omission of the defendant alleged . . . caused the loss for which

the plaintiff seeks to recover damages." 15 U.S.C.A. § 78u-4.  The element is a critical one to a

securities fraud case.  The Exchange Act makes a remedy available "not to provide investors

with broad insurance against market losses, but to protect them against those economic losses

that misrepresentations actually cause."  *Dura Pharmaceuticals, Inc. v. Brouda*, 544 U.S. 336,

345 (2005).  To satisfy this standard, it thus is not sufficient that the misrepresentation "touch

upon" a loss even in the sense that it is a "necessary condition of any such loss."  *Id.* at 344.

Moreover, a plaintiff "must allege not only the but-for causation of their losses but also the

proximate causation, or that the fraud 'concealed something from the market that, when

disclosed,' would foreseeably and "negatively affect[ ] the value of the security."[8] *Abramson v.*

*Newlink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020) (quoting *Lentell*, 396 F.3d at 173); *see*

---

[8] Or, in the case of a theory of fraud on which a plaintiff was induced to sell at too low a price, a
statement or omission is actionable if its disclosure would cause the security's price to increase.

*ATSI*, 493 F.3d at 106 ("Loss causation . . . is the proximate causal link between the alleged

misconduct and the plaintiff's economic harm.").  "[A] misstatement or omission is the

'proximate cause' of an investment loss if the risk that caused the loss was within the zone of

risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor."

*Lentell*, 396 F.3d 161, 173 (2d Cir.2005).[9]  A plaintiff may establish loss causation "by

demonstrating either '(1) a corrective disclosure or (2) a materialization of a concealed risk.'"  *In*

*re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 765 (S.D.N.Y. 2017) (quoting *In re Lehman*

*Brothers Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 304 (S.D.N.Y. 2011)); *see Lentell*, 396 F.3d

at 173.

     Plaintiffs claim that AMID's conduct depressed the price of the CUs and that as a result

of the alleged fraud they sold CUs at a price that was "artificially" lower than the price the CUs

should have yielded on the market had the truth been known.  Am. Compl. ¶ 148.  But they do

not allege the price of the CUs rebounded after the truth became known—after ArcLight

announced its offer for AMID.  Nor do they allege that the "materialization of the concealed

risk"—that ArcLight was making an offer—caused their loss.  Rather, their claim is that AMID

"manipulated the price for AMID CUs by reducing and then suspending the distributions paid to

AMID CU holders," and that the manipulation resultingly "depressed the price of AMID CUs . .

. undoubtedly assisted in persuading the Conflicts Committee to accept ArcLight's offer."

Compl. ¶¶ 147, 149.  Put another way, Plaintiffs' claim is that ArcLight's allegedly low offer

would never have been accepted by the Conflicts Committee if the First Cut had not lowered the

CU price to begin with.  Plaintiffs further allege that "Defendants' false explanation for the

---

[9] It is "unsettled whether the heightened particularity standard under Fed. R. Civ. P. 9(b) or the
plausibility standard under Fed. R. Civ. P. 8 applies to pleading economic loss."  *Gray v. Wesco
Aircraft Holdings, Inc.*, 2021 WL 745310, at *1 n.3 (2d Cir. Feb. 26, 2021)

distribution cuts enabled them to accomplish those distribution cuts, since a truthful explanation would have demonstrated that the distribution cuts were conflicted transactions under the partnership agreement." *See Id.* ¶ 149.  In short, Plaintiffs' claim is indistinguishable from a claim of corporate mismanagement or breach of fiduciary duty.  They claim losses suffered by them as holders of CUs as a result of decisions with which they disagree and which, according to their claims, were motivated by the illicit objective to drive the CU price down.  They do not allege losses resulting from misrepresentations or omissions conveyed to them when they were either purchasing the CUs or selling them.

These allegations are insufficient to establish loss causation.  The loss that the securities laws compensate is that caused by a misrepresentation that either (1) causes a plaintiff to buy at a price that is too high, in which case the loss results from an eventual downturn in the price; or (2) causes a plaintiff to sell at a price that is too low, leading him to suffer foregone income when the price eventually rises.  In either case, the loss is manifested when either the truth is revealed or the risk that was concealed materializes.  *See In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d at 765.  Loss causation is not established where, as here, the value of a security held by a plaintiff declines after either management or the market do not perform according to the plaintiff's expectations.  Corporate mismanagement, if it results in a breach of duty, is addressed by the corporate law or the documents forming the enterprise in which the investor invests.  Unexpected market variation is the ordinary risk any investor assumes.

That is what Plaintiffs allege here.  They do not claim that they *purchased* the CUs for more than they should have.  There is no claim that AMID's alleged misrepresentations caused the CU price to increase artificially or not to decrease as it should have.  Nor do any Plaintiffs plausibly allege that at any point during the Class Period they suffered an economic loss by

*selling* the CUs for a price lower than the price those CUs would have been worth had the market known the truth—that ArcLight intended to further decrease the price of the CUs and to make a low-ball offer.  Arguably, any class member who sold during the class period would have enjoyed a windfall and benefitted from the concealment of that risk—on Plaintiffs' theory, the holders of CUs ultimately suffered a loss when ArcLight's plan to acquire AMID materialized and the transaction was consummated.  Had such a scheme been known in advance, presumably investors would have paid less for the CUs and the Plaintiffs who sold during the Class Period would not have been able to realize the proceeds from such CU sales during the class period that they received.  Thus, they have not alleged loss causation as a result of the omission or misrepresentation.

The point is highlighted by Plaintiffs' allegations that loss causation is established because the Conflicts Committee would have disapproved the First Distribution Cut as a conflicted transaction if ArcLight's ultimate plan to acquire AMID had been disclosed and because it would not have recommended the approval of the ArcLight offer but for the distribution cuts and the ensuing drop in CU price—in other words that the Conflicts Committee itself was deceived.  That is not a theory of loss causation from securities fraud, i.e., fraud in the purchase or sale of securities.  At most, in that instance, the alleged securities fraud merely "touches upon" the loss suffered as a necessary condition of the loss but not as a proximate cause of the loss.  The CU holders did not suffer a loss caused by the misrepresentations.  Instead, accepting Plaintiffs' theory, the loss was caused only as a result of an attenuated chain of events Plaintiffs ask the Court to assume ultimately led on a but-for basis to their loss.  In particular, Plaintiffs entreat the Court to conclude that if Arclight or AMID had disclosed ArcLight's plan to ultimately acquire AMID, (1) AMID would have determined that the issue of the distribution

41

cut should be decided upon by the Conflicts Committee in the first instance; (2) the directors on the Conflicts Committee—sitting without the AMID directors affiliated with ArcLight—would not have made the same decision that the Board (with the ArcLight-affiliated directors included) made regarding the First Distribution Cut; (3) had AMID not made the First Distribution Cut it would have been able to generate elsewhere and as efficiently the capital it saved by making the First Distribution Cut, and AMID's stock price would not have dropped; (4) ArcLight still would have made the offer for AMID; (5) the Conflicts Committee—which had approved the merger consideration as fair and in the best interests of the CU unitholders even after becoming aware of both the First and Second Distribution Cuts and the impact that those decisions purportedly had on the stock price—would nonetheless have decided to reject ArcLight's bid; and (6) the price of AMID's CUs would have risen rather than dropped in response to the Conflicts Committee's decision, else ArcLight—having expressed that the offer was its final offer—nonetheless would have increased the offer and the Plaintiffs would have obtained greater consideration for the CUs.  Such a theory does not satisfy the requirement that the alleged misrepresentations or omissions be both the "but-for causation" and the "proximate causation" of plaintiff's losses, *Abramson*, 965 F.3d at 179, i.e., that "the risk that caused the loss [be] within the zone of risk concealed by the misrepresentation and omissions alleged by a disappointed investor."  *Lentell*, 396 F.3d at 173 (alternation omitted); *cf. Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 15 (2010) (rejecting RICO claim on proximate causation grounds where "[m]ultiple steps . . . separate[d] the alleged fraud from the asserted injury" and the "theory of liability rest[ed] on the independent actions of third and even fourth parties"); *see generally* Mark A. Perry, *RICO's Lessons for Loss Causation*, 14 Wall Street Lawyer 3 (2010).

Accordingly, even assuming the truth of the allegations that the Conflicts Committee was misled and made an ill-advised decision resulting in loss to the CU holders, that loss would flow from the decision of the Conflicts Committee and not from any misrepresentation to Plaintiffs or the market.  Loss causation is alleged, if at all, only indirectly.  It may be that the Conflicts Committee would have stepped in and somehow prevented the First Distribution Cut and disapproved the ArcLight offer had it known in July that ArcLight was planning to make an offer.   That is Plaintiffs' theory.  Alternatively, it may well be that knowledge that ArcLight was contemplating making an offer would only have reinforced AMID's decision not to make the distribution and to conserve its cash.  After all, a significant part of the distribution would have been paid to ArcLight and not to the Plaintiffs here.  It also well could have been that the Conflicts Committee—had they known of the potential offer—would have decided that retaining the cash would have improved AMID's business prospects and its balance sheet and thus enhanced its value, relative to the value it would have had if it had distributed the cash—thus increasing the bargaining power of the Conflicts Committee.  Plaintiffs do not allege how AMID would have performed and the CU price reacted had AMID not made the decision to reduce the distribution and to distribute the cash.  All of these are imponderables.  And that is precisely the point.  Loss causation is a theory of proximate causation.  The case law requires the loss to flow directly from the misrepresentation.  *See Abramson*, 965 F.3d at 179; *Dura*, 544 U.S. at 345. Here, "[t]he number of dots the Court must connect to produce [Plaintiffs'] theory of loss causation are too numerous and attenuated to succeed."  *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 587 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

### B.       Scheme to commit market manipulation

Defendants separately move to dismiss Plaintiff's claims for market manipulation under Section 10(b) and Rule 10b-5(a) and (c) for failure to state a claim for relief.

To plead a claim of market manipulation, a plaintiff must allege (1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *ATSI*, 493 F.3d at 101. The plaintiff must plead "to the extent possible, 'what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue.'" *Id*. at 102 (quoting *Baxter v. A.R. Baron & Co.*, 1995 WL 600720, at *6 (S.D.N.Y. Oct. 12, 1995)). The complaint also "must plead with particularity facts giving rise to a strong inference that the defendant intended to deceive investors by artificially affecting the market price of securities." *Id.*

Importantly for this case, market manipulation is "virtually a term of art when used in connection with securities markets." *Santa Fe Indus.*, 430 U.S. at 476-77 (internal quotation marks and citation omitted). It is distinct from corporate mismanagement that affects the price of a security. *See id*. at 477 ("Congress did not mean for the term "manipulation" to "bring within the scope of [Section] 10(b) instances of corporate mismanagement . . . in which the essence of the complaint is that shareholders were treated unfairly by a fiduciary"). "[M]anipulation 'connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities.'" *ATSI*, 493 F.3d at 100 (quoting *Ernst & Ernst*, 425 U.S. at 199. In other words, "case law in this circuit and elsewhere has required a showing that an alleged manipulator engaged in market activity aimed at deceiving investors as to how other market participants have valued a security. The deception arises from the fact that investors are misled to believe 'that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators.'" *Id.*

(quoting *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999)).  Thus, "courts generally ask whether a transaction sends a false pricing signal to the market."  *Id*.  Plaintiff must allege "a misplaced belief in the price of the security as being set by arms-length, bona fide trading." *Fezzani v. Bear, Steans & Co.*, 716 F.3d 18, 23 (2d Cir. 2013).  "[U]nder *ATSI*, manipulation violates Section 10(b) when an artificial or phony price of a security is communicated to persons who, in reliance upon a misrepresentation that the price was set by market forces, purchases the securities."  *Id.* at 25.  In the absence of such allegations, no claim of market manipulation can be stated.

Plaintiffs fall short of satisfying those standards.  The essence of their claim is a disagreement with AMID's decision first to reduce the distribution to the CU holders and later to agree to terms with the lending banks to suspend distributions so long as AMID's leverage was above a certain level.  As to the First Distribution Cut, Plaintiffs presumably would have had AMID continue to make large distributions to its unit holders and either not to have made the investments in its business that the AMID board and management determined it should make or, alternatively, to find the cash elsewhere.  They do not allege what they would have had AMID do with respect to the demands of its lenders in December 2019 that led to the Second Distribution Cut.  The price impact of each of AMID's decisions, however, was accurately reflected in the share price of the CUs.  Plaintiffs do not allege a false price signal; the nub of their claim is that the price signal was accurate, but just not what it should have been had AMID made other decisions.  That allegation is not sufficient to support a claim for market manipulation.  *See Santa Fe Indus.*, 430 U.S. at 477.  The CU holders may not have liked AMID's decisions.  They may believe that they were self-interested or constituted a breach of fiduciary duty.  But the law did not require AMID to distribute its cash to the current CU holders

and to wind down its business at the expense of foregoing opportunities that would generate profits (and presumably distributable income) for its shareholders in the long term at the risk that if it did not do so it would face a lawsuit for market manipulation under the Securities Exchange Act.

Plaintiffs' own allegations make the point.  They complain that the First Distribution Cut and the termination of the Southcross Merger immediately depressed the CU price from a closing price on July 27, 2018 of $6.60 to $6.10 on July 30, 2018, and $5.30 on July 31, 2018.  Am. Compl. ¶ 111.  But, as Plaintiffs' allegations make clear, if the price drop is attributable to AMID's decisions, it is because the market accurately understood the message that those decisions were sending—that AMID was a partnership that was either unable or presently unwilling to make distributions, and that Southcross and AMID's public equity investors deemed no longer worthy of investing in at the price it previously was trading at.  AMID sent no "false pricing signal," *ATSI*, 493 F.3d at 100; the market price dropped as a consequence of "arms-length, bona fide trading," *Fezzani*, 716 F.3d at 23, and as a function of the interplay of supply and demand.  *See ATSI*, 493 F.3d at 100.  Put simply, accepting Plaintiffs' allegations, more investors wanted to sell CU units as a result of AMID's decision than wanted to buy them.

So too with the other disclosure that Plaintiffs allege resulted in a price impact—AMID's December 31, 2018 announcement of the new terms with the lending banks that limited AMID's ability to issue distributions.  Am. Compl. ¶¶ 128-29.  Plaintiffs allege that in the wake of that announcement and "as expected," the CU price collapsed.  *Id*. ¶ 130.  But if it was "expected" that the CU price would drop that is because that would be a natural result of an announcement that AMID either did not have the financial ability to continue to pay distributions or that, as a result of its agreement with the lending banks, it no longer had the right to do so.  There is

nothing false in the "pricing signal." *ATSI*, 493 F.3d at 100.  The market reacted as the market naturally would react in those circumstances.

This case is thus analogous to the recent decision of the United States District Court for the Eastern District of New York in *Brady v. Top Ships Inc.*, 2019 WL 3553999, at *8 (E.D.N.Y. Aug. 5, 2019), *aff'd sub nom. Onel v. Top Ships, Inc.*, 2020 WL 1608523 (2d Cir. Apr. 2, 2020). There, the defendant allegedly "repeatedly induce[d] artificial increases to the price of [its] common stock" by executing a series of reverse stock splits, so that two of its shareholders could "sell at a profit their common stock." *Id.*, at *7.  This conduct did not satisfy the elements of market manipulation because all of the alleged activities of the defendant corporation were "fully disclosed to the market." *Id*; *see Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011) ("[T]he market is not misled when a transaction's terms are fully disclosed.").  There, as here, the only information that Plaintiffs alleged was *not* disclosed was the "true purpose" of the reverse stock splits—"namely, that they formed part of [d]efendants' manipulative scheme." *Id.*, at *8.  The court accurately identified this argument as "a classic example of circular reason and conclusory pleading." *Id*.  It observed that "[p]laintiffs have only alleged that defendants' conduct was manipulative because they did not tell shareholders that their conduct was manipulative." *Id*.  Because the information about the underlying transaction—the reverse stock splits—was fully disclosed, all of the market participants, including plaintiffs, were "equally informed and similarly situated," and there was no "false pricing signal." *Id*. at *9 (citing *ATSI*, 493 F.3d at 100).

Just as in *Brady*, in this case, the price of the CUs simply reflected the natural interplay of supply and demand in a marketplace of equally informed and similarly situated participants. There was no false price signal, and no sustainable claim for market manipulation.[10]

### C.    Scienter

Defendants also allege that both the misrepresentation and the manipulation claims should be dismissed for failure to allege scienter as against Defendants GP, the Individual Defendants, and AMID.[11]   To establish scienter, a Plaintiff must "adequate[ly] plead[] that the defendant acted with intent 'to deceive, manipulate, or defraud.'"   *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d at 764 (quoting *Tellabs*, 552 U.S. at 157).   To clear this threshold, a complaint must allege facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."   *ATSI*, 493 F.3d at 99.   Moreover, those facts must be pleaded with particularity.[12]

---

[10] Plaintiff cites a Second Circuit case from 1967, *Mut. Shares Corp. v. Genesco, Inc.*, in which the Second Circuit reversed denial of a preliminary injunction based on a claim of manipulation under Section 10(b)in connection with the purposeful reduction of dividends in order to buy out minority stockholders more cheaply.  384 F.2d 540, 546 (2d Cir. 1967).  Notably, the *Genesco* Court specifically rejected the argument that plaintiffs could prevail to establish loss causation, but found that "the claim for injunctive relief largely avoids [that] issue[]."  *Id*. at 547. Moreover, the *Genesco* Court did not consider whether the dividend reduction conveyed any false impression to the market regarding the actual price, as determined by the interplay of supply and demand, of the underlying securities, which is what more recent Second Circuit and Supreme Court precedent holds is necessary to make out a manipulation claim.  *See ATSI*, 493 F.3d at 100 ("manipulation connotes 'intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities'") (quoting *Ernst & Ernst*, 425 U.S. at 199); *id*. (manipulation arises from conduct intended to lead investors falsely to believe "that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators.") (quoting *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999)).

[11] Defendants do not challenge the allegations of scienter as against ArcLight.  The claim with respect to the only statement it made is dismissed not because ArcLight did not know the true facts regarding its potential plans to acquire AMID but because the potential for that transaction was not required to be disclosed.

[12] Although a plaintiff "need not plead manipulation to the same degree of specificity as a plain misrepresentation claim," *ATSI*, 493 F.3d at 102, even under this more relaxed pleading standard,

Plaintiffs have not pled facts to establish that GP, AMID, or any of the individual defendants had a motive or opportunity to commit fraud.  Plaintiff's entire theory rests on allegations of conduct that would have harmed AMID and its general partner—that Defendants acted to depress the CU price so as to benefit ArcLight in taking AMID private.

Plaintiffs allege that both GP and the AMID directors named as individual defendants shared ArcLight's scienter, because GP was ArcLight's subsidiary and "operated under the complete control of ArcLight," Am. Compl. ¶ 140, and because AMID's directors "served on the [AMID board] due to their connection to ArcLight and were therefore operating as agents of ArcLight." *Id*. ¶ 141.  As to GP, however, "a parent-subsidiary relationship is not on its own sufficient to impute the scienter of the subsidiary to the parent or affiliate." *Valenti v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 317 (S.D.N.Y. 2011).  "Rather, a plaintiff must demonstrate that the parent or affiliate possessed some degree of control over, or awareness about, the fraud." *Youngers v. Virtus Inv. Partners Inc.*, 2017 WL 5991800, at *5 (S.D.N.Y. Dec. 4, 2017) (emphasis in original).  *See Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) ("[W]hether Kidder defrauded plaintiffs and whether its parent, GE, defrauded plaintiffs are different questions.").  Plaintiff makes no allegations that GP or AMID shared ArcLight's motive or opportunity.  Nor are there any non-conclusory allegations that any of the AMID directors were in fact agents of ArcLight; Plaintiffs only allege that they served on the board "due to their connection to ArcLight."  Am. Compl. ¶ 141; *see N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 122 (2d Cir. 2001) ("[A]n agency relationship results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act.") (internal quotation marks and

the Complaint fails to allege scienter.

citations omitted).  More importantly, to allege scienter as to individual defendants based on a theory of motive, plaintiff must allege that those defendants "benefitted in some concrete and personal way from the purported fraud."  *Novak*, 216 F.3d at 307-8.  "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry."  *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  Thus, even if it were established that AMID's directors were agents of ArcLight—which is it is not—it would not follow that they shared ArcLight's motive and opportunity.  There are no allegations that any of the Individual Defendants had any motive to facilitate an acquisition by ArcLight of AMID at a deflated price.

Where a plaintiff "cannot make the 'motive' showing," then "the strength of the circumstantial allegations must be correspondingly greater."  *ECA*, 553 F.3d at 198-99 (quoting *Kalnit*, 264 F.3d at 142).  Plaintiffs have not plausibly alleged facts "constituting strong circumstantial evidence of conscious misbehavior or recklessness" on the part of any Defendant.  *ATSI*, 493 F.3d at 99.  Recklessness is defined as "at the least, . . . an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *ECA*, 553 F.3d at 198 (quoting *Novak*, 216 F.3d at 308).  Plaintiffs rely on the Preliminary Information Statement, which states that "in spring 2018, ArcLight began to consider a potential strategic transaction involving the Partnership, including a potential take private transaction, and discussed such strategic alternatives internally with the ArcLight investment committee."  *Id*. ¶ 134.  Further, Plaintiffs rely on the fact that Defendant Reeves, who is a director of AMID, is also a member of ArcLight's investment committee.  *Id*. ¶ 135.  Thus, Plaintiffs allege that at the time AMID was

disclosing that it took the First Cut as part of a revised capital allocation plan, AMID knew that ArcLight had an undisclosed "interest in buying AMID as of at least the Spring of 2018." *Id*. ¶¶ 135, 143.

This theory is flawed. First, at the time the First Distribution Cut was announced, ArcLight had not even made an internal decision to make an offer for AMID much less actually conveyed an offer. There is no allegation that AMID or its CEO and CFO, who are not alleged to be affiliated with ArcLight, knew as of July 2018 (when the First Distribution Cut was announced) that ArcLight was thinking of making an offer much less of a scheme for ArcLight to make a low-ball offer or, more importantly, that they knew that the decision to reduce the distribution was part of any such scheme. As laid out above, AMID had been making statements for months—well before the supposed scheme was hatched—that it was revising its capital strategy and that it had ceased to offer CUs or PUs for sale. There is no evidence that AMID or its managers believed that the decision to reduce the distribution was made for any other reason. Indeed, based on Plaintiffs' own allegations, any such decision to reduce the distribution for that reason would have been thoroughly irrational. As of July 2018, the ArcLight offer was only one of several possibilities; the others would have left AMID on its own. Even after ArcLight made an offer, such offer was subject to revision. Under these circumstances, in the only interest of AMID and its CEO and CFO would have been to make decisions to increase the value of AMID and increase its attractiveness to ArcLight or any other prospective buyer, not—as the complaint would have the Court believe—to make decisions deliberately against AMID's economic interests. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir.1994) (the court "assume[s] that the defendant is acting in his or her informed economic self-interest").

The same is true with respect to the alleged misrepresentations in the September 2018 Press Release and the December 2018 8-K.  Those statements came after it had been disclosed that ArcLight was pursuing a transaction to take AMID private.  However, there are no well-pled allegations that any Defendant had "knowledge of facts or access to information contradicting their public statements."  *Novak*, 216 F.3d at 308.  As to the September 2018 Press Release, in September 2018 ArcLight approached representatives of AMID to inform them that ArcLight was considering a possible take private transaction.  There are no allegations that any Defendant had knowledge of facts contradicting the statement in the September 2018 Press Release that ArcLight's offer was "unsolicited."  Nor is there any allegation of any facts contradicting the reasons stated in the December 2018 8-K for why AMID made the Second Distribution Cut— namely, that cutting distributions was a condition extracted by AMID's creditors in the course of negotiating an amendment to AMID's credit facility.  Indeed, an abundance of circumstantial evidence reaffirms the veracity of those stated reasons: comments by Kalamaras and Bourdon regarding challenging equity markets; evidence that at the time AMID had high leverage on its balance sheet; and evidence that AMID consented to the Second Distribution Cut in order to induce its creditors to agree to other provisions of the amendment to its credit facility that permitted AMID to avoid a default. *See* Dkt. No. 52-6, at 8-9; Dkt. No. 52-1 at 23.

As to Defendant Revers, there is no allegation in the Complaint that he knew at any point that the decision to cut the distribution was made as part of any scheme.  As described above, the First Distribution Cut, made in July 2018, was made months before ArcLight engaged lawyers or bankers to explore a possible take-private transaction which it only did in September 2018.  And when it did take those steps in September 2018, it initially sought advice about a number of strategic alternatives.  Dkt. No. 52-1 at 19.  This undercuts any notion that Revers or any other

Defendant was aware of a scheme being orchestrated by ArcLight to depress the price of AMID CUs to advance its interest in taking AMID private.  If in September 2018 ArcLight had decided to pursue any of the other strategic alternatives it was then considering, presumably a depressed AMID CU price would have harmed its own interests.  Moreover, there is no allegation that even if Revers knew of a scheme to drive down the price of AMIDs CUs or if he knew of a plan by ArcLight to take AMID private, he also knew that the reason for the distribution cut was to reduce the price of AMID CUs.  There is no allegation that Revers had any involvement in any of AMID's decisions or announcements at issue or the reasoning behind them.

To sustain a claim under Plaintiff's theory of scienter, the Defendants would have to have "[known] facts or had access to information suggesting that their public statements were not accurate." *Novak*, 216 F.3d at 308.  The only allegation regarding ArcLight's intentions prior to the First Distribution Cut is that in spring 2018 it "began to consider" a transaction with AMID and "discussed strategic alternatives internally."  *Id*. ¶ 134.  These allegations do not support a claim that any Defendant had the requisite scienter under Section 10(b).

### D.    Control person allegations

Finally, Plaintiffs allege control person liability under Section 20(a) against the Individual Defendants by virtue of their positions and their power to control public statements by and about AMID and GP.  "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud. *ATSI*, 493 F.3d at 108 (citing *First Jersey*, 101 F.3d 1450, 1472 (2d Cir. 1996)).  Because Plaintiffs fail to allege any primary violation, it cannot establish control person liability.  Therefore their claim under Section 20(a) is dismissed.

**CONCLUSION**

For the foregoing reasons, the motion to dismiss, at Dkt. No. 45, is GRANTED.  The

Amended Complaint is DISMISSED without prejudice to Plaintiffs filing a Second Amended

Complaint within thirty (30) days of this Opinion and Order.  The Clerk of Court is respectfully

directed terminate all pending motions and close the case.  Plaintiff may re-open the case upon

the filing of a Second Amended Complaint within thirty (30) days of this Opinion and Order.


SO ORDERED.


Dated: March 8, 2021
      New York, New York                           LEWIS J. LIMAN
                                         United States District Judge